# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| FRIDLEY PUBLIC SCHOOL DISTRICT, INDEPENDENT SCHOOL DISTRICT 14,<br><br>DULUTH PUBLIC SCHOOL DISTRICT, INDEPENDENT SCHOOL DISTRICT 709, and<br><br>EDUCATION MINNESOTA,<br><br>   *Plaintiffs*,<br>  v.<br><br>KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security,*<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,<br><br>TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*,<br><br>MARCOS CHARLES*, in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations*,<br><br>DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*,<br><br>U.S. CUSTOMS AND BORDER PROTECTION, | **COMPLAINT** |

RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection,*

GREGORY BOVINO, *or his successor, in his official capacity as Commander of the U.S. Border Patrol,*

THOMAS HOMAN, *in his official capacity as White House Executive Associate Director of Enforcement and Removal Operations*,

    *Defendants.*

1. The education of children has always been regarded as a matter of "supreme importance." *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923). Education is "necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence." *Wisconsin v. Yoder*, 406 U.S. 205, 221, (1972).

2. Indeed, education is "perhaps the most important function of state and local governments." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). In *Brown*, the Supreme Court recognized "the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship . . . . In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Id.*

3.     And the Supreme Court has also long recognized the critical responsibility of state and local governments to provide a public education in a manner that reflects the values and needs of children in their communities. "Local control over the education of children allows citizens to participate in decisionmaking" and ensures that "school programs can fit local needs." *Bd. of Educ. of Okla. Pub. Schs. v. Dowell*, 498 U.S. 237, 248 (1991).

4.     In recognition of this fundamental importance of public education, and of the disruptive effect on education that would occur if immigration authorities were to conduct enforcement operations in or near schools, the federal government has for more than 30 years restricted immigration enforcement near schools and other "sensitive locations." The federal government has long recognized that it could effectively enforce immigration laws without, in its words, "denying or limiting . . . children access to their schools."

5.     Under that longstanding policy, the federal government barred immigration enforcement in or near sensitive locations "to the fullest extent possible." Federal immigration agents were allowed to carry out such actions only in exigent circumstances or with prior approval from supervisors who were themselves bound by the government's policy to avoid such actions whenever possible. Where enforcement actions had to occur at sensitive locations, like schools or "[a] place where children gather, such as a . . . school bus stop," they were to be done in nonpublic areas and with the aim of minimizing the impact on people's access to the sensitive location.

6.     Soon after taking office, the new administration abruptly reversed course and abandoned these longstanding protections.

7.     In a memorandum issued on January 20, 2025, then-Acting Secretary of the Department of Homeland Security, Benjamine Huffman, rescinded the prior sensitive locations policy. In place of the guardrails that policy provided, Acting Secretary Huffman determined that the decision whether to carry out enforcement actions at or near schools should be left to federal agents' individual discretion, guided only by "common sense."

8.     Unsurprisingly, the revocation of decades-old protections for schools and other sensitive locations by Defendants Department of Homeland Security ("DHS") and DHS Secretary Kristi Noem has led to a growing number of immigration enforcement actions at or near these formerly protected areas. In recent weeks, the administration has launched "Operation Metro Surge" to accelerate its immigration enforcement efforts in the Minneapolis-St. Paul metropolitan area (the "Twin Cities Metro Area"), which has resulted in federal agents becoming an increasingly common presence at or near schools and school bus stops.

9.     As a result, parents, children, and teachers, regardless of immigration status, reasonably fear going to school. School districts and teachers across Minnesota have reported significant reductions in attendance rates since the onset of "Operation Metro Surge."

10.     Defendants' actions have caused direct and irreparable harm to the abilities of school districts and educators to fulfill their functions—to educate children and to provide access to educational services and a safe learning environment.

11.     Defendants' unexplained and irrational change in agency policy is arbitrary and capricious and was done without undertaking notice-and-comment rulemaking, and therefore violates the Administrative Procedure Act ("APA").

12.     The Court should hold the Defendants' new policy unlawful and order appropriate preliminary and permanent relief.

## JURISDICTION AND VENUE

13.     This Court has federal-question jurisdiction under 28 U.S.C. § 1331.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1) and 5 U.S.C. § 703 because Defendants are United States agencies or officers or employees sued in their official capacities, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

15.     Plaintiff Fridley School Public Schools ("Fridley Schools") is a public school district located in Anoka County, Minnesota. It serves approximately 2,800 students in its six schools in the City of Fridley, Minnesota, an inner-ring suburb that borders Minneapolis and is a 15-minute drive from downtown Minneapolis. It is under the management and control of its duly elected School Board, which is charged with "the business of the district, the school houses, and the interests of the schools thereof." Minn. Stat. § 123B.02, subd. 1 (2024). The School Board is authorized to sue on the district's behalf. *Id.*, subd. 19. It is the "duty and the function of [Fridley Schools] to furnish school facilities to every child of school age residing in any part of the district." *Id.*, subd. 2. The School Board "must superintend and manage the schools of the district; adopt rules for their organization,

government, and instruction; keep registers; and prescribe textbooks and courses of study." *Id*. § 123B.09, subd. 8 (2024).

16.    Plaintiff Duluth Public Schools ("Duluth Schools") is a public school district located in St. Louis County, Minnesota. Duluth Schools serves 9,100 students in its 21 schools. Duluth Schools is under the management and control of its duly elected School Board which is charged with "the business of the district, the school houses, and the interests of the schools thereof." Minn. Stat. § 123B.02, subd. 1 (2024). The School Board is authorized to sue on the district's behalf. *Id.*, subd. 19. It is the "duty and the function of [Duluth Schools] to furnish school facilities to every child of school age residing in any part of the district." *Id.*, subd. 2. The School Board "must superintend and manage the schools of the district; adopt rules for their organization, government, and instruction; keep registers; and prescribe textbooks and courses of study." *Id*. § 123B.09, subd. 8 (2024).

