**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

|  |  |
|---|---|
| FRIDLEY PUBLIC SCHOOL DISTRICT, INDEPENDENT SCHOOL DISTRICT 14, *et al.*,<br><br>     *Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, *et al.*,<br><br>     *Defendants*. | Case No. 0:26-cv-01023 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY
UNDER 5 U.S.C. § 705 OR, IN THE ALTERNATIVE,
A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................ 3

I.      DHS removed longstanding protections for schools and other protected areas ........................................................................................................................ 3

        A.      For over thirty years, government policy protected schools, bus stops, and other protected areas from immigration enforcement actions ................ 3

        B.      The  current administration rescinded these protections on day one .............. 6

II.     DHS's 2025 Policy chills families from sending children to school ...................... 7

        A.      DHS has implemented the 2025 Policy by accelerating immigration enforcement near schools and bus stops ........................................................ 7

        B.      DHS's 2025 Policy has disrupted schools and chilled student attendance nationwide ................................................................................... 10

III.    DHS's 2025 Policy harms Plaintiffs ..................................................................... 11

        A.      Fridley and Duluth Schools ......................................................................... 11

                1.    Fridley and Duluth Schools have faced heightened enforcement activity on school property and near schools and school bus stops ....... 12

                2.    Fridley and Duluth Schools have had significant drops in attendance due to enforcement near schools and school bus stops ....... 13

                3.    The 2025 Policy raises the school districts' expenditures .................... 15

        B.      Education Minnesota ................................................................................... 17

                1.    The 2025 Policy harms EdMN's educator-members ........................... 18

                2.    The 2025 Policy interferes with EdMN's operations .......................... 19

ARGUMENT .................................................................................................................... 20

I.      Plaintiffs' APA claim is likely to succeed on the merits ...................................... 21

II.     Plaintiffs will suffer irreparable harm if the 2025 Policy is not stayed ................ 25

        A.      The 2025 Policy irreparably harms the school districts ............................... 25

i

B.    The 2025 Policy irreparably harms Education Minnesota ........................... 28

III.    The balance of the equities and public interest favor a stay ................................... 29

**CONCLUSION** ................................................................................................. 30

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*ARC of Iowa v. Reynolds*,
    559 F. Supp. 3d 861 (S.D. Iowa 2021) ................................................................... 29

*Brown v. Bd. of Ed. of Topeka*,
    347 U.S. 483 (1954) .................................................................................................. 26

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
    98 F.4th 220 (5th Cir. 2024) ................................................................................... 28

*Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*,
    840 F.2d 701 (9th Cir. 1988) ................................................................................. 29

*Dakotans for Health v. Noem*,
    52 F.4th 381 (8th Cir. 2022) .................................................................................. 26

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ..................................................................................................... 24

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ................................................................................................ 22

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .......................................................................................... 22, 23

*Gen. Motors Corp. v. Harry Brown's, LLC*,
    563 F.3d 312 (8th Cir. 2009) ................................................................................. 25

*HIAS, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021) ........................................................................... 26, 29

*Iowa Migrant Movement for Just. v. Bird*,
    157 F.4th 904 (8th Cir. 2025) ............................................................................ 25, 28

*Issa v. Sch. Dist. of Lancaster*,
    847 F.3d 121 (3d Cir. 2017) ................................................................................... 29

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .............................................................................. 25, 30

*Make the Rd. N.Y. v. Noem,*
No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ............................ 20, 21

*Minnesota v. USDA,*
No. 25-cv-4767, 2026 WL 125180 (D. Minn. Jan. 16, 2026) ..................... 21, 27, 29

*Missouri v. Trump,*
128 F.4th 979 (8th Cir. 2025) ........................................................ 27, 29, 30

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ................................................................................ 21, 22

*Nat'l Educ. Ass'n-N.H. v. NH Att'y Gen.,*
806 F. Supp. 166 (D.N.H. 2025) ................................................................. 26

*Ohio v. EPA,*
603 U.S. 279 (2024) .............................................................................. 21, 23

*Phila. Yearly Meeting v. DHS,*
No. 25-cv-0243, 2026 WL 280089 (D. Md. Feb. 3, 2026) .................................. 22

*Plyler v. Doe,*
457 U.S. 202 (1982) ...................................................................................... 29

*Texas v. United States,*
40 F.4th 205 (5th Cir. 2022) ......................................................................... 21

*Trump v. CASA, Inc.,*
145 S. Ct. 2540 (2025) .................................................................................. 20

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ......................................................................................... 21

*Wisconsin v. Yoder,*
406 U.S. 205 (1972) ...................................................................................... 26

**STATUTES**

5 U.S.C. § 705 ……...………………………………………………….…………20, 21

5 U.S.C. § 706..….………………………………………………….…………….20, 21

Minn. Stat. § 120A.379.………..…….………………………….….…….………14, 15

iv

**INTRODUCTION**

On a cold January day in a Minneapolis suburb, a child boarded the school bus while immigration agents handcuffed his parent at the bus stop and carried them away. A few miles away, agents arrested two parents at an elementary school as the parents picked up their kids from school. Agents swarmed the grounds of another Minneapolis high school, tackled and detained a staff member, and deployed chemical irritants around students and teachers. In just the last few months, immigration agents have arrested parents, students, and educators at bus stops and outside schools, parked in school parking lots and adjacent streets, and surveilled people as they commute to and from school. In classrooms across the country, students ask their teachers if ICE will come for them as they are leaving school or waiting for the bus. Many students have stopped coming to school for that reason.

For over thirty years, government policy directed immigration agents to avoid such enforcement activity at or near schools, school bus stops, hospitals, churches, shelters, or other sensitive locations absent exceptional circumstances. From 2021 to 2025, the relevant policy mandated that agents avoid enforcement actions in those areas "to the fullest extent possible" and set detailed pre-approval and post hoc reporting requirements for when such actions "needed" to occur. Like its predecessors, the 2021 policy rested on the recognition that arrests, raids, and other enforcement actions in or near those areas would chill access to essential services like education. And it reflected the "bedrock" principle that the government "can accomplish" its immigration "enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter," or "people of faith access to their places of worship."

1

On January 20, 2025, the Department of Homeland Security ("DHS") revoked those longstanding protections in a one-page memo on the new administration's first day in office. In place of those protections, DHS gave agents broad discretion to conduct immigration enforcement operations (including arrests) at and near schools and other previously protected areas without high-level approval or post hoc documentation. DHS did not explain that sudden reversal or consider its impacts on schools, teachers, and students. And it did not consider whether more limited changes, short of abandoning its prior policy wholesale, could accomplish the same enforcement goals.

