# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| FRIDLEY PUBLIC SCHOOL DISTRICT, INDEPENDENT SCHOOL DISTRICT 14, DULUTH PUBLIC SCHOOL DISTRICT, INDEPENDENT SCHOOL DISTRICT 709, and EDUCATION MINNESOTA, | Case No. 26-cv-1023 (LMP/LIB) |

*Plaintiffs*,

v.

**BRIEF OF AMICI CURIAE FAITH-BASED ORGANIZATIONS AND FAITH LEADERS IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY UNDER 5 U.S.C. § 705 OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION**

KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, MARCOS CHARLES, in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations, DAVID EASTERWOOD, in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement, U.S. CUSTOMS AND BORDER PROTECTION, RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection, GREGORY BOVINO, or his successor, in his official capacity as Commander of the U.S. Border Patrol, and THOMAS HOMAN, in his official capacity as White House Executive Associate Director of Enforcement and Removal Operations,

*Defendants*.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................. ii

STATEMENT OF INTEREST OF AMICI CURIAE ....................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT.................................. 4

ARGUMENT ................................................................................................... 7

    I.    Recission of the sensitive locations policy impermissibly burdens
religious exercise, and the government acted arbitrarily and capriciously
by failing to consider that consequence............................................... 8

    II.    Amici's experiences demonstrate how rescinding the sensitive locations
policy infringes on religious exercise. ............................................... 11

CONCLUSION .............................................................................................. 19

# TABLE OF AUTHORITIES

Page(s)

## Cases

Agudath Israel of Am. v. Cuomo,
  983 F.3d 620 (2d Cir. 2020) ........................................................... 7

DHS v. Regents of the Univ. of Cal.,
  591 U.S. 1 (2020)............................................................................ 7

Everson v. Bd. of Educ.,
  330 U.S. 1 (1947)............................................................................ 8

Korte v. Sebelius,
  735 F.3d 654 (7th Cir. 2013) .......................................................... 9

New England Synod v. DHS,
  2026 WL 412329 (D. Mass. Feb. 13, 2026) ........................... passim

Ohio v. EPA,
  603 U.S. 279 (2024)................................................................ 11, 19

Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS,
  767 F. Supp. 3d 293 (D. Md. 2025)......................................... passim

Roberts v. U.S. Jaycees,
  468 U.S. 609 (1984)........................................................................ 8

Roman Catholic Diocese of Brooklyn v. Cuomo,
  592 U.S. 14 (2020)........................................................... passim

Tandon v. Newsom,
  593 U.S. 61 (2021).......................................................................... 9

Tandon v. Newsom,
  992 F.3d 916 (9th Cir. 2021) .......................................................... 9

## Statutes & Rules

42 U.S.C. § 2000bb ............................................................................ 7

42 U.S.C. § 2000bb-1 ........................................................................ 9

## Other Authorities

Polo et al., Abrahamic Solidarity: Tzedakah, Christian Charity, and Zakat
  as Theological Accounting Frameworks for Socioeconomic Justice
  Ethical Governance, 107 Pharos J. Theo. 1 (2026).................... 18

## STATEMENT OF INTEREST OF AMICI CURIAE*

Amici curiae are religious organizations and leaders in and around Minneapolis, Minnesota. The Department of Homeland Security's recission of its longstanding sensitive locations policy has substantially burdened amici's ability to exercise their religious beliefs, serve their communities, and adhere to the fundamental teachings of their faiths. Amici file this brief in support of plaintiffs' motion for a stay or, alternatively, for a preliminary injunction, to explain how the government's policy change was arbitrary and capricious not only for the reasons highlighted by plaintiffs, but also because the government failed to consider how the 2025 policy change substantially infringes on religious liberties. Amici are:

**Bishop Kevin Kenney.** Bishop Kenney serves as auxiliary bishop of the Catholic Archdiocese of Saint Paul and Minneapolis and its Vicar for Latino Ministry. He was ordained a bishop in October 2024. Guided by the Archdiocese's mission to make Jesus known and loved, Bishop Kenney helps manage a broad network of over 180 parishes, numerous Catholic schools, and various charitable ministries that support the spiritual and social needs of parishioners. Bishop Kenney emphasizes service to poor and marginalized communities as a central tenet of the Gospel and as a way to show respect for the inherent, God-given dignity of every human being.