17.    Plaintiff Education Minnesota ("EdMN") is the leading advocate for public education in Minnesota. EdMN's over 89,000 union members work in pre-K–12 schools and higher education institutions statewide. EdMN's members include almost all of Minnesota's K–12 public school teachers; education support professionals; faculty at several university campuses, and community and technical colleges; college students preparing for careers in education; and retired educators who have devoted their lives to students. EdMN is affiliated with the American Federation of Teachers, National Education Association and AFL-CIO. Over 66,000 EdMN members are employed by school districts, including Fridley Schools and Duluth Schools. EdMN asserts claims on behalf of itself, its members, and other recipients of its services, including public school district students.

18.     Defendant Department of Homeland Security ("DHS") is the federal agency responsible for enforcing United States immigration laws and policies.

19.     Defendant Kristi Noem is Secretary of DHS. She is sued in her official capacity.

20.     Defendant ICE is an agency subcomponent of DHS.

21.     Defendant Todd M. Lyons is the Senior Official Performing the Duties of the Director of ICE. Defendant Lyons is sued in his official capacity.

22.     Defendant David Easterwood is the Saint Paul Field Office Acting Director of Enforcement and Removal Operations for ICE. The Saint Paul Field Office is responsible for ICE activities in Minnesota, Iowa, Nebraska, North Dakota, and South Dakota. Defendant Easterwood is sued in his official capacity.

23.     Defendant Marcos Charles is Acting Executive Associate Director of Enforcement and Removal Operations ("ERO") within ICE. Defendant Charles is sued in his official capacity.

24.     Defendant CBP is an agency subcomponent of DHS.

25.     Defendant Rodney Scott is the Commissioner of CBP. Defendant Scott is sued in his official capacity.

26.     Defendant Gregory Bovino is the Commander of the U.S. Border Patrol. Defendant Bovino is sued in his official capacity.

27.     Defendant Thomas Homan is the White House Executive Associate Director of Enforcement and Removal Operations. Defendant Homan is sued in his official capacity.

# FACTUAL BACKGROUND

I.    **The Current Administration Rescinds Protections for Schools, School Bus Stops, and Other "Sensitive Locations"**

A.    **The Government's Longstanding Policy Protecting "Sensitive Locations"**

28.    The federal government has had a long-standing policy and practice, dating back to at least the early 1990s, to refrain from immigration enforcement operations in or near schools or other "sensitive" or "protected" locations.

29.    In 1993, the Acting Associate Commissioner of the Immigration and Naturalization Service ("INS") James A. Puleo directed that immigration enforcement operations at schools, places of worship, or other sensitive locations "require advance written approval by the District Director of Chief Patrol Agent."[1] The 1993 policy described the standards by which a proposed enforcement action could be deemed appropriate, including "[t]he availability of alternative measures," "[t]he importance of the enforcement objective," and how federal agents could "minimize the impact on the operation of the school."[2] The memo detailed that exceptions to this policy must be approved in writing beforehand unless certain exigent circumstances arose. If such an

---

[1] Memorandum from James A. Puleo, Acting Assoc. Comm'r, Immigr. & Naturalization Serv., Enforcement Activities at Schools, Places of Worship, or at Funerals or Other Religious Ceremonies 1 (May 17, 1993), *available at* https://www.ice.gov/doclib/foia/policy/10029.1_EnforcementActivitiesSchoolsPlacesWorship_05.17.1993.pdf.

[2] *Id*. at 1–2.

exigent circumstance did arise, "the matter must be reported immediately" up the chain of command.[3]

30.    INS ceased to exist in 2003, when most of its functions were transferred to ICE, USCIS, and CBP. Since then, DHS and its subcomponents reiterated INS's approach. In a memorandum dated December 26, 2007, the Director of ICE's Enforcement Office of Investigations Marcy M. Forman issued a policy that directed all employees to consider the "sensitivity of engaging in arrests or other enforcement activities at areas where children are present, such as educational institutions."[4] The 2007 policy explained:

> The presence [of ICE] agents conducting investigative activity at schools, or in venues where children's activities occur, has always been a point of particular sensitivity . . . . Accordingly, it is important to emphasize that great care and forethought be applied before undertaking any investigative or enforcement type action at or near schools, other institutions of education, and venues generally where children and their families are present.[5]

Forman also directed all employees to consider the "sensitivity of engaging in arrests or other enforcement activities at areas where children are present, such as educational institutions."[6]

31.    In 2008, the ICE Assistant Secretary Julie L. Myers reiterated that "ICE personnel should refrain from conducting enforcement actions or investigative activities at or near sensitive community locations such as schools, places of worship, and funerals or

---

[3] *Id.* at 2.

[4] Memorandum from Marcy M. Forman, Dir., Off. of Investigations, U.S. Immigr. & Customs Enforcement, Enforcement Actions at Schools (Dec. 26, 2007), *available at* https://www.ice.gov/doclib/foia/policy/10029_EnforcementActionsSchool_12.26.2007.pdf.

[5] *Id.*

[6] *Id.*

other religious ceremonies, except in limited circumstances."[7] Myers observed that the "[p]recedent for this approach is clear," and indicated that the 1993 memo "remain[ed] in effect."[8] Myers described the limited exigent circumstances that may require ICE to act at or near sensitive locations like schools, which included "terrorism-related investigations, matters of public safety, or actions where no enforcement activity is involved."[9]

32.    In 2011, ICE adopted further guidance designed to ensure that enforcement actions neither occurred at nor were focused on sensitive locations absent either exigent circumstances (such as terrorism, imminent risk of death, or pursuit of a dangerous felon) or prior written approval. Where "extraordinary circumstances" compelled enforcement action at or near a sensitive location, federal agents were required to "conduct themselves as discre[et]ly as possible, consistent with officer and public safety, and make every effort to limit the time at or focused on the sensitive location."[10]

33.    In 2013, CBP Deputy Commissioner David V. Aguilar issued a memo similarly restricting enforcement actions at sensitive locations, including schools, noting that "[w]hen CBP enforcement actions or investigative activities are likely to lead to an apprehension at or near such locations, written approval . . . is required" and that exigent