The decision to revoke the protected locations policy was arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"). And it irreparably harms the plaintiffs in this case. As a result of the change in policy, Plaintiffs Fridley and Duluth Public Schools have seen student absences balloon and have shifted many students to remote learning because families fear they will encounter immigration agents if they go to school. This threatens school funding, disrupts teaching, and frustrates the districts' core educational missions. Plaintiff Education Minnesota, an association of educators, will suffer harm to its members and its own business operations if the new policy stays in effect. The balance of equities and public interest—including the fundamental interest in children's access to education—favor a return to the longstanding status quo ante.

Accordingly, the Court should stay the new policy under Section 705 of the APA, or in the alternative, preliminarily enjoin the policy.

## FACTUAL BACKGROUND

### I. DHS removed longstanding protections for schools and other protected areas

#### A. For over thirty years, government policy protected schools, bus stops, and other protected areas from immigration enforcement actions

For more than three decades, government policy placed sharp restrictions on immigration enforcement operations in "protected areas"—also known as "sensitive locations"—including schools, hospitals, and houses of worship.

In 1993, an Immigration and Naturalization Service ("INS") memorandum expressed the "policy of the [INS] to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools" and "places of worship." Curtis Decl. Ex. 1.[1] Operations on school grounds "require[d] advance written approval" from high-level INS supervisors. *Id.* at 1. The memorandum established mandatory criteria that governed such approvals. *Id.* "In determining the appropriateness of the proposed action," it directed, "District Directors and Chief Patrol Agents *shall* consider the following: [t]he availability of alternative measures," like "making the arrest off [school] premises," that "would achieve the [same] enforcement objective"; "[t]he importance of the enforcement objective in the context of [INS] priorities"; "[m]easures" to "minimize the impact on operation of the school or place of worship"; and "[w]hether the action has been requested or approved by managers of the institution involved." *Id.* at 1-2. The policy permitted agents to enter a school or house of worship without prior

---

[1] All citations to "Curtis Decl." and "Ex." refer respectively to the Declaration of Kathleen Curtis and numbered exhibits thereto filed concurrently with this memorandum.

3

approval only in "exigent circumstances," a determination that itself followed specific criteria, and directed that any such entry "must be reported immediately … to the appropriate Assistant Commissioner." *Id.* at 2. And it directed that any "[e]xceptions" to the policy "must be approved in writing by the Associate Commissioner for Enforcement." *Id.*

Fifteen years later, in 2008, DHS reaffirmed that the 1993 memorandum "directed" agents to "attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools" and "places of worship," and that "direction … remain[ed] in effect." Ex. 2 at 1-2. The 2008 memorandum stressed that, while there may be "specific situations requiring ICE personnel to act at or near" sensitive places, like "terrorism-related investigations" or "matters of public safety," "[a]ny such case *must* be raised to the appropriate Headquarters program office prior to any action or, in exigent circumstances, as soon as practicable." *Id.* at 2 (emphasis added).

In 2011, ICE released yet another directive designed to "ensure" that ICE "enforcement actions" "do not occur at nor are focused on sensitive locations such as schools" absent exceptional circumstances. Ex. 3. Like its predecessors, the 2011 memorandum mandated that, absent "exigent circumstances"—like "terrorism" or "an imminent risk of death, violence, or physical harm"—"[a]ny planned enforcement action at or focused on a sensitive location" like a school "must" have prior approval from high-level DHS officials, whom the memorandum specifically listed. *Id.* at 2-3. In 2013, Customs and Border Protection ("CPB") issued a memo similarly restricting enforcement actions at sensitive locations such as schools. Ex. 4.

4

In a 2021 memo superseding prior guidance, DHS Secretary Alejandro Mayorkas set the policy that was in effect until January 2025. The 2021 memorandum reaffirmed that DHS had an "obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area." Ex. 5 (the "Protected Locations Policy") at 3. The memorandum defined that obligation's operative terms. A "protected area" included schools and any "place where children gather, such as a playground, recreation center, childcare center, before- or after-school care center, foster care facility, group home for children, or school bus stop." *Id.* at 2-3. "Enforcement actions" included "arrests, civil apprehensions, searches, inspections," and "surveillance." *Id.* at 3.

"The phrase 'to the fullest extent possible' recognize[d] that there might be limited circumstances under which an enforcement action needs to be taken in or near a protected area." *Id.* These included a "national security threat," "an imminent risk of death, violence, or physical harm to a person," the "hot pursuit of an individual who poses a public safety threat" or "a personally observed border-crosser," or when a "safe alternative does not exist." *Id.* at 4. Even in those exceptional circumstances, however, the memo directed that "[t]o the fullest extent possible," any such action "should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area." *Id.* And like the prior iterations, the memorandum directed that "[a]bsent exigent circumstances," agents "must seek prior approval" from headquarters officials or their delegees "before taking enforcement action at or near a protected area." *Id.* Also like prior memoranda, it included a post hoc reporting provision: Any enforcement action taken near

5

a protected location was to be reported to headquarters and "must be fully documented" in the agency's records "in a manner that can be searched and validated," with the "reason(s) why the enforcement action was taken there" and "a situational report of what occurred during and immediately after the enforcement action." *Id.* at 4-5. The policy also required DHS to train all employees on these requirements. *Id.* at 4.

In laying down those rules, the Protected Locations Policy explained that enforcement actions in or near protected areas could "restrain people's access to essential services or engagement in essential activities." *Id.* at 2. "For example, if [DHS] take[s] an action at an emergency shelter, it is possible that noncitizens, including children, will be hesitant to visit the shelter and receive needed food and water, urgent medical attention, or other humanitarian care." *Id.* And the memo directed that agents "need to consider the fact that an enforcement action taken near—and not necessarily in—the protected area can have the same restraining impact on an individual's access to the protected area itself." *Id.* at 3.