---

\* No party or counsel for any party authored this brief in whole or in part or made a monetary contribution intended to fund its preparation or submission. No person other than amici curiae, their members, or their counsel made any monetary contribution to the preparation or submission of this brief. Plaintiffs have consented to the Faith-Based Organizations and Faith Leaders' Motion for Leave to file Amicus Curiae Brief, and defendants have taken no position.

**First Universalist Church of Minneapolis and Reverend Jen Crow.** The First Universalist Church of Minneapolis is an 800-plus-member faith community that is rooted in principles of love, justice, and radical inclusivity. For more than 160 years, the Church has provided a powerful voice for justice in Minneapolis and beyond. The congregation exercises its faith, in part, by protecting the poor and oppressed, building a more inclusive community, and providing a supportive space for personal and collective transformation. Reverend Crow serves as Senior Minister of the Church, where she provides spiritual leadership, supports pastoral care, and helps the community live out its values of love, equity, and justice.

**Interfaith Action of Greater Saint Paul.** Interfaith Action of Greater Saint Paul (Interfaith Action) is a nonprofit organization composed of religious member organizations from diverse faith and spiritual traditions. The organization acts on its members' faith-based missions to help others by providing critically needed shelter for families, emergency services related to food and clothing, workforce development, and other forms of support. Interfaith Action also, again in line with its members' religious missions, pursues systemic solutions to poverty through programs focused on high-impact volunteering, educational events, and opportunities that bring religious and community members into conversation with civic leaders.

**Minnesota Council of Churches.** The Minnesota Council of Churches (MCC) is a statewide coalition of 24 member denominations representing the regional governing and administrative bodies of Historic Black, Mainline Protestant, and Peace Church traditions. Its member denominations include Lutheran, Methodist, Episcopal, African Methodist

Episcopal, and other Protestant traditions.  Collectively, MCC represents about one million Christians across Minnesota.  MCC provides assistance and programming to help congregants live out their faith, including by providing refugee services and other initiatives to support vulnerable populations.

**Minnesota Rabbinical Association.**  The Minnesota Rabbinical Association (MRA) serves as the collective moral and religious voice of the Minnesota Jewish community, representing a diverse body of rabbis across all major denominations.  The MRA provides a vital forum for congregational and non-congregational rabbis to confer on pressing community issues, facilitate cooperative programming, and offer guidance on matters of Jewish law and ethics.  Grounded in a mission to pursue justice and safeguard human dignity, the MRA frequently engages in public advocacy and multifaith collaboration to protect civil liberties, combat prejudice, and uphold the constitutional rights of all Minnesotans.

**Rabbi Harold J. Kravitz.**  Rabbi Kravitz is the Rabbi Emeritus of Adath Jeshurun Congregation in Minnetonka, Minnesota, where he served the community for over 35 years.  Ordained by the Jewish Theological Seminary, Rabbi Kravitz began his tenure at the synagogue in 1987.  He held the Max Newman Family Chair in Rabbinics and served as Senior Rabbi from 1996 until 2023.  Beyond his congregational leadership, Rabbi Kravitz served as past President of the Rabbinical Assembly, the international professional association of Conservative rabbis.  Rabbi Kravitz's faith has motivated him to serve his community throughout his career, including as past board chair of a nonprofit dedicated to hunger relief called MAZON: A Jewish Response to Hunger.

**Reverend Ben Connelly.** Reverend Connelly is a Soto Zen Buddhist teacher and Dharma heir in the Katagiri lineage. Based at the Minnesota Zen Meditation Center, Reverend Connelly translates Mahayana philosophy into practical guidance for navigating the challenges of modern life and fostering collective liberation. His practice emphasizes the integration of traditional Buddhist wisdom and contemporary social and ecological engagement. He focuses his mindfulness work and multifaith outreach on intersectional liberation, racial justice, and climate justice.