---

[7] Memorandum from Julie L. Myers, Assistant Sec'y, U.S. Immigr. & Customs Enforcement, Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations 1 (July 3, 2008), *available at* https://www.ice.gov/doclib/foia/policy/10029_FieldGuidanceEnfActNearSensitiveLocati ons_07.03.2008.pdf.
[8] *Id.*
[9] *Id.* at 2.
[10] *Id.* at 3.

circumstances requiring CBP to enter these sensitive locations "must be reported immediately through the respective chain of command."[11]

34.    In 2021, DHS Secretary Alejandro Mayorkas issued a memorandum reaffirming the government's historic policy of avoiding enforcement at sensitive locations ("Mayorkas Memo").[12]

35.    The Mayorkas Memo described a "fundamental" and "bedrock" principle: DHS "*can accomplish* [its] enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more."[13] The Memo recognized that enforcement actions in or around sensitive locations could "restrain people from accessing the protected area to receive essential services or engage in essential activities."[14]

36.    The Mayorkas Memo thus announced that DHS had an "obligation to refrain, *to the fullest extent possible*, from conducting a law enforcement action in or near a protected area."[15] And it explained that the "enforcement actions" covered by the policy

---

[11] Memorandum from David V. Aguilar, Deputy Comm'r, U.S. Customs & Border Protection, U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations 1–2 (Jan. 18, 2013), *available at* https://web.archive.org/web/20161223230902/https://foiarr.cbp.gov/streamingWord.asp?i=1251 (archived at Dec. 10, 2016 at 01:19:56 GMT).

[12] Memorandum from Alejandro N. Mayorkas, Sec'y, Dep't of Homeland Sec., to Tae D. Johnson, et al., Guidelines for Enforcement Actions in or Near Protected Areas (Oct. 27, 2021), *available at* https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw10272021.pdf.

[13] *Id.* at 2 (emphasis added).

[14] *Id.* at 3.

[15] *Id.* (emphasis added).

"include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance."[16]

37.    The Mayorkas Memo recognized that certain exigent circumstances might require enforcement in or near a sensitive location. Outside those circumstances, however, it dictated that "an Agent or Officer must seek prior approval" before proceeding. And because the Mayorkas Memo applied to all DHS personnel, not just line-level federal agents, any official asked to provide prior approval of an enforcement action at a sensitive location would themselves be bound by the rule that such actions were to be avoided "to the fullest extent possible."

38.    Consistent with that direction, ICE's website formerly emphasized that "[a]bsent exigent circumstances, DHS officers and agents must seek prior approval" before taking enforcement actions at protected areas.[17] And it explained that individuals who believe DHS officers violated the sensitive locations policy should file complaints with ICE, CBP, the Office of the Inspector General, or the DHS Office for Civil Rights and Civil Liberties.

39.    Congress also required ICE to submit public reports on enforcement activities in or near protected areas, which "shall include the total number of enforcement actions at sensitive locations, broken down by field office; type of sensitive location;

---

[16] *Id.* at 4.

[17] *Protected Areas Enforcement Actions*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/about-ice/ero/protected-areas (archived Jan. 19, 2025 06:16:20 GMT) (on file with counsel).

whether prior approval was given; what type of exigent circumstances existed, if any; and the number of non-targeted individuals who were also apprehended."[18]

### B. The Current Administration Abandons Protections for Sensitive Locations

40.    In January 2025, DHS broke with decades of prior practice and removed the guardrails that had long protected schools, school bus stops, and other sensitive locations.

41.    In a short memo from then-Acting Secretary Benjamine Huffman ("Huffman Memo"), DHS rescinded the Mayorkas Memo and its protections for sensitive locations, effective immediately.[19]

42.    The Huffman Memo jettisons the former rule that enforcement at sensitive locations should be avoided "to the fullest extent possible." It contains no replacement constraints on federal agents' authority. It does not require any internal process before federal agents may carry out enforcement at these locations. And it does not require that exigent circumstances exist before federal agents enter sensitive locations, let alone define what exigent circumstances could justify such operations. Instead, the Huffman Memo leaves these decisions to individual federal agents' "enforcement discretion" and "common sense," specifically disavowing the need for "bright line rules" to cabin that discretion.

---

[18] DEPARTMENT OF HOMELAND SECURITY, IMMIGRATION ENFORCEMENT AT SENSITIVE LOCATIONS, FISCAL YEAR 2020 REPORT TO CONGRESS (Apr. 18, 2022) (quoting H.R. REP. NO. 116-180, at 35 (2019)), *available at* https://www.dhs.gov/sites/default/files/2022-06/ICE%20-%20Immigration%20Enforcement%20at%20Sensitive%20Locations.pdf.

[19] Memorandum from Benjamine C. Huffman, Acting Sec'y, Dep't of Homeland Sec., to Caleb Vitello, et al., Enforcement Actions in or Near Protected Areas (Jan. 20, 2025), *available at* https://www.dhs.gov/sites/default/files/2025-03/25_0120_S1_enforcement-actions-in-near-protected-areas.pdf.

43.    Although DHS undid more than 30 years of policy, it did not explain why the previous policy had failed. It did not address how people may have come to rely on the policy. It did not address any of the harms it was likely to cause. And it did not outline any alternatives that the agency considered.

44.    In a press release issued the next day, DHS stated of its new policy:

> This action empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murders [sic] and rapists—who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.[20]

45.    Following the Huffman Memo, then-Acting ICE Director Caleb Vitello issued further instructions to staff ("Vitello Memo" and, together with the Huffman Memo, the "2025 Policy").[21] The Vitello Memo applies to ICE personnel but not to CBP personnel. It states in relevant part:

> I have great faith in the judgment of our law enforcement personnel and, accordingly, charge Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area. AFODs and ASACs may provide authorization for such actions either verbally or in writing. Before authorizing an immigration enforcement action at a site where a public demonstration is underway,

---

[20] *Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole*, DHS (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse.