As support for those obligations, the memo found that DHS "can accomplish [its] enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter," or "people of faith access to their places of worship." *Id.* at 2. "Adherence" to that "fundamental" principle, it said, was a "bedrock" of "our stature as public servants." *Id.*

**B. The current administration rescinded these protections on day one**

The current administration threw out these longstanding protections the day it took office. In a half-page memo issued on inauguration day, January 20, 2025, DHS rescinded the Protected Locations Policy "effective immediately." Ex. 6 ("2025 Policy"). The 2025

6

Policy announced that DHS would no longer set "bright line rules regarding where [the] immigration laws [were] permitted to be enforced." Ex. 6. Instead, it instructed immigration agents to use "enforcement discretion" and "common sense" to decide whether to conduct arrests, raids, or other enforcement operations near schools. *Id.*

In a follow-up memorandum, ICE "charge[d] Assistant Field Office Directors … and Assistant Special Agents in Charge" to make "case-by-case determinations" about when to take such actions at sensitive locations. Ex. 8. Like the Huffman Memo, the follow-up memo did not supply any criteria for making those determinations. *Id.*

## II. DHS's 2025 Policy chills families from sending children to school

### A. DHS has implemented the 2025 Policy by accelerating immigration enforcement near schools and bus stops

DHS's decision to rescind the Protected Locations Policy has predictably increased immigration enforcement operations in previously protected areas—in Minnesota and nationwide. Since January 2025, DHS agents have repeatedly arrested parents and students as they wait at school bus stops. *See* Ex. 9; Ex. 10, C-D-Decl.¶10; Ex. 11, M-A-Decl.¶8; Ex. 12, M-L-S-Decl.¶12; Ex. 13, S-R-Decl.¶ 11; Ex. 14, J-V-Decl.¶10. They have detained parents and guardians near schools and as they drop off and pick up their kids. *See* Ex. 15, N-S-Decl.¶10; Ex. 16, S-T-Decl.¶9. They have stopped and boarded school buses and school vans loaded with students. Ex. 17, Hewett-Olatunde Decl.¶9; Exs. 18, 19; Ex. 20, P-S-Decl.¶9. DHS vehicles have waited in school parking lots and staked out school bus stops and the streets in front of schools at drop-off and pick-time. *See* Ex. 21, Wagner Decl.¶4; Ex. 22, Schmidt Decl.¶3; Ex. 10, C-D-Decl.¶9. In at least one incident,

7

immigration agents even shot a reporter a half block from a school. *See* Ex. 23, A-R-Decl.¶13; Ex. 16, S-T-Decl.¶12.

The Protected Locations Policy would have prohibited such arrests, surveillance, and uses of force in these locations absent exceptional circumstances and, in most cases, high-level approval. *See* Ex. 5 at 2-4. Indeed, educators from Minnesota and across the country cannot recall any immigration enforcement actions near schools and school bus stops when federal policy protected those locations. *See, e.g.*, Ex. 40, Byron Decl.¶29; Ex. 14, J-V-Decl.¶7; Ex. 10, C-D-Decl.¶7; Magas Decl.¶6. Now, they are routine.

In recent weeks, Minnesota schools have been among the hardest hit by the new wave of school-adjacent immigration enforcement. DHS agents have detained teachers, staff, and others outside elementary schools, middle schools, high schools, and daycares, and arrested parents and students at school bus stops. *See* Ex. 18; Ex. 24; Ex. 25, L-V-Decl.¶11; Ex. 9; Ex. 52, H-R-Decl.¶11; Ex 11, M-A-Decl.¶8, Ex. 50, E-V-Decl.¶3; Ex. 51, Graff Decl.¶19. One teacher reported that ICE "snatched one of [their] homeroom students from his school bus stop, roughed him up, and released him at 3 A.M. the next morning." Ex. 26, M-D-Decl.¶9. In an incident that captured national attention, agents in tactical gear armed with assault rifles swarmed the lawn of a local high school, pushed multiple school employees, shot a canister of chemical irritants toward a group of people that included students, and fired rubber bullets that struck a parent in the foot. Ex. 31, E-L-Decl. ¶¶3-7; Ex. 32, T-H-Decl.¶3-5; Ex. 33, N-L-Decl.¶¶4-8; Ex. 34, M-R-Decl.¶¶5-7. At a Minneapolis charter school, agents followed two students into the school parking lot, boxed them in, and questioned them about their legal status. Ex. 27, N-K-Decl.¶3; Ex. 30, J-W-

Decl.¶3. At a nearby college, agents aimed weapons at students outside a residence hall. Ex. 28, Chernega Decl.¶5. Elsewhere in Minnesota, agents detained a parent at a bus stop as their child boarded the school bus. Ex. 29, J-R-Decl.¶8. Agents have followed students home from their school buses, Ex. 30, J-W-Decl.¶4, and pulled over a van carrying students with cognitive and physical disabilities. Ex. 17, Hewett-Olatunde Decl.¶9; Exs. 18, 19.

In many other school districts across Minnesota, ICE agents have often waited near school bus stops and followed school buses, Ex. 56, D-Y-Decl.¶¶3-4; Ex. 21, Wagner Decl.¶4; parked in school parking lots, school driveways, and streets adjacent to schools, Ex. 35, Sinicariello Decl. ¶¶3-5; Ex. 41, K-W-Decl.¶10; Ex. 26, M-D-Decl.¶11; Ex. 12, M-L-S-Decl.¶¶9, 15; Ex. 47, Lewis Decl.¶¶8-10, 12; used drones to look inside buildings at an elementary school, Ex. 52, H-R-Decl.¶9; photographed staff, Ex. 47, Lewis Decl.¶14; and conducted drive-bys at school bus stops and drop-off and pick-up locations, Ex. 53, J-S-Decl.¶¶4-5. In Burnsville, agents brake-checked cars, flipped off parents patrolling near school bus stops, and blasted the song "Ice, Ice Baby" when a bus was scheduled to drop off elementary school students. Ex. 36, A-B-Decl.¶¶3-6. In Columbia Heights, an ICE agent entered the parking lot of a high school and approached the loading dock connected to a school courtyard on school property. Ex. 35, Sinicariello Decl.¶4; Ex. 37, Nelson Decl.¶4. Students took video of the incident and sent it to their family, who became panicked that ICE had come to their children's school. Ex. 35, Sinicariello Decl.¶4.

Several of these incidents triggered school lockdowns to protect students from the dangers posed by armed agents conducting enforcement operations near school grounds. *See, e.g.*, Ex. 38, Pohlman Decl.¶4; Ex. 16, S-T-Decl.¶12; Ex. 39.

9

**B. DHS's 2025 Policy has disrupted schools and chilled student attendance nationwide**

The flood of school-adjacent enforcement actions unleashed by the 2025 Policy has frightened students and disrupted classrooms nationwide. Children ask teachers, "what happens if ICE comes up and tries to take us … while we're trying to get on the bus?" Ex. 17, Hewett-Olatunde Decl.¶3. Students across Minnesota and across the country have expressed the same fears. *See* Ex. 40, Byron Decl.¶12 ("Students are asking [EdMN's] educators if they could be detained at school or on their bus ride home."); Ex. 35, Sinicariello Decl.¶6 ("Parents have told me they do not feel it is safe for their children to come to school. … One student told me they were afraid to wait for the bus to come to school, so they were staying home."); Ex. 41, K-W-Decl.¶12 (Minnesota elementary school teacher: "One student told me, 'if ICE comes and grabs me, make sure my parents know.'"); Ex. 42, Heavener Decl.¶14 (Chicago elementary school teacher: "[A] sixth grader told me she was worried that immigration officers would shatter the windows and force their way into the school."); Ex. 43, C-R-D-Decl.¶9 (Arkansas middle school teacher: "[S]tudents have repeatedly ask[ed] me," "what if ICE … comes to the school?"); Ex. 44, C-A-Decl.¶10 (Rhode Island middle school teacher: "Students have told me they are afraid at school departure time … because they are worried that ICE will come to school grounds and take their parents."). These widespread concerns have left students "anxious," "distracted," and unable to focus on learning. Ex. 17, Hewett-Olatunde Decl.¶3.