**The Right Reverend Craig Loya.** Bishop Loya serves as the tenth Bishop of the Episcopal Diocese of Minnesota. The Diocese is organized around four core priorities—discipleship, faithful innovation, justice, and congregational vitality—that guide its collective mission to engage in public life and foster equitable communities. Through his ministry, Bishop Loya advocates for the dignity of every person, emphasizing social justice and reconciliation as integral components of the Diocese's faith-based mission.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For decades, the government's sensitive locations policy respected the fundamental right to religious freedom by strictly limiting immigration enforcement actions in and around places of worship. Under that policy, officers were permitted to engage in enforcement actions in the vicinity of such locations only in exigent circumstances or with prior supervisory approval, and they were directed to minimize disruption if enforcement occurred. The sensitive locations policy enabled religious adherents across the country to attend in-person services and receive critical anti-poverty and anti-hunger services without fear, and it allowed religious organizations to exercise their beliefs by ministering to

immigrant communities. The policy also permitted the government to "accomplish [its] enforcement mission without denying . . . people of faith access to their places of worship." Memorandum from Alejandro N. Mayorkas, Secretary, DHS, Guidelines for Enforcement Actions in or Near Protected Areas, at 2–3 (Oct. 27, 2021). In short, the policy—which dates back to at least 1993 and which endured for 32 years and through five different presidential administrations—struck a vital balance and ensured sufficient protection for constitutionally enshrined religious liberties. *See* Memorandum from James A. Puleo, Acting Assoc. Comm'r, INS, Enforcement Activities at Schools, Places of Worship, or at Funerals or Other Religious Ceremonies, HQ 807-P, at 1 (May 17, 1993).

In 2025, however, the government suddenly rescinded the sensitive locations policy and replaced it with a reckless and discretionary regime that has effectively chilled religious freedom. The policy today permits individual ICE agents to conduct enforcement activities in or near religious spaces as they deem appropriate, based solely on case-by-case judgment and so-called "common sense." Rescission has had an immediate and obvious impact on amici's religious observance. Under the new policy, ICE agents routinely: conduct enforcement in houses of worship with no notice; run operations out of church parking lots; and track and intimidate employees and volunteers of religious communities as they go about observing their faith.

As plaintiffs argue, the government's rescission of the sensitive locations policy was arbitrary and capricious in violation of the Administrative Procedure Act because (among other reasons) the government "ignored . . . important aspect[s] of the problem[s]" arising from immigration enforcement on school premises when it rescinded the longstanding

policy.  Dkt. 27 at 23.  Plaintiffs demonstrate with compelling force the devastating consequences that the recission of the policy has had on schools, teachers, students, and communities.  That alone is sufficient to justify the relief plaintiffs seek.

But there is a separate and independent reason to grant that relief—namely, that the government failed to consider the foreseeable and unacceptable infringements on the freedom of religion that would result from the policy change.  In wiping out its longstanding policy, the government ignored the First Amendment and the Religious Freedom and Restoration Act (RFRA) violations that would result from substantially burdening the rights to religious freedom and association.  *See Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, 767 F. Supp. 3d 293, 336 (D. Md. 2025) (preliminarily enjoining warrantless immigration enforcement actions at or near places of worship); *New England Synod v. DHS*, 2026 WL 412329, at *31 (D. Mass. Feb. 13, 2026) (same).

Amici's experiences attest to how the 2025 policy has significantly burdened religious rights.  Attendance at amici's religious events has dropped precipitously as staff, members, and congregants—immigrants and nonimmigrants alike—have been forced to stay away from places of worship to avoid the risk of harassment, interrogation, violence, and unlawful arrest.  Places of worship have had to adopt screening and security measures designed to protect their members—measures that are antithetical to religious tenets compelling amici and similar organizations to minister to and serve all comers.  Religious organizations whose missions include serving immigrant communities have been precluded from doing so.  And religious organizations' coffers have suffered, as decreased attendance has caused reduced donations while acute community needs have demanded

additional expenditures. As one court that enjoined the 2025 policy has explained, "[t]he prospect that a street-level law-enforcement agent—acting without a judicial warrant and with little or no supervisory control—could conduct a raid during a church service, or lie in wait to interrogate or seize congregants as they seek to enter a church, is profoundly troubling." *New England Synod*, 2026 WL 412329, at *1.