[21] Memorandum from Caleb Vitello, Acting Dir., ICE, to Russell Hott, et al., Common Sense Enforcement Actions in or Near Protected Areas (Jan. 31, 2025), *available at* https://www.ice.gov/doclib/foia/policy/CommonSenseEnforcementActInNearProtectedAreas.pdf.

AFODs and ASACs must consult with local Office of the Principal Legal Advisor leadership for guidance on constitutional considerations.[22]

46.    DHS agents told a news channel when the new policy was announced that they expected it would "free them up to go after more illegal immigrants, because illegal immigrants have until now been able to hide near schools and churches and avoid arrest."[23]

## II.    DHS Implements New Policy by Taking Enforcement Actions at or Near Minnesota Public Schools and Their Bus Stops

47.    Since the change in policy, DHS has conducted a slew of enforcement operations at or near schools and school bus stops, including in Minnesota.

48.    On or around December 6, 2025, Defendants launched "Operation Metro Surge" in the Twin Cities Metro Area, which includes Fridley. Over the following weeks, Defendants "surged" DHS agents to Minnesota, reportedly to arrest "murderers, rapists, pedophiles, and gang members" in an effort to "Make America Safe Again."[24] By early January 2026, as many as 3,000 DHS agents were reportedly present in and around the Twin Cities, a number around five times the size of the entire Minneapolis police force.[25]

---

[22] *Id.* at 2.

[23] Adam Shaw & Bill Melugin, *Trump DHS Repeals Key Mayorkas Memo Limiting ICE Agents, Orders Parole Review*, FOX NEWS (Jan. 21, 2025), https://perma.cc/KSC2-MAUR.

[24] Secretary Kristi Noem (@Sec_Noem), X (Jan. 6, 2026 7:52 PM CT), https://x.com/Sec_Noem/status/2008718230039450008.

[25] Jeff Hargarten & Jake Steinberg, *Homeland Security Presence in Minnesota Dwarfs Twin Cities' Largest Police Forces*, STAR TRIB. (Jan. 13, 2026), https://www.startribune.com/how-ice-numbers-compare-to-twin-cities-largest-police-forces/601562617; Cameron Peters, *What 3,000 Federal Agents Are Doing in Minnesota*, VOX (Jan. 15, 2026), https://www.vox.com/the-logoff-newsletter-trump/475412/minneapolis-minnesota-ice-immigration-agents-violence-insurrection-act.

Defendant DHS acknowledged that "[t]he largest DHS operation is happening right now in Minnesota."[26]

49.    Defendants initially claimed that the surge was aimed at rooting out fraud in Minnesota, and the White House has expressed that the DHS agents were sent to help with "targeted, door-to-door investigations at locations of suspected fraud."[27]

50.    But Defendants' investigations have not been "targeted." DHS agents have conducted raids and made arrests throughout local communities, including at sensitive locations including hospitals, churches, and schools. DHS agents have detained and disrupted the lives of individuals while they work, heal, pray, and pursue an education. These DHS agents appear to conduct general sweeps, interrogating and detaining people based on their perceived race or ethnicity.

51.    As part of the surge, DHS agents have conducted numerous enforcement operations at or near other Minnesota schools, as well as daycare centers.[28] Reports indicate that DHS agents have been staging enforcement activities in school parking lots and that

---

[26]    DHS    (@DHSgov),    X    (Jan.    6,    2026    3:21    PM    CT), https://x.com/DHSgov/status/2008650038847959106; *see also* DHS (@DHSgov), X (Jan. 6, 2026, 12:02 PM CT), https://x.com/DHSgov/status/2008600031620952221  ("We have the largest immigration operation ever taking place right now.").

[27] *Fact Sheet: President Donald J. Trump Establishes New Department of Justice Division for National Fraud Enforcement*, WHITE HOUSE (Jan. 8, 2026), https://www.whitehouse.gov/fact-sheets/2026/01/fact-sheet-president-donald-j-trump-establishes-new-department-of-justice-division-for-national-fraud-enforcement.

[28] Susan Du, *ICE Operations Are Encroaching On Schools and Daycares*, STAR TRIB. (Jan. 16, 2026), https://www.startribune.com/minnesota-daycares-say-ice-is-targeting-its-workers/601560204; John Lauritsen, *Minnesota Educators and Families Call On ICE Agents to Stay Away from Schools*, CBS NEWS (Jan. 9, 2026), https://www.cbsnews.com/minnesota/news/minnesota-educators-families-ice-agents-stay-away-schools.

federal agents have detained people on or near school grounds and at school bus stops.[29] Several illustrative examples from just this past month include:

52.     **Fridley Public Schools**. On January 31, 2026, DHS agents staged their enforcement operations in the parking lot of at least two Fridley Schools buildings. DHS agents have followed Fridley Schools leadership, including its superintendent and school board members.

53.     **Roosevelt High School in Minneapolis.** On January 7, 2026, a chaotic scene unfolded on the grounds of Roosevelt High School, approximately 20 minutes from Fridley. According to school officials, when school was dismissed for the day, DHS agents came onto school property and "began tackling people, handcuffed two staff members and released chemical weapons on bystanders."[30] According to witnesses and video footage, officers dragged a person on a sidewalk outside of the school, broke out the window of a vehicle, and tear-gassed staff and students.[31] Video captured by a student during the incident shows a student appearing to lob a snowball at a federal agent. In response, the

---

[29] Elizabeth Shockman, *Kids, Staff, Parents Detained: How Federal Activity in Minnesota is Affecting Schools and Students*, MPR NEWS (Jan. 23, 2026), https://www.mprnews.org/story/2026/01/23/how-schools-and-students-are-affected-by-ice-enforcement.