Many families have stopped sending their children to school altogether. Attendance has plunged in schools across Minnesota, particularly among school districts with large

10

Hispanic and Latino populations. One Minneapolis charter school reported that fewer than half its 800 students are coming to class because of fear of immigration agents. Ex. 45. Another Minneapolis high school has seen attendance drop by 70-80 percent. Ex. 30, J-W-Decl.¶5. At an elementary school in Columbia Heights, whose student body is 66% Hispanic, approximately one-fifth of the student body is routinely absent because students are afraid to come to school. Ex. 37, Nelson Decl.¶7. And a student at Roosevelt high school in Minneapolis estimates that a quarter of his classmates have stopped coming to school. Ex. 32, T-H-Decl.¶7. Parents have told school staff the primary reason: They have heard about immigration arrests and other ICE encounters near schools and bus stops, and they are afraid that the same things will happen to them or their children if they come to school. Ex. 30, J-W-Decl.¶5; Ex. 17, Hewett-Olatunde Decl.¶4; Ex. 46, Gaverick Herrera Decl.¶4; Ex. 47, Lewis Decl.¶19, 21; Ex. 48, Magas Decl.¶7.[2]

## III.   DHS's 2025 Policy harms Plaintiffs

### A. Fridley and Duluth Schools

DHS's rescission of the Protected Locations Policy is directly interfering with Fridley and Duluth Schools' operations and costing them significant time and money. Both districts have seen a sharp rise in ICE enforcement activity on and near school property and near school bus stops. The ongoing threat of ICE enforcement activity has caused a drop in attendance, disrupted classes, increased teacher workloads, and strained school finances.

---

[2] Studies estimate that at least 49,000 Minnesota children reside with an undocumented parent and around 9,000 Minnesota students are themselves undocumented. Ex. 55 at 2.

### 1. Fridley and Duluth Schools have faced heightened enforcement activity on school property and near schools and school bus stops

An inner-ring suburb that borders Minneapolis, Fridley has seen frequent DHS enforcement operations around its schools. On January 7, 2026, DHS agents stopped several Fridley Schools staff members close to school property and held one of them at gunpoint. Ex. 47, Lewis Decl.¶6. On January 29, a DHS vehicle trailed Fridley Superintendent Dr. Brenda Lewis from Fridley High School to a district elementary school. *Id.*¶7. Two days later, DHS agents used Fridley elementary and middle school parking lots as staging areas for enforcement operations. *Id.*¶¶8-10. On February 4, Dr. Lewis saw six ICE vehicles loaded with multiple agents drive back and forth directly in front of another elementary school during morning drop-off. *Id.*¶11. The next day, a Fridley teacher and a school security camera observed an ICE agent waiting in an elementary school parking lot in full tactical gear. *Id.*¶12. Yet another day, immigration agents followed a Fridley Schools parent after she dropped off her student, coming within 50 feet of the school. *Id.*¶13. On still another morning, agents came to an elementary school during morning drop-off, approached the school principal, and took photos and videos of him. *Id.*¶14. Another afternoon, Fridley's security director photographed ICE agents parked in a community park adjacent to both Fridley's middle schools and its high school. *Id.*¶16.

Although Duluth has experienced less ICE activity than the inner Minneapolis suburbs, agents have operated near schools on several occasions. On December 19, 2025, an ICE vehicle parked near a Duluth High School for approximately an hour to investigate "a target." Ex. 48, Magas Decl.¶6. The district has received several calls from community

members concerned about how close the agents were to the school. *Id.* Another day, DHS agents in tactical gear staged in a parking lot outside a preschool before they retrieved rifles from the back of their vehicles and tried to enter a nearby apartment. Ex. 18.

**2.  Fridley and Duluth Schools have had significant drops in attendance due to enforcement near schools and school bus stops**

As in other districts, these immigration enforcement operations near schools and school bus stops have caused significant drops in attendance in both Fridley and Duluth Schools. Since December 2025, Fridley Schools' attendance has dropped by approximately one-third. Ex. 47, Lewis Decl.¶19. On two different days in January 2026, Fridley Schools had to cancel classes because so many students and staff were afraid to come to school. *Id.*¶21. Families have told school staff directly that they are keeping their kids home out of fear that immigration agents would arrest them or their children near school or the school bus stops. *Id.* The district has received hundreds of calls and messages from families and staff members saying they were afraid to come to school for the same reason. *Id.*¶¶19, 21. The new policy chills staff attendance as well. Non-citizen staff members are afraid to come into work due to the risk of being detained by ICE near school. *Id.*¶32.

In Duluth, too, families have told school staff that they are afraid to send their children to school because of immigration enforcement at or near schools and school bus stops. Ex. 48, Magas Decl.¶7. Multiple Duluth students are absent due to those concerns. *Id.*¶7-9. The threat of immigration enforcement has especially affected English Language Learner (ELL) and English as a Second Language (ESL) students. Duluth's Adult ELL courses are "almost empty" because students "do not feel safe coming to class due to the

13

risk of immigration enforcement activities near school buildings." *Id.*¶8. About a third of the students in Allison Dingler's high school ESL class have missed one to five weeks of school since December 2025. Ex. 49, Dingler Decl.¶5. Parents cited reports of ICE enforcement at Minneapolis high schools as the reason for the absences. *Id.* They told Ms. Dingler that they were keeping their kids home for fear they would encounter immigration agents at or on the way to school. *Id.* Ms. Dingler was heartbroken to tell one mother that she could not assure her child's safety if they came to school in person. *Id.*¶7.

These widespread absences make it harder—and often impossible—for the districts to educate their students. When students are absent from school, they lose access to direct instruction, academic support, and special education services, and they fall behind academically. Ex. 47, Lewis Decl.¶23; Ex. 48, Magas Decl.¶11; Ex. 51, Graff Decl. ¶8-14. And when students return from such prolonged absences, teachers must put in additional work to remediate the educational losses. *See* Ex. 49, Dingler Decl.¶9; Ex. 48, Magas Decl.¶11. ESL students require even more help: because they rely on their in-person ESL classes to learn every subject, they require accelerated instruction in English to understand both the lessons they missed and the current material being taught in their math, science, and history classes. Ex. 49, Dingler Decl.¶9.