The government failed to consider these all-too-predictable effects when rescinding the sensitive locations policy. For this reason, too, this Court should grant plaintiffs' motion to stay or to enjoin DHS from implementing its new 2025 policy. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30, 36 (2020).

## ARGUMENT

Just as the government acted arbitrarily and capriciously when it ignored the damage to schools that would result from abandoning its longstanding sensitive locations policy, *see* Dkt. 27 at 22–23, it did the same by failing to consider how such change would result in foreseeable and unacceptable infringements of the freedom of religion. The First Amendment protects not only the "private right to religious belief," but also "physical acts" like "assembling with others for a worship service" and expressing religious beliefs in congregation. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020). The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, reinforces these constitutional rights through a rigorous statutory framework that imposes strict scrutiny on government conduct that substantially burdens the free exercise of religion. As both a constitutional and a statutory matter, therefore, the government is limited in taking actions—like abandoning the sensitive locations policy—that adversely affect the ability

of religious organizations and their communities to congregate. *See Phila. Yearly Meeting*, 767 F. Supp. 3d at 336; *New England Synod*, 2026 WL 412329, at *31.

## I. Recission of the sensitive locations policy impermissibly burdens religious exercise, and the government acted arbitrarily and capriciously by failing to consider that consequence.

The First Amendment guards against incursions on religious liberty—"our first freedom." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 23 (2020) (Gorsuch, J., concurring). It reflects the Framers' "conviction that individual religious liberty [is] achieved best" when government is "stripped of all power to . . . interfere with the beliefs of any religious individual or group." *Everson v. Bd. of Educ.*, 330 U.S. 1, 11 (1947). And because "[a]n individual's freedom" to "worship" couldn't be "vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed," the Supreme Court has long recognized that the "freedom of association receives protection as a fundamental element" of the freedom of religion. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 622 (1984). If the government takes action that will "significantly affect" or "burden" those interwoven rights to religious expression and association, it must defend its action by identifying a strong government interest that could not be advanced in a less restrictive manner. *Phila. Yearly Meeting*, 767 F. Supp. 3d at 322, 326.

RFRA reinforces these protections as a statutory matter. RFRA bars the government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," unless the government can prove that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of

furthering" that interest. 42 U.S.C. § 2000bb-1(a)–(b). RFRA "explicitly reaffirms our national commitment to the 'free exercise of religion as an unalienable right,' existing prior to and above ordinary law." *Korte v. Sebelius*, 735 F.3d 654, 673 (7th Cir. 2013).

The Constitution and RFRA protect not only people, but also the places—like churches, mosques, synagogues, and temples—where people congregate to worship, strengthen their community of co-believers, and give effect to their faith. *See Phila. Yearly Meeting*, 767 F. Supp. 3d at 321–26, 329–30; *New England Synod*, 2026 WL 412329, at *22. The Constitution and RFRA shield spaces of worship "not because of th[e] magnificent architecture or superlative acoustics, but because they are a sanctuary for religious observers to practice their faith." *Tandon v. Newsom*, 992 F.3d 916, 937 (9th Cir. 2021) (Bumatay, J., concurring in part). Because "attending religious services" lies at "the very heart of the First Amendment's guarantee of religious liberty," the Supreme Court has repeatedly struck down government actions—such as limitations on in-person gatherings—that interfere with the ability to attend religious services at places of worship. *Roman Catholic Diocese*, 592 U.S. at 19–20; *see also Tandon v. Newsom*, 593 U.S. 61, 64 (2021).

Two federal courts recently analyzed how the government's abandonment of the sensitive locations policy in favor of its new regime impermissibly burdens religious exercise. Both courts held that the policy change substantially burdened religious groups' rights and issued injunctions prohibiting the government from implementing the change.