[30] Elizabeth Shockman, *Minneapolis Schools Cancel Classes After Border Patrol Clash Disrupts Dismissal at Roosevelt*, MPR NEWS (Jan. 8, 2026), https://www.mprnews.org/story/2026/01/08/after-border-patrol-clash-at-roosevelt-minneapolis-schools-cancel-classes

[31] *Id.*; Lydia Morrell & Davis Griswold, *Witnesses Say Agents Arrest Minneapolis School Staff, Tear Gas Students; DHS Claims No Tear Gas Was Used*, KARE 11 (updated Jan. 10, 2026), https://www.kare11.com/article/news/local/ice-agents-flood-into-roosevelt-high-school-in-minneapolis/89-e0d004b0-bb3d-41b7-949c-e4867f97f7c9.

federal agent indiscriminately sprays the area of students and staff with pepper spray or some other chemical.[32]

54.     ***Un Mundo Nuevo Children's Academy in Apple Valley.*** On January 7, 2026, a teacher at Un Mundo Nuevo Children's Academy, a preschool in a Minneapolis suburb, was detained by ICE when she exited the school building after being tricked to come outside by a false claim that someone hit her car.[33]

55.     ***Jardin Spanish Immersion Academy in Minneapolis.*** On January 7, 2026, DHS agents removed a teacher from her car directly outside Jardin Spanish Immersion Academy in Minneapolis.[34]

56.     ***Mis Amigos Spanish Immersion in Golden Valley***. Also on January 7, 2026, parents at Mis Amigos Spanish Immersion in Golden Valley, a preschool in another Minneapolis suburb, alerted one another about masked men in DHS vehicles circling the block.[35]

---

[32] Video posted by The New York Times (@nytimes), INSTAGRAM, *Minneapolis shut down its public schools following a violent confrontation between federal agents and civilians at a high school on Wednesday, just hours after an ICE agent shot and killed Renee Good in the city* (Jan. 11, 2026), https://www.instagram.com/reel/DTYVZQ2jbvK/; Video posted by Fox 9 Minneapolis-St. Paul (@fox9), YouTube, *ICE agents deploy pepper spray during chaotic scene at Minneapolis high school* (Jan. 8, 2026), https://www.youtube.com/shorts/CkThi8KMl2s.
[33] Du, *supra* note 28.
[34] *Id.*
[35] *Id.*

57. ***Concord Education Center in Inver Grove Heights***. On January 12, 2026, a paraprofessional at a special education school in Inver Grove Heights, a suburb south of St. Paul, was arrested in the school parking lot.[36]

58. ***Elementary School in Brooklyn Center***. On January 14, 2026, the parent of an elementary school student in Brooklyn Center, a suburb just across the river from Fridley, was detained by federal agents while waiting at a school bus stop.[37]

59. ***School Vans Operating for St. Paul Public Schools***. During the week of January 15, 2026, two vans operating under contract with St. Paul Public Schools to carry students and staff were pulled over by federal immigration agents while en route to school.[38]

60. ***School Vans Operating for Anoka-Hennepin School District***. On January 20, 2026, two student transportation vans with high school students on board were pulled over by federal immigration agents while on their way to school.[39]

---

[36] Kristi Miller, *Inver Grove Heights Special Ed Teacher Held by ICE for Nearly 12 Hours*, PIONEER PRESS (Jan. 12, 2026), https://www.twincities.com/2026/01/12/inver-grove-heights-teacher-at-special-education-school-held-by-ice-for-nearly-12-hours/.

[37] Mara Klecker & Anthony Lonetree, *Attendance Drops at Minnesota Schools as Federal Immigration Enforcement Intensifies Anxieties*, STAR TRIB. (Jan. 15, 2026), https://www.startribune.com/attendance-drops-at-minnesota-schools-as-federal-immigration-enforcement-intensifies-anxieties/601560458; *Update: Federal ICE Activity Within the District*, ROBBINSDALE AREA SCHS. (Jan. 14, 2026), https://www.rdale.org/discover/news/article/~board/district-news/post/update-federal-ice-activity-within-the-district.

[38] Du, *supra* note 28.

[39] Elizabeth Shockman, *Kids, Staff, Parents Detained: How Federal Activity in Minnesota is Affecting Schools and Students*, MPR NEWS (Jan. 23, 2026), https://www.mprnews.org/story/2026/01/23/how-schools-and-students-are-affected-by-ice-enforcement.

61.    ***Little Canada Elementary School.*** On January 21, 2026, an elementary school in Little Canada was forced to implement extra security measures while DHS agents were in the school's parking lot during school hours.[40] Little Canada, a Twins Cities suburb, is just a few miles from Fridley.

62.    ***Roseville Education Center.*** On January 21, 2026, Roseville school officials said that DHS agents also used the Aŋpétu Téča Education Center in Roseville as a staging area the same afternoon.[41] Roseville, a Twins Cities suburbs, is just a few miles from Fridley.

63.    ***Hopkins Public School Students.*** On January 22, 2026, a Hopkins parent reported seeing vehicles that appeared to belong to ICE waiting near a bus stop just before ICE detained a young child she often escorted to the bus stop.[42] ICE detained the child, his sibling, and his parents later that day.

64.    ***Richfield Middle School Bus Route.*** Richfield Public Schools confirmed that federal agents were present on a school bus route on January 29, 2026.[43]

---

[40] David Griswold, *Little Canada Elementary Implements 'Secure' Protocol While ICE Agents Were In Parking Lot During School Hours*, KARE 11 (Jan. 21, 2026), https://www.kare11.com/article/news/local/ice-in-minnesota/little-canada-elementary-secure-protocol-ice-agents-in-parking-lot-during-school-hours/89-92cdb60d-18f9-48b0-96df-6a75a839a477.

[41] *Id.*

[42] Becky Z. Dernbach, *ICE Detains Two Hopkins Students Along with Their Family, School District Says*, SAHAN J. (Jan. 22, 2026), https://sahanjournal.com/education/ice-detains-hopkins-students.

[43] Lydia Morrell, *Richfield Middle School Confirmed Federal Agents on Bus Route*, KARE 11 (Jan. 30, 2026), https://www.kare11.com/article/news/local/ice-in-minnesota/richfield-middle-school-confirmed-federal-agents-on-bus-route/89-c58d1609-5d81-4b94-8d0e-57e4d9b2e460.