The chronic absences that flow from the threat of immigration arrests around schools and bus stops do not just disrupt learning—they also jeopardize the school districts' funding. Minnesota law requires schools to unenroll students who are absent for 15 consecutive days. Minn. Stat. § 120A.37, subd. 9. And for every student dropped from their rolls, the school districts lose funding. Ex. 47, Lewis Decl.¶24; Ex. 48, Magas Decl.¶10

14

(noting that Duluth Schools stands to lose $10,000 annually for each unenrolled student). Fridley Schools has already had to unenroll 20 students due to consecutive absences since December 2025, meaning that the district will lose thousands of dollars for those students. Ex. 47, Lewis Decl.¶25. Duluth has already lost at least one student, and several more are approaching the 15-day cut-off. Ex. 48, Magas Decl.¶9. If students continue to remain absent at the current rate because they fear immigration enforcement near schools and bus stops, Fridley and Duluth Schools risk losing even more funding. Ex. 47, Lewis Decl.¶25.

### 3. The 2025 Policy raises the school districts' expenditures

Even as it jeopardizes school funding streams, the 2025 Policy has cost the school districts many hours of additional labor and hundreds of thousands of dollars in additional expenses. And the policy will continue to strain the districts' budgets if it remains in effect.

Both Fridley and Duluth Schools have had to expand online learning programs to teach children who are afraid to come to school in person. Ex. 47, Lewis Decl.¶26; Ex. 48, Magas Decl.¶12. Since January 20, Fridley Schools has had to shift more than 400 students to remote instruction. *Id.* To support these online programs, teachers must do hours of additional work: They must take valuable time to redesign lesson plans to deliver them online, trying to connect to students through the internet, and working to get them Wi-Fi hot spots and computers. Ex. 49, Dingler Decl.¶10; Ex. 47, Lewis Decl.¶27; Magas Decl.¶11-12. Since many students still attend class in person, teachers must prepare two versions of each lesson—one for in-person students and one for remote students. Ex. 49, Dingler Decl.¶10. Yet, "[w]ithout the connection to teachers and peers that in-person learning provides, students have struggled to make academic progress at home." Dingler

15

Decl.¶6. Online instruction is not as effective as in-person instruction—especially for young children, students with disabilities, and ESL students. Ex. 47, Lewis Decl.¶28. The move to remote learning therefore "will result in academic and social setbacks that will persist beyond this school year and require additional resources to remediate." *Id*. In other words, teachers must do "double the work" for worse results. Ex. 49, Dingler Decl.¶10.

When students cannot go to school, they also lose access to food and healthcare services that schools normally provide. Ex. 47, Lewis Decl.¶30. Many Fridley students depend on free and reduced-cost school lunches to eat. *Id.* "Students cannot effectively learn when they are hungry." *Id.* Fridley Schools social workers, typically charged with providing services to students and families such as suicide risk assessments and support for students in foster care or who are unhoused, are now instead focused on acquiring and delivering food to students who are afraid to come to school. *Id.*¶31. They do so at their own personal risk, as DHS agents have followed them while they make deliveries. *Id.*

The 2025 Policy drains school resources in other ways, too. Shortly after DHS rescinded the Protected Locations Policy, families began to express urgent concerns about the threat of immigration enforcement activity on or near school grounds, bus stops, and off-campus school activities due the new policy. Ex. 48, Magas Decl.¶5. As a result, both districts have had to devote significant time and resources to change their processes and procedures to prepare for enforcement actions in or near schools, school bus stops, and after-school activities. *Id.*¶14; Ex. 47, Lewis Decl.¶34. Since December 2025, Duluth's safety team and administrators has spent approximately 30% of their time—the equivalent of $573,000 in wages—to revise protocols, draft communications to staff, students, and

16

parents, and train staff about how to handle immigration enforcement actions on school premises. Ex. 48, Magas Decl.¶14-16. To accomplish these urgent tasks, school staff have delayed other critical projects. *Id.*¶17 For example, an AI program that Duluth Schools planned to roll out in early 2026 is on hold because administrators have not had time to complete necessary work on the project. *Id*. As long as the 2025 Policy exposes their school zones and bus stops to enforcement actions, both districts will need to divert their limited resources to train staff about how to keep students and school property safe when armed immigration agents operate in those locations. *Id.*¶14; Ex. 47, Lewis Decl.¶34.

The 2025 Policy also raises transportation costs. Fridley Schools has also spent more than $100,000 to provide door-to-door transportation at the request of families who feel unsafe waiting at school bus stops where they might encounter immigration agents. Ex. 47, Lewis Decl.¶20. To ensure staff feel safe coming to work, Fridley Schools also incurs high costs to provide door-to-door transportation for almost 30 staff members. *Id.*¶32.

## B. Education Minnesota

Plaintiff Education Minnesota ("EdMN") is also harmed by the new policy. EdMN is an association of over 84,000 local union members who work in pre-K–12 schools and higher education institutions throughout Minnesota. Ex. 40, Byron Decl.¶2. EdMN's mission is to strengthen professional excellence in education and enhance the development of each learner in Minnesota. *Id*. In support of its mission, EdMN's 100-person staff provides legal services, professional development, and negotiation guidance to its members. *Id.*¶3. DHS's decision to rescind the Protected Locations Policy harms both EdMN's educator-members and the organization itself. *Id.*¶4

17

### 1. The 2025 Policy harms EdMN's educator-members

The new policy directly impacts EdMN's educator-members. Ex. 40, Byron Decl.¶27. Many of EdMN's members are not U.S. citizens. *Id.*¶21. Two members, both special education paraprofessionals, were arrested by DHS agents at work. *Id.*¶9. "Nearly all" non-citizen members are terrified that they will be stopped or detained near school grounds or on their way to school. *Id.*¶21; Ex. 13, S-R-Decl.¶¶14-16. Some non-white members, fearing racial profiling, are being driven to and from school by white colleagues because they are afraid of being detained at or near school. Ex. 40, Byron Decl.¶20. At least one member has taken an unpaid leave of absence because they are afraid to travel to school. *Id.*