In one case, Quaker, Cooperative Baptist, and Sikh groups challenged the 2025 policy change under the First Amendment and RFRA because of the effect it had on their

religious practice.  *Phila. Yearly Meeting*, 767 F. Supp. 3d at 306.  The district court there agreed with the plaintiffs that the change imposed "a significant burden on expressive associational rights" because immigration enforcement at places of worship "deter[s] attendance at worship, ministry, and other events that occur at houses of worship especially among immigrants, by causing fear of surveillance, interrogation, or arrest."  *Id.* at 323.  The plaintiffs had a "large number of immigrant worshippers, provide[d] services to immigrants, or [were] located among large immigrant populations."  *Id.*  The plaintiffs also "affirmed that their religious beliefs include welcoming and encouraging all to attend their services, regardless of immigration status," and so were "within the range of locations likely to be targeted for immigration enforcement."  *Id.*  Multiple plaintiffs from different faith traditions saw "reductions in attendance," which interfered with their "communal worship and activities" like "singing and praying together."  *Id.* at 324.  The court ruled that these effects—among others—constituted a substantial burden and that the government had less restrictive means to achieve its immigration-enforcement objectives.  *Id.* at 330–33.  The court thus enjoined the government from implementing or enforcing the policy change.  *Id.* at 337.

In another case, Quaker, Baptist, and Lutheran groups across the country likewise secured an injunction against the rescission of the sensitive locations policy.  *New England Synod*, 2026 WL 412329, at *5–6, 31.  The plaintiffs explained how federal agents "used the parking lot" of a church "as a staging area for an immigration-enforcement action," making congregants unwilling to attend services as a result.  *Id.* at *12–15.  The district court ruled that the plaintiffs suffered injury from "decreased attendance at worship

services," "a decrease in attendance at plaintiffs' social ministries," and "financial harm in the form of decreased donations." *Id.* at *8–10. Without reaching the constitutional question, the court concluded that those burdens ran afoul of RFRA and that the government's 2025 policy change was not the least restrictive means of furthering the government's interest in enforcing immigration. *Id.* at *23, 25. The court thus entered an injunction that "largely track[ed] the contours" of the pre-2025 policy. *Id.* at *31.

Just as the government did nothing to contend with the foreseeable harm that would be suffered by schools as a result of rescinding the sensitive locations policy, *see* Dkt. 27 at 23, it also neglected to consider the harm that would result to religious freedom. In failing to address that "important" issue, the government acted arbitrarily and capriciously, *Ohio v. EPA*, 603 U.S. 279, 293–94 (2024), providing further reason why this Court should issue a stay or a preliminary injunction as plaintiffs request.

## II. Amici's experiences demonstrate how rescinding the sensitive locations policy infringes on religious exercise.

Amici have experienced firsthand the harms caused by the government's rescission of the sensitive locations policy. These experiences further confirm that the government's adoption of its new 2025 policy was arbitrary and capricious. *See* Dkt. 27.

**(1) In-Person Worship.** Multiple amici's religions require regular in-person ministry and worship. Exhibit B: Declaration of Rabbi Harold Kravitz ("Kravitz Decl.") ¶ 5; Exhibit C: Declaration of Interfaith Action of Greater Saint Paul ("Interfaith Decl.") ¶ 11; Exhibit D: Declaration of First Universalist Church and Reverend Jen Crow ("Crow Decl.") ¶ 4; *see Roman Catholic Diocese*, 592 U.S. at 19 (confirming that there are

"important religious traditions" in many faiths "that require personal attendance"). Certain religious sacraments, for instance, cannot be administered remotely. Exhibit E: Declaration of the Right Reverand Craig Loya ("Loya Decl.") ¶ 5 (Eucharist and anointment of the sick); Exhibit F: Declaration of Bishop Kevin Kenney ("Kenney Decl.") ¶ 4 (Holy Communion). For some faith traditions, official denominational policy prohibits virtual ministry. Loya Decl. ¶ 5. "The heart" of these spiritual traditions "is direct, person-to-person engagement." Exhibit G: Declaration of Reverend Ben Connelly ("Connelly Decl.") ¶ 4.

The government's policy change discourages and chills observance of this core religious tenet. People of color and documented and undocumented immigrants alike have observed the severity of ICE enforcement actions in their communities. The real threat that they, too, could be the targets of enforcement actions backed with violent force while exercising their religious freedoms at a place of worship has caused an all-too-predictable decrease in participation and attendance. Exhibit H: Declaration of the Minnesota Rabbinical Association ("MRA Decl.") ¶ 9. Roughly 70% of local Latino Catholic parishioners, for example, have stopped coming to weekly Mass out of fear they will encounter ICE agents at or around worship services. Kenney Decl. ¶ 5. The number of regular attendants at one Latino Episcopal congregation has dropped from 130 to 14—"directly inhibit[ing] [the] community's ability to worship with and minister to the faithful as [it] otherwise would." Loya Decl. ¶ 8.