65.    ***Columbia Heights School District Students***. At Columbia Heights High School, only two miles from Fridley High School, DHS agents drove onto school property and approached the school's loading dock before encountering school administrators.[44] Schools in the district have had to hold recess indoors because DHS agents were present nearby, and multiple Columbia Heights students have been detained by ICE.[45] Just down the street, Valley View Elementary School has had three students and at least 25 parents detained, and the school's principal spends each school morning and dismissal checking the perimeter for DHS agents.[46]

66.    DHS's presence in and near school property has created an atmosphere of fear, for native-born citizens, naturalized citizens, and legally present immigrants alike. Parents across the state are afraid to send their children to school, and schools have had to adjust their programs. On January 9, 2026, for example, half of St. Paul Public Schools' Spanish-speaking students were absent, as were a quarter of its Somali students.[47] A charter school in Richfield reported that its student attendance on January 20, 2026, was only 39%.[48] Due to safety concerns following the events at Roosevelt High School, Minneapolis

---

[44] Becky Z. Dernbach, *'Why Detain A 5-Year-Old?' Columbia Heights School Leaders Speak Out Over Students Taken By ICE*, Sᴀʜᴀɴ J. (Jan. 21, 2026), https://sahanjournal.com/education/ice-minnesota-columbia-heights-students-detained/.
[45] *Id.*
[46] Jana Shortal, *'It's Been Heavier Than Ever': Dozens of Parents of Columbia Heights Students Detained by ICE*, KARE 11 (Jan. 30, 2026), https://www.kare11.com/article/news/local/ice-in-minnesota/parents-columbia-heights-students-detained-by-ice-liam-ramos/89-e02a2956-eb9e-42a4-92d3-3c01d9573d90.
[47] Klecker & Lonetree, *supra* note 37.
[48] Ellen Galles, *Several School Districts Offering Online Learning in Response to ICE Activity*, KTSP (Jan. 16, 2026), https://kstp.com/inside-your-schools/several-school-districts-offering-online-learning-in-response-to-ice-activity.

Public Schools closed January 8 and 9. These cancellations impacted around 100 schools and 30,000 students. And multiple school districts—including Minneapolis, St. Paul, Fridley, Robbinsdale, Bloomington, and Columbia Heights—now offer online learning options in response to DHS activity throughout the Twin Cities.[49] District 196 serving Eagan, Apple Valley, and Rosemount is also offering an online option.[50]

### III. DHS's Activity at or Near Schools and School Bus Stops Harms Plaintiffs

#### A. Fridley Public School District

67.     Fridley Schools is no exception to DHS's "Operation Metro Surge." Just as DHS's activity at or near schools has disrupted education through the Twin Cities Metro Area and across the state, it disrupts the regular functioning of Fridley Schools and directly interferes with the district's duty to educate its students.

68.     First, Fridley Schools closed its schools on January 9 and 16, 2026, due to safety concerns related to immigration enforcement activities, including a staff member being stopped by armed DHS agents near school property. The closure disrupted the regular functioning of the district and its delivery of educational services as required under Minnesota law.

---

[49] Galles, *supra* note 48; Message from Zena Stenvik, Superintendent, Columbia Heights Pub. Schs. (Jan. 9, 2026), https://app.smore.com/n/1e6mr; Howard Thompson, *Minnesota School Districts Offering Online Learning Amid ICE Surge Concerns*, Fox 9 (Jan. 18, 2026), https://www.fox9.com/news/minnesota-school-districts-offering-online-learning-amid-ice-surge-concerns.
[50] Howard Thompson, *Minnesota School Districts Offering Online Learning Amid ICE Surge Concerns*, Fox 9 (Jan. 18, 2026), https://www.fox9.com/news/minnesota-school-districts-offering-online-learning-amid-ice-surge-concerns.

69.     Second, Fridley Schools' attendance rate has dropped nearly one-third during the surge. Families have indicated that they have been afraid to send their students to school because of the many examples of immigration enforcement near school grounds or at school bus stops in the Twin Cities Metro Area. Under Minnesota law, Fridley Schools will lose education funding for each student that is absent more than 15 days during the school year. *See* Minn. Stat. § 120A.37, subd. 9; Minn. Stat. § 126C.05. As a result, if ICE continues to chill school attendance through enforcement activity near schools and their bus stops, Fridley will lose significant funding.

70.     Third, because of the immigration enforcement-related decline in school attendance, in order to fulfill the district's duty to "superintend and manage the schools of the district" and "prescribe . . . courses of study Minn. Stat. § 123B.09, subd. 8 (2024), Fridley Schools began offering remote e-learning options on January 20, 2026. This required diverting financial and staff resources from other work. Over four hundred families have opted into remote learning. As a result, teachers have had to divert hours of time from other tasks to create new curricula for remote learning. As Fridley Schools learned when test scores fell during the Covid-19 pandemic, remote learning is not as effective for many students as in-person learning. As a result, remote learning will undoubtedly result in academic and social setbacks that will impact Fridley students into the future, requiring Fridley to devote more resources to remediate the harm.

71.     Fourth, many Fridley Schools' social workers, who are charged with providing "services and support to students and families" and "connect[ing] students and families to various resources in the community," are now focused on acquiring and

delivering food to families who are too nervous to go grocery shopping.[51] This diverts their time from their normal work. It also puts their personal safety at risk, as DHS agents have been seen following them while they make deliveries.[52]

72.    Fifth, Fridley Schools' teaching and non-teaching staff, many of whom are immigrants, are now afraid to come into work because they risk being stopped or detained by DHS agents notwithstanding the fact that they are legally authorized to be in the U.S. and work for the school district. This constant fear is making it incredibly hard for employees to do their jobs.

73.    Sixth, Fridley Schools' superintendent, Dr. Brenda Lewis, now spends each afternoon patrolling, looking for DHS agents near schools and bus stops.[53] On at least one occasion, district security and Dr. Lewis identified DHS agents parked at Commons Park, a public park next to several schools.