Due to the 2025 Policy, EdMN's members must also "spend[] significant extra time developing lesson plans and materials for students who are [learning] online." Ex. 17, Hewett-Olatunde Decl.¶6; *see* Ex. 40, Byron Decl.¶15; Ex. 33, N-L-Decl.¶10. At one member's high school in St. Paul Minnesota, 200 students—one-fifth of the student body— have registered for online learning. Ex. 17, Hewett-Olatunde Decl.¶5. As a result, some members are spending hours everyday recording video lessons for remote students. Ex. 40, Byron Decl.¶15. A high school teacher had to create additional materials for students who moved to an online program to get the Advanced Placement credits they would have received if they were attending school in person. Ex. 35, Sinicariello, Decl.¶7. A middle school teacher had to deliver math workbooks to students learning at home, but then struggled to provide feedback because students did not have a good way to submit their homework. Ex. 33, N-L-Decl.¶ 10. In another member's high school music class, between

18

one-quarter and one-third of students (almost entirely Latino and Somali students) now participate virtually. Ex. 54, N-W-Decl.¶¶5-6. And because online learning is less effective than in-person schooling, members have had to invest additional time to catch students up. Ex. 40, Byron Decl.¶¶15-16. Some report having to be on call at all hours of the day to respond to remote students who contact them. *Id.*¶15. Much is at stake for the educators themselves. Lower student test scores will impact members' evaluations and threaten their jobs. *Id.*¶17.

EdMN's members are carrying many burdens beyond concerns about academic performance. They must spend class time responding to student questions about the threat of immigration enforcement on or near schools and buses. Ex. 40, Byron Decl.¶12.  Many are providing food support for students who are not receiving free school breakfast and lunch because they are afraid to come to school. *Id.*¶23. Several EdMN members experience regular lockdowns in their schools because agents have been seen nearby. *Id.*¶27. Teachers feel burnt out and exhausted by this additional stress, Ex. 17, Hewett-Olatunde Decl.¶10, and have requested additional mental health supports, Ex. 40, Byron Decl.¶24-25. The strain also impacts their physical health. Ex. 35, Siniacariello Decl.¶10.

### 2.    The 2025 Policy interferes with EdMN's operations

The 2025 Policy has also forced EdMN to shift its limited organizational resources to respond to the challenges its members are facing. Ex. 40, Byron Decl.¶4. EdMN has devoted resources to developing and executing multiple trainings on how schools should respond when agents come onto school property or request data from schools. *Id.*¶6. It has held at least 15 such trainings for hundreds of members since DHS rescinded the Protected

Locations Policy. *Id.* EdMN developed these trainings in response to demands from members, as many school districts do not have policies that instruct teachers about how to respond to these situations. *Id.* EdMN's field staff have also had to divert time to field questions about immigration agents' activities near schools, like: "What do I tell my students if we are forced to go into a lockdown because of ICE/Border Patrol?" or "What do I tell families who ask if it's safe for them to send their kids to school, which is in a community that has seen heavy ICE/Border Patrol activity?" *Id.*¶¶6-7. Just last month, EdMN's seven attorneys collectively spent over 100 hours answering questions and developing guidance and other resources related to DHS agents' presence in and around Minnesota schools. *Id.*¶11. As a result, EdMN's staff have been unable to devote that time to their other necessary duties in service of their mission, like supporting members through their typical daily challenges. *Id.*¶8. And EdMN has not been able to provide necessary professional development training to teachers to the same extent as before. *Id.*¶13

## ARGUMENT

Section 705 of the APA authorizes courts to stay agency action while the litigation proceeds to final judgment. *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *16 (D.C. Cir. Nov. 22, 2025). Whereas § 706 of the APA authorizes a court to "set aside"—that is, to vacate—agency actions at final judgment, "a stay under Section 705 functions as a temporary form of vacatur." *Id.* (citation modified). Section 705 allows courts to "preliminarily 'set aside' a new agency rule" while the court considers the merits of the case in a plenary fashion. *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2567 (2025) (Kavanaugh, J., concurring) (quoting 5 U.S.C. § 706(2)). Unlike an injunction, a § 705 stay

20

does not "direct individuals to act or not to act"; rather, it "suspends" the legal effect of the unlawful agency action. *Make the Rd.*, 2025 WL 3563313, at *16 (citation omitted). Here, a stay would temporarily set aside the 2025 Policy and "re-establish the status quo absent" that policy, meaning that it would reinstate Protected Locations Policy until final judgment. *Id.* at *17 (quoting *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022)).

Whether to enter a § 705 stay turns on the same factors that courts consider for a preliminary injunction. *Minnesota v. USDA*, No. 25-cv-4767, 2026 WL 125180, at *8 (D. Minn. Jan. 16, 2026). The plaintiff must show (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm" without relief; (3) "the balance of equities tips in [its] favor"; and (4) the relief serves the "public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs have made those showings here.[3]

## I.  Plaintiffs' APA claim is likely to succeed on the merits

Under the APA, courts must set aside agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious if it is "not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation modified). To satisfy that standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between

---

[3] Because the same factors govern both forms of relief, if the Court is not inclined to grant a § 705 stay, it should issue a preliminary injunction barring Defendants from implementing or otherwise giving effect to the 2025 Policy.

21

the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified).[4]

When an agency changes a policy, it must both "display awareness that it *is* changing position" and "show there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And it must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516. Where the previous policy had "engendered serious reliance interests," the agency must provide a "more detailed justification" for the reversal. *Id.* "An unexplained inconsistency in agency policy" is "arbitrary and capricious." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (citation modified).

The 2025 Policy fails to satisfy those basic standards for at least four reasons.

*First*, DHS failed to "show that there [were] good reasons" to depart from its longstanding policy of avoiding immigration enforcement in sensitive locations. *Fox*, 556 U.S. at 515. While the 2025 Policy acknowledged that it rescinded the Protected Locations Policy, it did not explain why that policy needed to be replaced or what DHS believed to be the advantages of the new policy. *See* Ex. 6. Indeed, the 2025 Policy provides no rationale at all. In the Protected Locations Policy, DHS concluded that it was paramount that it protect schools and other sensitive locations because enforcement actions near those locations chill people's access to the "essential services" and "activities that occur there," and because DHS "can accomplish [its] enforcement mission without denying or limiting

---

[4] The Protected Locations Policy is a final agency actions subject to APA review. *Phila. Yearly Meeting v. DHS*, No. 25-cv-0243, 2026 WL 280089, at *4-5 (D. Md. Feb. 3, 2026).

22

individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter," and "people of faith access to their places of worship." Ex. 5 at 2. But the 2025 Policy does not explain why (or even if) DHS believed those prior conclusions were incorrect or outweighed by other concerns. The 2025 Policy was "arbitrary and capricious to ignore such matters." *Fox*, 556 U.S. at 515.