The actions of ICE officers since the government's rescission of its longstanding policy only confirm the reasonableness of congregants' concerns. For instance, ICE

officers recently entered a St. Paul church's parking lot during a worship service and photographed attendees' license plates—producing an atmosphere of terror among churchgoers. Interfaith Decl. ¶ 12. Other amici report that ICE officers have circled around synagogue and church property during religious services, including memorials and wakes, and have followed attendees when they were leaving religious sites. Crow Decl. ¶ 6; Kenney Decl. ¶ 7; MRA Decl. ¶ 8. These actions have "directly caused" a "stark and devastating" drop in attendance at religious services. Interfaith Decl. ¶ 11. And even in communities where enforcement actions have not yet been observed, the real possibility of such actions—together with the dramatic risks of confrontation and violence they pose— seriously chills religious adherents' willingness to exercise their religious rights in person.

"Such reductions in attendance significantly affect [amici's] expressive association because [their] beliefs require communal worship and activities." *Phila. Yearly Meeting*, 767 F. Supp at 323–24 (confirming that "[a] government policy may burden associational rights by deterring attendance at religious activities"). These effective bars on religious attendance "strike at the very heart of the First Amendment's guarantee of religious liberty." *Roman Catholic Diocese*, 592 U.S. at 19–20.

The threat of immigration enforcement at or near places of worship has relegated some religious services from the pews to Zoom. Interfaith Decl. ¶ 14. One St. Paul pastor—herself an immigrant—has taken to preaching remotely out of fear that immigration enforcement or ICE activity might disrupt her religious services. *Id.* ¶ 16. Catholic communities, too, have endeavored to provide resources online. Kenney Decl. ¶ 6. Such efforts are "an imperfect solution and cannot substitute for in-person ministry,

worship and celebration." *Id.* The Supreme Court has recognized that "remote viewing is not the same as personal attendance" and thus serves as no substitute at all. *Roman Catholic Diocese*, 592 U.S. at 19; *accord Phila. Yearly Meeting*, 767 F. Supp. 3d at 307 ("attending worship [together] is a much more powerful religious experience" than doing so remotely).

If that were not enough, some religious adherents have been discouraged from engaging in remote worship at all. One Jewish synagogue, for example, removed all videos of its services from YouTube and stopped posting any new recordings, out of fear that ICE agents would use the footage "to identify attendees or monitor religious messages." MRA Decl. ¶ 10. In light of "ICE's online surveillance efforts," congregants of many faiths have "fear[ed] and do not join" their religions' online services. Interfaith Decl. ¶ 14. This has further estranged people from their religious exercise and communities in a profound and troubling way.

**(2) Caring for Immigrants.** The government's actions also have substantially burdened amici's "exercise of religion in relation to their . . . immigrant-focused services." *Phila. Yearly Meeting*, 767 F. Supp. 3d at 330. Many in the Jewish and Christian communities, for example, believe that "welcoming immigrants and caring for those who are separated from their homes and families" serve as "direct expression[s]" of their faith. Exhibit I: Declaration of the Minnesota Council of Churches ("MCC Decl.") ¶ 5; Kravitz Decl. ¶ 3; MRA Decl. ¶ 4. This principle, like similar tenets in countless other religions, compels many faith communities to open their doors to smaller congregations (often comprising predominantly immigrant members) seeking a place to assemble. *Id.* ¶ 6;

Interfaith Decl. ¶ 13.  But the specter of ICE agents' entering places of worship has driven down attendance among immigrant or vulnerable communities, infringing the rights not only of the smaller congregations whose attendance has plummeted, but also of the host congregations hoping to give effect to their faith by providing a safe place of worship for more vulnerable communities.  *Id.* ¶ 10.