74.    The disruption of education, fear and uncertainty permeating the community, and extraordinary measures the Fridley Schools has had to implement, have caused significant harm to the district's ability to provide a safe and stable learning environment for all students.

---

[51] *Student Support Services*, FRIDLEY PUB. SCHS., https://www.fridleyschools.org/students-and-families/student-support-services (last visited Feb. 3, 2026).
[52] Angela Davis, *How Federal Immigration Activity is Affecting Minnesota Schools*, MPR NEWS (Feb. 2, 2026), https://www.mprnews.org/episode/2026/02/02/how-federal-immigration-activity-is-affecting-minnesota-schools.
[53] Sarah Mervosh, *A Minnesota School District Guards Against ICE, From Dawn to Dusk*, N.Y. TIMES (Jan. 31, 2026), https://www.nytimes.com/2026/01/31/us/minneapolis-school-district-ice-agents.html?smid=nytcore-ios-share&referringSource=articleShare.

## B. Duluth Public School District

75.    DHS's activity at or near schools and school bus stops also harms the regular functioning of Duluth Schools and interferes with the district's duty to educate its students. For example:

76.    First, DHS's revocation of the longstanding protected areas policy set forth in the Mayorkas Memo has left Duluth Schools with significant uncertainty about what to expect from DHS agents. As a result of ICE enforcement activity in schools, Duluth Schools' safety team members and other administrators have spent approximately 30% of their time planning related to immigration activities. Duluth Schools administrators have also spent significant time revising its processes and procedures regarding potential entry of DHS agents onto school premises, among other things. All this redirected administrative time translates to a cost of approximately $573,000 per month spent on emergency planning rather than normal district business.

77.    Second, Duluth Schools has seen increased absenteeism among its students from immigrant communities because, due to the threat of ICE enforcement near school grounds and bus stops, they do not feel safe coming to school. Duluth Schools is left with the decision to either expand online learning options for students, or risk that students will accrue more than 15 consecutive absences and be unenrolled from the school. *See* Minn. Stat. § 120A.37, subd. 9. Losing students impacts financing and resources for the district. Reenrolling students once they are able to return to school diverts administrative time from other tasks. And expanding online learning options also requires investment of District resources allocated elsewhere.

78.    Furthermore, Duluth Schools' Superintendent, Assistant Superintendent, Communications Officer, and union leaders have dedicated additional hours and days to district-wide communication efforts. These efforts aim to provide support and reassurance to the community regarding the district's commitment to defense and protection.

### C. Education Minnesota

79.    DHS's activity at or near schools harms the teacher-members of EdMN. It requires educators to spend additional hours supporting students who are absent, attending school remotely, or experiencing distress in the classroom because they fear ICE activity at or near schools. It forces educators to modify or cancel student activities and devote additional time and resources to protecting and supporting students and their families. And teacher-members themselves have experienced the impacts of DHS's activity on and near school grounds, as well as the increased anxiety and emotional distress that comes with working in a location that is no longer a safe space. There are numerous examples:

80.    "A" is an educator at a school in the Saint Paul Public School District. Out of approximately 1,000 students at her school, approximately 200 have registered for online learning because they are afraid to come to school in person. Student attendance is variable even with the online option. A is investing significant extra time into developing lesson plans and materials for students online, which reduces the time available for lesson planning, grading, and other work.

81.    "K" is an educator at a school in the Columbia Heights Public School District. Her school had a large number of students opting to stay home when the immigration enforcement surge began. A student reported being pulled over by DHS agents

on a street corner near the school. DHS agents have entered school parking lots on multiple occasions, including once during the school day when students were present and could see the DHS agent. This interrupted learning for the day because no one could focus. Between one-quarter and one-third of the students at her school have opted to move to online learning in the new semester, which creates added burden on teachers and adversely impacts academic outcomes.

82.     "V" is an educator at a school in the Rochester Public School District. Many students enrolled in Spanish immersion and newcomer programs do not feel safe coming to school in person. Attendance has declined, which impacts learning. Teachers are spending time gathering and providing food and other supplies to families who are afraid to leave their homes. They are also spending time patrolling around schools at arrival and dismissal time to ensure student safety because federal immigration agents have been seen near the school. One of his colleagues was pulled over on the way to work and asked by federal immigration agents to provide paperwork proving their citizenship status. These sorts of encounters impact teachers' ability to focus on instruction.

83.     "N" is an educator at a school in the Minneapolis Public School District. On January 7, 2026, DHS agents were present on the grounds of Roosevelt High School shortly after school dismissal. DHS agents tackled someone and deployed pepper spray towards where students and others were standing on school property. Minneapolis Public Schools canceled school for two days after the incident. This occurred near the end of a quarter and impacted student assessments. Since this incident, somewhere between a quarter and a third of his students have enrolled in online learning because they are afraid to come to school

in person. As a music teacher, N does not have enough instruments for students learning remotely, so he has to construct an entirely different course for those students. Students registered for the same course are not receiving the same instruction. Teachers are operating in crisis mode every day rather than focusing on instruction. Many have set up food pantries in their school and deliver food to several families every day who are afraid to go to the grocery store. They are providing rent support for parents who are unable to leave their homes and go to work. They have to figure out how to help families without being followed by federal immigration agents and putting themselves and families in danger. They are at school bus stops, walking children from the bus stop into their apartments so that their parents do not have to risk harassment or detention just trying to get their kids home from school. Teachers are patrolling school grounds during drop off and pick up to ensure federal immigration agents do not enter school property.

84.    Teachers' ability to perform all aspects of their jobs have been adversely impacted by DHS's revocation of the protected areas policy set forth in the Mayorkas Memo.

85.    EdMN's President Monica Byron addressed this growing impact on Minnesota teachers and students in a January 8, 2026 statement, explaining that ICE's "presence near our schools puts students and educators at serious risk. Every moment they

remain near schools endangers children, educators and families" and "directly undermine[s] teaching and learning."[54]

## CLAIMS FOR RELIEF

### COUNT I
#### Violation of Administrative Procedure Act—5 U.S.C. § 706(2)(A)
#### Arbitrary and capricious

86.     The paragraphs above are incorporated and reasserted as if fully set forth here.

87.     In 2025, Defendants rescinded their longstanding policy regarding civil immigration arrests at sensitive locations set forth in the Mayorkas Memo and replaced it with the 2025 Policy that broadly authorizes DHS immigration enforcement actions at or near sensitive locations.