*Second*, in issuing the 2025 Policy, DHS ignored another "important aspect of the problem": the obvious and substantial harms that the new policy would inflict on children's access to education nationwide. *Ohio*, 603 U.S. at 293. The new policy has predictably led to routine immigration enforcement at or near schools and school bus stops, which has devastated schools across the country. As described above, since January 2025, DHS agents have repeatedly arrested parents at school bus stops while they wait for their children to come or go to school, detained parents outside schools as they drop off and pick up their kids, stopped and boarded school buses and school vans loaded with students, detained students at their dormitories on college campuses, outside schools, and as they wait at the school bus stop, and intimidated students, parents, and teachers by using school property and the immediate vicinity as staging areas for enforcement operations. *Supra* Background II.A. As a result, students across the country reasonably fear going to school, their attendance has plummeted, and their academic performance is at severe risk. *Id.* at II.B. The Protected Locations Policy presaged these consequences. *See* Ex. 5 at 2 (noting that immigration enforcement near schools could interfere with "essential services" and "access to … schools"). Yet the 2025 Policy disregarded these already anticipated harms.

23

*Third*, DHS failed to consider obvious alternatives to giving agents unbound discretion to raid schools and other sensitive locations. Before an agency throws out its existing policy wholesale, it "must consider" any "alternatives that are within the ambit of the existing policy." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citation modified). The Protected Locations Policy included at least five key elements: (1) a mandate to avoid enforcement operations in protected areas "to the fullest extent possible"; (2) a definition and examples of "protected areas"; (3) an explanation of when avoidance is not "possible" and an enforcement action "needs to be taken in or near a protected area"; (4) a requirement of pre-approval from headquarters or its delegates except in "exigent circumstances"; and (5) a requirement of post hoc reporting when pre-approval was not obtained. *See* Ex. 5. But DHS did not consider maintaining or modifying any of those elements before it jettisoned the whole policy. *See* Ex. 6. DHS did not, for example, consider replacing the mandate to avoid protected locations whenever "possible" with a more flexible presumption against such enforcement, narrowing the definition of "protected areas," or keeping the reporting requirements. Nor did it consider providing standards to guide agents in their use of "discretion." *Id.*

*Fourth*, the 2025 Policy entirely fails to account for the substantial reliance interests created by the prior protections for sensitive locations. When departing from a prior policy, an agency must "assess whether there were reliance interests [engendered by the prior policy], determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. Teachers, parents, and children across the country have relied for decades on the protection the prior policy provided to

24

learn, work, and teach without fear that immigration agents will arrest them or their colleagues and fellow students. But DHS did not consider those reliance interests when it abandoned the Protected Locations Policy. As a result, schools are now forced to develop new procedures and train staff to handle immigration enforcement near schools and bus stops and to create remote learning options that they did not develop before, when they relied on the old policy. *Supra* Background III.A.3 & B. Students have stopped going to school, and teachers must scramble to develop separate curricula for students learning online. *Id.* For all these reasons, the 2025 Policy is arbitrary and capricious.

## II. Plaintiffs will suffer irreparable harm if the 2025 Policy is not stayed

Plaintiffs face imminent irreparable harm absent a stay. A party suffers irreparable harm when it "has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The moving party need not "prove with certainty the threat of irreparable harm"; it need only prove that irreparable harm is "likely" without preliminary relief. *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 928 (8th Cir. 2025). As explained above, the 2025 Policy harms Plaintiffs on multiple fronts. *Supra* Background III. Those harms are irreparable.

### A.  The 2025 Policy irreparably harms the school districts

*First*, the new policy makes it much "more difficult" for Fridley and Duluth Schools "to accomplish their primary mission[s]" and therefore establishes "irreparable harm." *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). Minnesota school districts have a duty to provide their students with a free and appropriate public education,

25

Ex. 47, Lewis Decl.¶4; Ex. 48, Magas Decl.¶3, Ex. 51, Graff Decl. ¶3-6—"perhaps the most important function of state and local governments," *Brown v. Bd. of Ed. of Topeka*, 347 U.S. 483, 493 (1954); *see Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972) (noting that "[p]roviding public schools ranks at the very apex of the function of a State," which has the "high responsibility for education of its citizens").

The 2025 Policy thwarts that fundamental function. Because their families fear immigration consequences near schools and school bus stops, students have stopped going to school. Ex. 47, Lewis Decl.¶19; Ex. 48, Magas Decl.¶7-9. In Fridley, 20 students have been absent for more than two weeks, and 92 others have transferred out of the district, moved out of state, or left the country—far more than usual. Ex. 47, Lewis Decl.¶25. Parents have made clear those absences owe to the school-adjacent immigration enforcement authorized by the 2025 Policy. *See*, *e.g.*, Ex. 47, Lewis Decl.¶19; Ex. 48, Magas Decl.¶7; Ex. 49, Dingler Decl.¶5. Because the 2025 Policy frustrates the school districts' ability to educate their students, it causes them grave and irreparable harm. *See Nat'l Educ. Ass'n-N.H. v. NH Att'y Gen.*, 806 F. Supp. 166, 207 (D.N.H. 2025) (finding irreparable harm because challenged law "hinder[ed] the school district plaintiffs' core mission of providing their students with a high quality education" ); *see also Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022) (holding that law that undermined organization's ability "to reach its audience" inflicted irreparable harm); *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (holding organization suffered irreparable harm because, due to the challenged policy, it could not serve as many people).

*Second*, the 2025 Policy doubles teachers' workloads and reduces the attention they

can give each student. To teach students afraid to come to school because of the 2025 Policy and the enforcement actions that flow from it, both school districts have had to expand online programs. Ex. 47, Lewis Decl.¶26; Ex. 48, Magas Decl.¶12. That demands that teachers sink time into redesigning lesson plans, troubleshooting tech issues, and catching students up when they fall behind. Ex. 47, Lewis Decl.¶28; Ex. 48, Magas Decl.¶10-12; Ex. 49, Dingler Decl.¶10. And the more students fall behind, the more work teachers will need to do to remediate the losses. Ex. 47, Lewis Decl.¶28; Ex. 48, Magas Decl.¶11. That lost time and effort, spent only to achieve worse results, is irreparable harm. *See Minnesota*, 2026 WL 125180, at *17–18 (finding the state's "need to spend significant money and divert other tangible and intangible resources" was irreparable harm).