Some religious organizations pursue the tenet of welcoming the stranger by providing resources directly to immigrants, along with other vulnerable communities. These forms of religious exercise, too, have been substantially burdened by the rescission of the sensitive locations policy.  The Minnesota Council of Churches (MCC), for example, offers walk-in ministry and resettlement assistance to immigrants on Thursdays.  MCC Decl. ¶ 7.  Before 2025, MCC's lobby regularly overflowed with people seeking assistance. *Id.*  Soon after the recission of the policy, however, ICE began "stag[ing] operations in [MCC's] parking lot and follow[ing] individuals into the surrounding community." *Id.*  As a result, MCC's lobby is now empty on Thursday mornings, to the detriment of both MCC and the immigrants who would stand to benefit from the services MCC offers.  *Id.*

Another amicus, Interfaith Action, works to feed the hungry—a commandment with roots in many faith traditions, including Judaism, Christianity, and Hinduism—by operating a grocery-delivery program to provide food to home-bound members of the Saint Paul community.  Interfaith Decl. ¶ 18.  Traditionally, programs like these have served many immigrants working to build lives in the Twin Cities.  Recently, however, one of Interfaith Action's community partners reported that ICE agents were surveilling volunteers who picked up groceries from the church's kitchen to be delivered throughout

the community.  *Id.*  MCC employees likewise "have been followed home from work by ICE agents, leaving them fearful to carry out acts of service in the community."  MCC Decl. ¶ 10.  In this way, ICE agents' surveillance of religious volunteers and employees harms not only communities in need by depriving them of food and other acts of service, but also the religious rights of volunteers and church leaders, who are prevented from acting on the commandment to serve their neighbors.  Interfaith Decl. ¶ 18.

ICE's operations have also prevented faith leaders from sharing opportunities for parishioners to engage in acts of service to immigrants, as their faith would otherwise demand.  Faith-based organizations, for example, have stopped advertising volunteer opportunities on public listservs to protect the safety of volunteers and recipients, which has resulted in fewer volunteers and fewer recipients of care.  *See, e.g.*, Interfaith Decl. ¶ 18; MRA ¶ 10.  The same is true of opportunities to donate funds:  Faith leaders report being wary to ask for donations publicly, for fear that ICE's awareness of the underlying programs will lead to harm.  Loya Decl. ¶ 14.  To protect themselves and their congregants from online surveillance, religious communities have removed service projects directed towards immigrant communities from their websites and scrubbed their newsletters of references to pro-immigrant organizations.  Interfaith Decl. ¶ 17.  ICE agents' surveillance near places of worship has had a chilling effect on those communities' communications about their mission-driven work, ultimately undercutting their ability to serve the vulnerable as their faith demands.

(3) **Welcoming All.**  The government's recission of the sensitive locations policy has required amici and their members to erect barriers, figurative and literal, to their places

of worship. These measures have been necessary to protect congregants and staff alike. But they seriously undercut religious communities' ability to welcome all comers, which is a central precept for religious accessibility and openness. MRA Decl. ¶ 12. Many faith traditions are called to accept any who choose to enter and to evangelize to any who may be open to the faith. *Id.*; MCC Decl. ¶ 5; Interfaith Decl. ¶ 13. Indeed, the tenets of many faith communities *require* ministering to the poor and the marginalized. Kravitz Decl. ¶¶ 3–4; Interfaith Decl. ¶ 13; Connelly Decl. ¶ 5; Crow Decl. ¶ 2–3; MRA Decl. ¶ 4.

These religious practices have been burdened—and in some instances halted entirely—by ICE operations in and around places of worship. Interfaith Decl. ¶ 13. Recent "ICE operations have forced *many* [faith communities] to close and lock their doors during traditional service times—and allow only pre-existing members to enter—to protect the safety of their employees and worshipers." *Id.*; *see also id.* ¶ 19 (identifying Muslim organization that has been "forced to operate with a single entryway under a locked-door policy"); MCC Decl. ¶ 7; Kenney Decl. ¶ 9; Loya Decl. ¶ 10; Crow Decl. ¶ 9. Congregations also have needed to invest in additional security measures, including placing volunteer ushers in parking lots and nearby sidewalks, to protect community members while they worship. MRA Decl. ¶ 12; Interfaith Decl. ¶ 12; MCC Decl. ¶ 7; Crow Decl. ¶ 10. All this is antithetical to the open doors and open spirit on which amici and similar religious organizations depend.