88.     Defendants' policy of authorizing enforcement actions at or near sensitive locations is a final agency action because it marks the consummation of Defendants' decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

89.     Under the APA, agencies cannot depart from prior policies without explaining their reasons for doing so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Agencies must, for example, "examine the relevant data and articulate a satisfactory explanation" for their choice. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463

---

[54] Press Release, Education Minnesota, Education Minnesota Demands ICE Stay Away from Schools (Jan. 8, 2026), *available at* https://educationminnesota.org/news/press-release/education-minnesota-demands-ice-stay-away-from-schools.

U.S. 29, 43 (1983). And they must specifically consider the reliance interests of those who may be impacted by a change in their policies. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–31 (2020).

90.     Defendants have not provided an adequate explanation for adopting and implementing the 2025 Policy, have failed to provide a reasoned explanation for the departures from prior policy, have offered pretextual reasons, and have failed to consider alternatives or important aspects of the problem, including reliance interests.

91.     It is thus unlawful, and DHS should be enjoined from implementing it.

92.     DHS's 2025 Policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

**COUNT II**
***Violation of Administrative Procedure Act—5 U.S.C. § 706(2)(D)***
***Without observance of procedure required by law***

93.     The paragraphs above are incorporated and reasserted as if fully set forth here.

94.     DHS requires that its rules and regulations go through the notice-and-comment process generally required by the Administrative Procedures Act. *R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 194 (5th Cir. 2023); *see also Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 875 (8th Cir. 2013); 5 U.S.C. §§ 553.

95.     Under the APA, a court shall "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

96.     Section 1103 authorizes the Secretary of Homeland Security to "establish such regulations" and "issue such instructions" to enforce "laws relating

to . . . immigration." 8 U.S.C. § 1103. The 2025 Policy is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights and obligations" and creates "legal consequences." *Bennett*, 520 U.S. at 177–78. This "pragmatic" assessment includes the creation or revocation of safe harbors. *Hawkes*, 578 U.S. at 600. Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); 5 U.S.C. § 706(2)(A); *see also Regents of the Univ. of Cal.*, 591 U.S. at 17

97. DHS has repealed its longstanding guarantee that, absent extraordinary circumstances, the government would not conduct immigration enforcement at protected areas, including schools or school bus stops. The 2021 Mayorkas Memo acts as the policy for DHS because it set a "statement of general . . . applicability and future effect designed to implement, interpret, or prescribe" the enforcement power of DHS agents. 5 U.S.C. § 551(4) (defining "rule").

98. To alter or rescind its protected-areas rule, DHS must first engage in notice-and-comment rulemaking, as required by the APA. *Nat. Res. Def. Council*, 894 F.3d 95, 113 (2d Cir. 2018); *see also* 5 U.S.C. § 553.

99. DHS did not engage in notice-and-comment rulemaking.

100. Because DHS rescinded the longstanding protected-area rule set forth in the Mayorkas Memo without going through the notice-and-comment process required of agency rules, it is not in observance of procedure required by law.

101. It is thus unlawful, and DHS should be enjoined from implementing it.

102. DHS's 2025 Policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, pray for relief as follows:

a.  Declare the 2025 Policy unlawful;

b.  Preliminarily set aside and stay the 2025 Policy under 5 U.S.C. § 705;

c.  Preliminarily and permanently enjoin Defendants from implementing, enforcing, acting according to, or reissuing under another name the 2025 Policy;

d.  Vacate and set aside the 2025 Policy;

e.  Preliminarily and permanently enjoin Defendants, including DHS's subcomponent agencies, from carrying out immigration enforcement operations at or near (i.e., within 1,000 feet) school property or school bus stops absent a judicial warrant or genuinely exigent circumstances;

f.  Award Plaintiffs costs of suit, attorneys' fees, and expenses to the greatest extent authorized by all applicable laws; and

g.  Issue such other relief as the Court deems proper.

Respectfully submitted,

Dated: February 4, 2026                  */s/Jeffrey J. Harrington*

**NILAN JOHNSON LEWIS PA**          **ZIMMERMAN REED LLP**
Amanda Cialkowski (0306514)         June Hoidal (033330X)
Kathleen Curtis (0388279)           Jeffrey J. Harrington (0327980)
250 Marquette Avenue South, Suite 800   David Cialkowski (0306526)
Minneapolis, MN 55401               Michael Laird (0398436)
(612) 305-7500                      Molly F. Billion (0402616)
acialkowski@nilanjohnson.com        Katja D. Lange (0504952)
kcurtis@nilanjohnson.com            80 South 8th Street, Suite 1100
                                    Minneapolis, MN 55402
                                    (612) 341-0400
                                    june.hoidal@zimmreed.com

**DEMOCRACY FORWARD
FOUNDATION**
P.O. Box 34553
Washington, D.C. 20043
(202) 322-1959
Elena Goldstein* (DC Bar 90034087)
Sean Ouellette* (DC Bar 1741535)
Allyson Scher* (DC Bar 1616379)
Paul R.Q. Wolfson* (DC Bar 414759)
egoldstein@democracyforward.org
souellette@democracyforward.org
ascher@democracyforward.org
pwolfson@democracyforward.org

*pro hac forthcoming

jeffrey.harrington@zimmreed.com
david.cialkowski@zimmreed.com
michael.laird@zimmreed.com
molly.billion@zimmreed.com
katja.lange@zimmreed.com

**THE LAW OFFICE OF
KEVIN C. RIACH**
Kevin Riach (389277)
125 Main St. SE, Suite 339
Minneapolis, MN 55414
(612) 203-8555
kevin@riachdefense.com

*Attorneys for Plaintiffs*