*Third*, the 2025 Policy costs the districts money they cannot recover later. With each student absent more than 15 days, the school districts will lose funding from the state—a loss that could reach into the hundreds of thousands of dollars for Fridley Schools alone. Ex. 47, Lewis Decl.¶24-25; Ex. 48, Magas Decl.¶10; Ex. 51, Graff Decl.¶22. And Fridley Schools has spent over $100,000 to provide door-to-door transportation for students and over 30 staff members who feel unsafe traveling to school on their own because they fear encounters with immigration agents near schools and school bus stops. Ex. 47, Lewis Decl.¶¶20, 32. Lest more of their students and staff stop coming to school, the school districts will need to sustain those expenditures so long as schools remain unprotected. Ex. 47, Lewis Decl.¶34; Ex. 48, Magas Decl.¶12. Since the districts "cannot recoup [those] financial loss[es] through a damages award because of sovereign immunity," those losses "constitute[ ] an irreparable injury." *Missouri v. Trump*, 128 F.4th 979, 996 (8th Cir. 2025).

27

*Fourth*, the 2025 Policy is forcing the school districts to develop new procedures and continuously train staff about what to do when immigration agents conduct arrests, searches, or other operations at or near schools and bus stops or stop school vehicles loaded with students. *See* Ex. 47, Lewis Decl.¶34; Ex. 48, Magas Decl.¶18. This need to "expend more time and resources to train their staff due to" the new policy inflicts irreparable harm. *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 236 (5th Cir. 2024). And because the school districts will need to continue those trainings as long as schools remain exposed to DHS enforcement actions, the harm will persist as long as the 2025 Policy remains in effect. Ex. 47, Lewis Decl.¶34; Ex. 48, Magas Decl.¶18.

**B.  The 2025 Policy irreparably harms Education Minnesota**

The 2025 Policy also harms EdMN's members, which in turn harms EdMN. *See Iowa Migrant Movement*, 157 F.4th at 928 (noting that organizations with associational standing may obtain preliminary injunctions based on irreparable harm to their members). As a result of the 2025 Policy, DHS agents have arrested two of EdMN's noncitizen members and "terrified" "nearly all" others. Ex. 40, Byron Decl.¶¶9, 20; Ex. 13, S-R-Decl.¶¶14-16. Chronic absences and the shift to remote learning have forced members to divert hours of their time to rework curricula, reteach lessons, and stay "on call" to reach students after hours. Byron Decl.¶¶15-16. Educators must spend class time carefully fielding questions from students about the threat of immigration enforcement near schools and bus stops and deliver food to students who have lost access to free and reduced lunch because they no longer go to school. *Id.*¶12, 22. This has all "practically doubl[ed]" teachers' workloads and left them exhausted. Ex. 41, K-W-Decl. ¶ 12; Ex. 17, Hewett-

28

Olatunde Decl.¶10; Ex. 33, N-L-Decl.¶10; Ex. 35, Sinicariello Decl.¶10; Ex.12, M-L-S-Decl.¶¶19-21. These increased workloads—and the emotional toll they take—are irreparable harms. *See Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.,* 840 F.2d 701, 709–10 (9th Cir. 1988) (holding that teacher's emotional distress following job reassignment was irreparable harm).

The 2025 Policy irreparably harms EdMN's business operations, as well. The sacrifices EdMN must make to its normal operations, like supporting members in labor matters, to develop and host trainings and field members' questions about how to handle school-involved immigration enforcement actions, including encounters with agents and requests for data, are not measurable or compensable in money. *Supra* Background III.B.2; *HIAS*, 985 F.3d at 326 (finding diversion of resources and frustration of mission is irreparable harm); *Minnesota*, 2026 WL 125180, at \*17 (same).

## III.    The balance of the equities and public interest favor a stay

The balance of equities and public interest, which "merge" when the federal government is the defendant, both favor a stay or injunction. *Missouri*, 128 F.4th at 997.

Because of the 2025 Policy, children across the country are not learning effectively or are missing school altogether. "[E]ven a 'few months' in an unsound program can make 'a world of difference in harm' to a child's educational development." *ARC of Iowa v. Reynolds*, 559 F. Supp. 3d 861, 877 (S.D. Iowa 2021) (quoting *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 142 (3d Cir. 2017)); *see also Plyler v. Doe*, 457 U.S. 202, 221 (1982) (describing the "lasting impact of [education's] deprivation on the life of the child"). Defendants cannot contend that the 2025 Policy serves the public interest while it deprives

29

students nationwide of educational opportunities. Nor did DHS refute its prior conclusion that the public interest required DHS to avoid disruptions at school. *See* Ex. 5 at 2. And children who miss school also lose access to the schools' affordable meals and healthcare services on which so many children depend. Ex. 40, Byron Decl.¶22-23.

On the other side of the balance, the government would suffer no harm by returning to the status quo it maintained for over three decades. *See supra* Background I. And there is no "public interest in the perpetuation of unlawful agency action." *Missouri*, 128 F.4th at 997 (quoting *Newby*, 838 F.3d at 12).

## CONCLUSION

For these reasons, the Court should grant the motion and stay—or, in the alternative, preliminarily enjoin enforcement of—the 2025 Policy.

30

Respectfully submitted,

Dated: February 23, 2026

*/s/ Sean Ouellette*

**NILAN JOHNSON LEWIS PA**
Amanda Cialkowski (0306514)
Kathleen Curtis (0388279)
250 Marquette Avenue South, Suite 800
Minneapolis, MN 55401
(612) 305-7500
acialkowski@nilanjohnson.com
kcurtis@nilanjohnson.com

**ZIMMERMAN REED LLP**
David Cialkowski (0306526)
June Hoidal (033330X)
Michael Laird (0398436)
Jeffrey J. Harrington (0327980)
Molly F. Billion (0402616)
80 South 8th Street, Suite 1100
Minneapolis, MN 55402
(612) 341-0400
david.cialkowski@zimmreed.com
june.hoidal@zimmreed.com
michael.laird@zimmreed.com
jeffrey.harrington@zimmreed.com
molly.billion@zimmreed.com

*\*Admitted pro hac vice*

**DEMOCRACY FORWARD
FOUNDATION**
Elena Goldstein\* (DC Bar 90034087)
Sean Ouellette\* (DC Bar 1741535)
Allyson R. Scher\* (DC Bar 1616379)
Paul R.Q. Wolfson\* (DC Bar 414759)
P.O. Box 34553
Washington, D.C. 20043
(202) 322-1959
egoldstein@democracyforward.org
souellette@democracyforward.org
ascher@democracyforward.org
pwolfson@democracyforward.org

**THE LAW OFFICE OF
KEVIN C. RIACH**
Kevin Riach (389277)
125 Main St. SE, Suite 339
Minneapolis, MN 55414
(612) 203-8555
kevin@riachdefense.com

*Counsel for Plaintiffs*

31