**(4) Finances.** The threat of arrests, raids, and surveillance also has affected faith groups' finances. Soliciting money and resources from members of the faith at places of worship is a central component of how churches keep their doors open and their lights on.

In the Christian, Jewish, and Muslim faiths, for instance, this is known (respectively) as tithing, ma'aser kesafim, and zakat. *See, e.g.*, Polo et al., *Abrahamic Solidarity: Tzedakah, Christian Charity, and Zakat as Theological Accounting Frameworks for Socioeconomic Justice Ethical Governance*, 107 Pharos J. Theo. 1, 13–14 (2026). But as ICE operations have threatened places of worship, attendance has decreased, preventing religious communities from collecting donations. Kenney Decl. ¶ 10; Loya Decl. ¶ 13; Interfaith Decl. ¶ 11; Crow Decl. ¶ 11. As a result, religious organizations like amici have less funding to support their operations and to fund acts of service that are central to their missions. Kenney Decl. ¶ 10; Crow Decl. ¶ 11; Interfaith Decl. ¶ 11; *Phila. Yearly Meeting*, 767 F. Supp. 3d at 312.

This is not a time when religious organizations can tighten their proverbial belts and dedicate fewer resources toward protecting their communities. ICE enforcement efforts have left many immigrant communities more vulnerable and impoverished than ever, with many too afraid to leave the house to work or buy necessities. In response, faith groups have mobilized to help with rent payments to keep community members in their homes, *see* Crow Decl. ¶ 11; grocery bills, *see* Interfaith Decl. ¶ 18; and other basic needs. These expenditures have required religious organizations to reach deep to satisfy their financial obligations while pursuing their religious missions. Loya Decl. ¶ 12. In that way, the decline in attendance and community funding caused by the rescission of the government's sensitive locations policy hits at the worst possible time.

\*     \*     \*

The government's new policy fails to respect the religious freedoms enshrined in our Constitution and federal law. The recission of the sensitive locations policy has allowed ICE to run roughshod over the constitutional and statutory rights of amici and the communities they serve, and it threatens to "diminish religious engagement in our community at a time it is needed most." Interfaith Decl. ¶ 20. In the year since the sensitive locations policy was rescinded, ICE agents freely knock on the doors of houses of worship, set up sweeping operations in the parking lots of religious organizations, and tail and intimidate volunteers and employees of faith communities otherwise acting in accordance with the tenets of their faith. MRA Decl. ¶ 8; Kenney Decl. ¶ 7; Interfaith Decl. ¶¶ 13, 20; MCC Decl. ¶ 9. When DHS rescinded the sensitive locations policy, it blatantly ignored this "important aspect of the problem," *Ohio*, 603 U.S. at 293—the effect ICE operations in and around places of worship would have on religious liberties. The government's failure to consider these predictable consequences was arbitrary and capricious. *See* Dkt. 27.

## CONCLUSION

The Court should grant plaintiffs' motion for a stay under the APA or, alternatively, a preliminary injunction.

DATED:  March 9, 2026

Respectfully submitted,

By: */s/ Chelsea Walcker*

Lauren R. Goldman* (NY #2952422)
Mark J. Cherry* (NY #5558010)
Iason Togias* (NY #6072433)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166
Telephone:    212.351.4000
lgoldman@gibsondunn.com
mcherry@gibsondunn.com
itogias@gibsondunn.com

Katherine M. Marquart* (CA #248043)
Matt Aidan Getz* (CA #335038)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California  90071
Telephone:    213.229.7000
kmarquart@gibsondunn.com
mgetz@gibsondunn.com

Chelsea Walcker (MN #0396792)
Irina Vaynerman (MN #0396759)
GROUNDWORK LEGAL
1650 West End Boulevard, Suite 100
St. Louis Park, Minnesota  55416
Telephone:    612.208.9349
chelsea@groundworklegal.org
irina@groundworklegal.org

Katharine M. Janes* (D.C. #1779452)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
Telephone:    202.955.8500
kjanes@gibsondunn.com

* Pro hac vice admission pending

*Attorneys for Amici Curiae*