# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| FRIDLEY PUBLIC SCHOOL DISTRICT, INDEPENDENT SCHOOL DISTRICT, *et al.*, | ) ) ) |
| *Plaintiffs*, | ) Case No. 0:26-cv-01023-LMP-LIB |
| *v.* | ) ) ) |
| KRISTI NOEM, *et al.*, | ) ) |
| *Defendants*. | ) ) |

## **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO STAY OR, ALTERNATIVELY, MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

I.      Statutory Background ............................................................................ 3

II.     DHS's Internal Guidance ...................................................................... 4

III.    Related Lawsuits .................................................................................... 7

LEGAL STANDARD ......................................................................................... 8

ARGUMENT ...................................................................................................... 9

I.      Plaintiffs Have Not Made a Clear and Unequivocal Showing That They Are
        Likely to Succeed on Their Claims. ...................................................... 9

        A.      Plaintiffs lack standing. ............................................................. 9

                1.      Plaintiffs have not clearly shown cognizable injuries. ..................... 11

                        a.      Any injury to Plaintiffs from the change in internal
                                immigration enforcement guidance is not legally
                                cognizable. ............................................................. 15

                        b.      Plaintiffs' injuries are not otherwise cognizable. ................. 17

                                i.      Plaintiffs have not demonstrated that the 2025
                                        Guidance shows that DHS has directly
                                        interfered with Plaintiffs. ........................... 17

                                ii.     Plaintiffs have not shown concrete,
                                        particularized, and certainly impending injuries
                                        to themselves based on their students' and
                                        members' concerns about potential
                                        enforcement. ............................................... 20

                2.      Plaintiffs have not clearly shown injuries caused by and
                        traceable to the 2025 Guidance. ................................................. 22

                3.      Plaintiffs have not shown that the relief sought would redress
                        their alleged injuries. ................................................................. 25

        B.      This Court lacks jurisdiction to issue the requested injunction. ................. 27

C.    Plaintiffs have not shown they are likely to succeed on their APA claims..................................................................... 29

1.    Enforcement is committed to agency discretion by law.................... 29

2.    The challenged action is not final agency action subject to APA review. ......................................................... 32

3.    Plaintiffs have failed to show that the Huffman Memorandum is arbitrary and capricious. ................................... 36

II.    Plaintiffs Have Not Shown That They Will Suffer Irreparable Harm if the Relief They Seek Is Not Granted. .......................................... 39

III.    Plaintiffs Have Not Shown That the Public Interest and Balance of Equities Support Granting the Relief. ................................. 41

IV.    Any Relief Granted Should be Narrowly Tailored and Limited to Named Parties with Standing ................................................. 42

CONCLUSION ........................................................... 45

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arizona v. United States*,
    567 U.S. 387 (2012).....................................................................................3, 32

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
    785 F.3d 710 (D.C. Cir. 2015)...................................................................33, 36

*Awad v. Ziriax*,
    670 F.3d 1111 (10th Cir. 2012) .........................................................................9

*B & D Land & Livestock Co. v. Conner*,
    534 F. Supp. 2d 891 (N.D. Iowa 2008)..............................................................9

*Bennett v. Spear*,
    520 U.S. 154 (1997)...................................................................................33, 35

*Berkley Risk Adm'rs Co. v. Accident Fund Holdings, Inc.*,
    No. 16-cv-2671, 2016 WL 4472943 (D. Minn. Aug. 24, 2016)......................40

*Biden v. Texas*,
    597 U.S. 785 (2022)...................................................................................28, 35

*California v. Texas*,
    593 U.S. 659 (2021)........................................................................................23

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983)..........................................................................................15

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)..................................................................................*passim*

*Cunningham v. Neagle*,
    135 U.S. 1 (1890)............................................................................................31

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006)........................................................................................10

*Dataphase Sys., Inc. v. C L Sys., Inc.,*
    640 F.2d 109 (8th Cir. 1981) ...................................................................... 9

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) ................................................................................... 23

*Dep't of Homeland Security v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) ................................................................................ 38, 39

*DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.,*
    76 F.3d 1212 (D.C. Cir. 1996) ................................................................ 36

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ................................................................................... 37

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ................................................................................... 37

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ..........................................................................*passim*

*Flandreau Santee Sioux Tribe v. U.S. Dep't of Agric.,*
    2019 WL 2394256 (D.S.D. June 6, 2019) ................................................. 9

*Garland v. Aleman Gonzalez,*
    596 U.S. 543 (2022) ................................................................................... 28

*Gen. Motors Corp. v. Harry Brown's, LLC,*
    563 F.3d 312 (8th Cir. 2009) .............................................................. 8, 40

*Gill v. Whitford,*
    585 U.S. 48 (2018) ..................................................................................... 42

*Go Leasing, Inc. v. Nat'l Transp. Safety Bd.,*
    800 F.2d 1514 (9th Cir. 1986) ................................................................ 31

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ............................................................................ 23, 26

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ............................................................................ 18, 19

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ................................................................ 30, 31, 36, 37

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ....................................................................... 10

*Hussen v. Noem*,
  No. 26-CV-324 (ECT/ECW), 2026 WL 657936 (D. Minn. Mar. 9, 2026) ............ 15, 41

*ICC v. Bhd. of Locomotive Eng'rs*,
  482 U.S. 270 (1987) ................................................................ 30, 31, 32

*Iowa League of Cities v. EPA*,
  711 F.3d 844 (8th Cir. 2013) ................................................................ 33

*JGE ex rel. Tasso v. United States*,
  772 F. App'x 608 (10th Cir. 2019) ............................................................ 30

*Laird v. Tatum*,
  408 U.S. 1 (1972) ...................................................................... 11, 21

*Libby Welding Co. v. United States*,
  444 F. Supp. 987 (D.D.C. 1977), *aff'd*, 595 F.2d 887 (D.C. Cir. 1979) ...................... 39

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ........................................................................ 30

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ........................................................................ 15

*Lujan v. Def. of Wildlife*,
  504 U.S. 555 (1992) .................................................................. 10, 12, 13, 27

*Mennonite Church USA v. DHS*,
  778 F. Supp. 3d 1 (D.D.C. Apr. 11, 2025) .......................................... 8, 23, 38

*Miller v. Honkamp Krueger Fin. Servs., Inc.*,
  9 F.4th 1011 (8th Cir. 2021) ................................................................ 40

*Minn. Bankers Ass'n v. Fed. Deposit Ins. Corp.*,
  152 F.4th 893 (8th Cir. 2025) ................................................................ 33

*Minnesota v. United States Dep't of Agriculture*,
    No. 25-CV-4767 (LMP/JFD), 2026 WL 125180 (D. Minn. Jan. 16, 2026).................. 18

*Missouri v. Biden*,
    52 F.4th 362 (8th Cir. 2022) ........................................................................................ 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ....................................................................................................... 37

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ......................................................................................... 11, 21, 23

*N.S. v. Dixon*,
    141 F.4th 279 (D.C. Cir. 2025) ................................................................................... 29

*New England Synod v. DHS*, 25-cv-40102-FDS,
    2026 WL 412329 (D. Mass. Feb. 13, 2026) ...................................................... 8, 29, 34

*Nken v. Holder*,
    556 U.S. 418 (2009) ..................................................................................................... 41

*Noem v. Vasquez Perdomo*,
    146 S. Ct. 1 (2025) ....................................................................................................... 14

*Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
    496 F. Supp. 3d 31 (D.D.C. 2020) ................................................................................ 9

*Packard Elevator v. ICC*,
    782 F.2d 112 (8th Cir. 1986) ...................................................................................... 40

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976) ..................................................................................................... 25

*Philadelphia Yearly Meeting of Religious Society of Friends v. DHS*,
    767 F. Supp. 3d 293 (D. Md. February 24, 2025) ................................................ 7, 8, 28

*Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*,
    324 F.3d 726 (D.C. Cir. 2003) ............................................................................... 33, 36

*Saline Parents v. Garland*,
    88 F.4th 298 (D.C. Cir. 2023), *cert. denied*, 145 S. Ct. 144 (2024) ...................... 11, 12

*Saline Parents v. Garland,*
     630 F. Supp. 3d 201 (D.D.C. 2022) ............................................................... 12

*Sampson v. Murray,*
     415 U.S. 61 (1974) ........................................................................................ 42

*Schmidt v. Lessard,*
     414 U.S. 473 (1974) ...................................................................................... 43

*Sinclair Wyo. Refin. Co. v. U.S. Env't Prot. Agency,*
     72 F.4th 1137 (10th Cir. 2023) ............................................................... 33, 36

*St. Louis Effort for AIDS v. Huff,*
     782 F.3d 1016 (8th Cir. 2015) ...................................................................... 42

*Starbucks Corp. v. McKinney,*
     602 U.S. 339 (2024) ...................................................................................... 42

*Tincher v. Noem,*
     164 F.4th 1097 (8th Cir. 2026) ..................................................................... 42

*Trump v. CASA, Inc.,*
     606 U.S. 831 (2025) ................................................................................. 42, 43

*United Presbyterian Church in the U.S.A. v. Reagan,*
     738 F.2d 1375 (D.C. Cir. 1984) ............................................................... 11, 12

*United States v. Texas,*
     599 U.S. 670 (2023) ................................................................................*passim*

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
     578 U.S. 590 (2016) ...................................................................................... 35

*Watkins Inc. v. Lewis,*
     346 F.3d 841 (8th Cir. 2003) ........................................................................ 40

*Winter v. Nat. Res. Def. Council, Inc.,*
     555 U.S. 7 (2008) ................................................................................. 8, 39, 41

## Statutes

5 U.S.C. § 551 ........................................................................................................ 32

5 U.S.C. § 701 ..................................................................................29, 30, 33

5 U.S.C. § 704 ...............................................................................................32

5 U.S.C. § 705 ........................................................................9, 10, 42, 43

5 U.S.C. §§ 701-706 ........................................................................................1

8 U.S.C. § 1103 ...............................................................................................3

8 U.S.C. § 1226 ......................................................................................*passim*

8 U.S.C. § 1227 ...............................................................................................3

8 U.S.C. § 1231 ...............................................................................3, 28, 43

8 U.S.C. § 1252 ...............................................................27, 28, 41, 43

8 U.S.C. § 1357 .................................................................3, 4, 32, 35

8 U.S.C. §§ 1221-1231 .................................................................................28

**Rules**

Fed. R. Civ. P. 65.........................................................................................43

**Other Authorities**

*Denver Public Schools v. Noem*,
   No. 1:25-cv-00474-DDD-KAS (D. Colo. Feb. 12, 2025) ....................................*passim*

## INTRODUCTION

This case involves a challenge to a change in internal guidance provided by Defendant Department of Homeland Security (DHS) to its immigration enforcement officers. For decades, DHS has issued internal guidance to immigration enforcement officers governing the factors they should consider, and the approvals they should obtain, before conducting enforcement actions in certain locations. That guidance has often changed. In 2021, then-Secretary of Homeland Security Alejandro Mayorkas issued a guidance memorandum (Mayorkas Memorandum) that identified certain areas—including, as relevant here, schools—as protected areas, generally explained when immigration enforcement officers should pursue enforcement in those areas, noting that the exercise of judgment was required, and provided that prior authorization by a supervisory official was required unless exigent circumstances were present. In January 2025, then-acting Secretary of Homeland Security Benjamine Huffman issued new internal guidance (Huffman Memorandum) instructing immigration officers to exercise "discretion" and "common sense" when conducting immigration enforcement activities in or near schools and other protected locations. The Huffman Memorandum also authorized DHS's enforcement components to issue further guidance, which U.S. Immigration and Customs Enforcement (ICE) has done, directing supervisory officials to make case-by-case determinations about enforcement actions in or near protected areas.

Plaintiffs, two school districts and an education organization, have moved for preliminary emergency relief alleging that the Huffman Memorandum is arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (APA),

1

because it does not provide a reason for rescinding the Mayorkas Memorandum. In their Motion, Plaintiffs seek to vacate or enjoin the Huffman Memorandum immediately. But Plaintiffs have not met their heavy burden to obtain the disfavored injunctive relief they seek. They have not shown that their APA claim is likely to succeed. First, Plaintiffs have not demonstrated that they have standing to bring their claim—that they have suffered cognizable and concrete injuries of their own that are traceable to the 2025 guidance and that could be redressed by an order from this Court. Plaintiffs' standing is further undermined by the recent draw-down of Operation Metro Surge, which renders Plaintiffs' alleged injuries—all of which stem from chance encounters with federal immigration officials—all the more speculative.

Second, Plaintiffs' claim is not reviewable under the APA because the Huffman Memorandum does not constitute final agency action from which legal consequences flow, and the guidance the memorandum provides immigration enforcement officers in the field is committed to DHS's discretion by law.

Third, even if the Court were to reach the merits of Plaintiff's APA claim, DHS adequately explained its reasons for making modest changes to its internal guidance for determining when immigration officers can take enforcement action in or near protected areas. DHS's guidance memoranda are not arbitrary and capricious, as they are more than sufficient to meet the narrow and deferential standard to APA review. Accordingly, this Court should deny Plaintiffs' request for injunctive relief.

**BACKGROUND**

I.    **Statutory Background**

"The Government of the United States has broad, undoubted power over the subject of immigration." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Through the Immigration and Nationality Act (INA) and related statutes, Congress has established an "extensive and complex" framework for the "governance of immigration." *Id.* at 395. "A principal feature" of this congressionally established "removal system is the broad discretion exercised by immigration officials." *Id.* at 396.

Congress has charged the Secretary of Homeland Security with "administration and enforcement" of immigration laws. *See* 8 U.S.C. § 1103(a)(1). As relevant here, Congress has vested immigration officers with broad authority to arrest, detain, and remove individuals who are unlawfully present or otherwise removable and to conduct warrantless searches. *See id.* §§ 1226(a) (permitting arrest and detention upon a warrant issued by the Secretary); 1231(a)(1)(A), (2) (authorizing detention of individuals with final removal orders); *see also* §§ 1227(a) (grounds for deportability); 1357(a)(1) (listing powers that immigration officers may exercise, including interrogation without a warrant of "any alien or person believed to be an alien as to his right to be or to remain in the United States").

This authority is subject to only a few location-based rules. Congress has limited certain investigative activities at farms. *See id.* §1357(e) (prohibiting officers from entering a farm or other outdoor agricultural operation for investigative purposes "without the consent of the owner (or agent thereof) or a properly executed warrant"). And it has granted immigration officers expanded authority for investigations near the border. *See id.* §

1357(a)(3) (providing that within 25 miles of an international border, immigration officers may have access, without a warrant, to any "private lands, but not dwellings").  But Congress has not otherwise imposed any location-based restrictions—such as restrictions related to schools—on the general arrest and detention authority of immigration officers.

## II.    DHS's Internal Guidance

Since at least 1993, DHS or its predecessor, the Immigration and Naturalization Service, has permitted immigration enforcement activities in or near protected locations, including schools.  Those policies have included varying levels of supervisory approval or exigent circumstances. *See, e.g.*, Mem. from James A. Puleo, Acting Assoc. Comm'r, Immigr. & Naturalization Serv., "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies" (May 17, 1993) (Puleo Memorandum) (Pls.' Ex. 1), ECF No. 28-1; Mem. from John Morton, Director, ICE, "Enforcement Actions at or Focused on Sensitive Locations" (Oct. 24, 2011) (Morton Memorandum) (Pls.' Ex. 3), ECF No. 28-3. As Director Morton explained, the agency's guidance was "not intended to categorically prohibit lawful enforcement operations" but rather is "meant to ensure that ICE officers and agents exercise sound judgment when enforcing federal law at or focused on sensitive locations[,]" particularly when a situation arises that does not permit prior approval. Morton Memorandum at 2; *see also* Mem. from David V. Aguilar, Deputy Comm'r, U.S. Customs & Border Prot., "U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations" (Jan. 18, 2013) at 1-2 (Pls.' Ex. 4), ECF No. 28-4 ("[w]hen situations arise" that do not permit "prior written approval, Agents and Officers are expected to exercise sound judgment and common sense"); Puleo

Memorandum at 3 ("officers are expected to exercise good judgement concerning the appropriate action to take" when exigent circumstances arise that do not permit prior approval).

In October 2021, the then-Secretary of Homeland Security issued updated guidance regarding enforcement activities in or near protected locations. Mem. from Alejandro Mayorkas, Sec'y of Homeland Sec., "Guidelines for Enforcement Actions in or Near Protected Areas" (Oct. 27, 2021) (Mayorkas Memorandum) (Pls.' Ex. 5), ECF No. 28-5. The Mayorkas Memorandum did *not* prohibit, but instead discouraged, enforcement actions in or near schools, and it provided no guarantee to school administrators that enforcement actions would not occur in or near schools. *Id.* at 3. Rather, it recognized that there were many circumstances "under which an enforcement action" in or near a protected location "needs to be taken[,]" including "exigent circumstances[.]" *Id.* at 3-4. Absent exigent circumstances, immigration officers could "seek prior approval from their Agency's headquarters, or as" agency heads "otherwise delegate," before conducting an enforcement action in or near a protected location. *Id.* at 4. The Mayorkas Memorandum offered a non-exhaustive list of circumstances that would justify an enforcement action in or near a protected location, but emphasized that the list included "only examples," was "not complete," and that "the exercise of judgment is required." *Id.* The exercise of judgment is also required when determining what constitutes a protected area and what constitutes "near" for purposes of an enforcement action. *Id.* at 3.

The Mayorkas Memorandum made clear that "[t]his guidance does not limit an agency's or employee's statutory authority . . . ." *Id.* at 4. It also clarified that the guidance

"is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law . . . ." *Id.* at 5.

On January 20, 2025, then-Acting Secretary of Homeland Security Huffman issued new guidance on enforcement actions in or near protected locations, superseding the Mayorkas Memorandum. Mem. from Benjamine C. Huffman, Acting Sec'y, ICE, "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025) (Huffman Memorandum) (Pls.' Ex. 6), ECF No. 28-6. The Huffman Memorandum eschewed default or bright-line rules, observing that officers frequently exercise discretion "to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location." *Id.* It directed that "[g]oing forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense" when considering enforcement actions in or near protected locations. *Id.* While the Huffman Memorandum stated that "[i]t is not necessary" for DHS "to create bright line rules regarding where our immigration laws are permitted to be enforced," it acknowledged that component heads "may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion." *Id.*

Then-acting ICE Director Vitello subsequently issued further guidance. Mem. from Caleb Vitello, Acting Director, ICE, "Common Sense Enforcement Actions in or Near Protected Areas" (Jan. 31, 2025) (Vitello Memorandum) (Pls.' Ex. 8), ECF No. 28-8. The Vitello Memorandum reiterated that ICE officers should exercise discretion and directed supervisory oversight over enforcement actions in or near protected locations by charging ICE Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge

(ASACs) "with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area." *Id.* at 2. Such supervisory ICE officials "may provide authorization for such actions either verbally or in writing." *Id.*

In sum, the Huffman Memo and Vitello Memo (the "2025 Guidance") indicated that officers should continue to use discretion and common sense in deciding where to conduct enforcement actions (including schools) and charged supervisors (AFODs and ASACs) with the responsibility to make case-by-case determinations about ICE enforcement actions. Pls.' Exs. 5 and 8.

## III.    Related Lawsuits

The 2025 Guidance has been challenged in at least four other lawsuits. Only one case involves a challenge relating to schools. In that case, *Denver Public Schools v. Noem*, No. 1:25-cv-00474-DDD-KAS (D. Colo. Feb. 12, 2025), the Denver Public School system filed a lawsuit alleging the Huffman Memorandum violated the APA and moved for preliminary relief. The court denied the motion for lack of standing. *See id.*, Transcript of Hearing on TRO at 51-57 (attached as Exhibit 1); *id.*, Minute Entry, ECF No. 37 (D. Colo. Mar. 7, 2025) (denying motion for a temporary restraining order and preliminary injunction for the reasons stated on the record).

In *Philadelphia Yearly Meeting of Religious Society of Friends v. DHS*, 767 F. Supp. 3d 293, 320 (D. Md. February 24, 2025), a court granted part of a requested injunction regarding religious locations, but refused to enjoin "DHS's ability to engage in arrests

pursuant to an administrative warrant." The government appealed the injunction to the Fourth Circuit. *See Philadelphia Yearly Meeting*, No. 25-1512 (4th Cir. May 6, 2025).

In *Mennonite Church USA v. DHS*, also involving religious organizations, the court denied plaintiffs' motion for a preliminary injunction for lack of standing. 778 F. Supp. 3d 1, 13 (D.D.C. Apr. 11, 2025). The court's denial of a preliminary injunction is on appeal before the D.C. Circuit. *Mennonite Church USA*, No. 25-5209 (D.C. Cir. June 5, 2025).

In *New England Synod v. DHS*, 2026 WL 412329, at *1 (D. Mass. Feb. 13, 2026), the court granted in part and denied in part plaintiffs' motion for a stay or, in the alternative, a preliminary injunction. *Id*. But the Court also concluded that the 2025 Guidance was not final agency action subject to review under the APA, denying the plaintiffs' request for injunctive relief as to the APA claims. *Id.* at *28. Regarding plaintiffs' religious freedom claims, the Court entered an injunction benefiting only a subset of plaintiffs with standing. *Id.* at *31-32.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "The party seeking a preliminary injunction bears the burden of establishing the necessity of this equitable remedy." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009). When considering a motion for preliminary injunction, courts weigh four factors: "(1) the threat of irreparable harm to the moving party; (2) the weight of this harm as compared to any injury an injunction would inflict on other interested parties; (3) the probability that

the moving party will succeed on the merits; and (4) the public interest." *Id.* (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).

The "burden on a movant to demonstrate that a preliminary injunction is warranted is heavier when, as here, granting the preliminary injunction will in effect give the movant substantially the relief it would obtain after a trial on the merits." *Flandreau Santee Sioux Tribe v. U.S. Dep't of Agric.*, 2019 WL 2394256, at *2 (D.S.D. June 6, 2019) (citation omitted). Disfavored injunctions alter the status quo or grant all the relief that the movant would win at trial. *See Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012). Here, Plaintiffs face this heavier burden because they seek a disfavored injunction: they seek to alter the status quo and receive all the relief they could obtain at trial, *i.e.*, preventing DHS from implementing its 2025 Guidance.

"The standard of review for relief under 5 U.S.C. § 705 is the same as the standard of review for preliminary injunctions." *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 45 (D.D.C. 2020); *see also B & D Land & Livestock Co. v. Conner,* 534 F. Supp. 2d 891, 905 (N.D. Iowa 2008).

## ARGUMENT

## I.    Plaintiffs Have Not Made a Clear and Unequivocal Showing That They Are Likely to Succeed on Their Claims.

Plaintiffs have not met their heavy burden to show a likelihood of success on their APA claims.

### A.    Plaintiffs lack standing.

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).

As the parties invoking federal jurisdiction, Plaintiffs bear the burden of establishing the three elements that constitute the "irreducible constitutional minimum of standing,"— namely that they have (1) suffered an "injury in fact"—an invasion of a legally protected interest which is "concrete and particularized," "actual or imminent" and not "conjectural" or "hypothetical" that is (2) "fairly traceable" to the challenged conduct of the defendant, and will (3) "likely" be redressed by a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992).

All three Plaintiffs bring this lawsuit on behalf of themselves; Education Minnesota ("EdMN") also brings suit on its members' behalf. *See* Mem. in Supp. of Pls.' Mot. for a Stay Under 5 U.S.C. § 705 or, in the Alternative, a Prelim. Inj., Pls.' Mem. at 12, ECF No. 27. Organizations have standing to sue on their own behalf if they satisfy the three elements of standing that apply to individuals. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024). Organizations have standing to sue on their members' behalf when their members "would otherwise have standing to sue in their own right" and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs "must make a 'clear showing'" that they are "'likely' to establish each element of

standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation omitted). Plaintiffs have not made that clear showing.

### 1. Plaintiffs have not clearly shown cognizable injuries.

Plaintiffs claim that the 2025 Guidance is arbitrary and capricious agency action because DHS did not provide an "adequate explanation" for the new guidance and for the change, "offered pretextual reasons," and did not consider reliance interests. Compl. ¶ 90. But Plaintiffs fail to show that they have standing to assert these claims under the law that applies to challenges to federal immigration enforcement guidance and under general standing principles.

It is well-settled that a cognizable injury cannot arise merely from the knowledge that the Government is engaged in certain activities. *Saline Parents v. Garland*, 88 F.4th 298, 304 (D.C. Cir. 2023) (citing *Laird v. Tatum*, 408 U.S. 1, 11 (1972)). There must be "some concrete harm (past or immediately threatened) apart from the 'chill' itself" that arises from an "'exercise of governmental power'" that is "regulatory, proscriptive, or compulsory in nature[.]" *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) (quoting *Laird*, 408 U.S. at 11). And the "complainant" must be either "presently or prospectively subject to the regulations, proscriptions, or compulsions" at issue. *Laird*, 408 U.S. at 11. In other words, the challenged Government action must directly regulate or constrain the party challenging the exercise of governmental power by issuing a "command[] or prohibition[] to the[] [P]laintiffs" or setting forth "standards governing their conduct." *United Presbyterian Church*, 738 F.2d

at 1378; *see also Clapper*, 568 U.S. at 419 (recognizing that past cases do not "suggest[] that plaintiffs can establish standing" based on the alleged chilling effect of a policy that "does not regulate, constrain, or compel any action on [the plaintiffs'] part").

The 2025 Guidance issues no such command or prohibition. Nor does it set forth standards governing Plaintiffs' conduct. Instead, the memoranda instruct *immigration enforcement officers* to exercise their discretion, use common sense, and consult certain supervisors when contemplating enforcement actions in or near protected locations. Because the 2025 Guidance does not directly "regulate, constrain, or compel" Plaintiffs or their members, any harms stemming from their fear that immigration enforcement activity might occur in or near their schools sometime in the future are not cognizable. *Clapper*, 568 U.S. at 419; *Lujan*, 504 U.S. at 562 (standing is "substantially more difficult" to establish when the plaintiff is not the "object" of the challenged government action); *see also Saline Parents v. Garland*, 630 F. Supp. 3d 201, 206-07 (D.D.C. 2022) (Attorney General memorandum instructing FBI and U.S. Attorneys to discuss strategies for assessing threats to school personnel did not "create an imminent threat of future legal actions against" the plaintiffs because the memorandum "cannot be considered [to] arguably proscribe" plaintiffs' conduct given that it did not "require that any particular action be taken"), *aff'd*, 88 F.4th 298 (D.C. Cir. 2023).

Moreover, the 2025 Guidance "does not *direct*" immigration enforcement officers to take actions in or near protected locations, it "merely *authorizes* them" to do so. *United Presbyterian Church*, 738 F.2d at 1380. Because the 2025 Guidance "*authorizes*—but does not *mandate or direct*—" the immigration enforcement actions Plaintiffs and their

members fear, Plaintiffs' "allegations are necessarily conjectural." *Clapper*, 568 U.S. at 412. "Simply put, [Plaintiffs] can only speculate as to how" immigration enforcement officers "will exercise their discretion" and common sense in determining whether to carry out enforcement operations in or near their schools. *Id.* Such speculation is insufficient to establish a cognizable injury. *Id.*

Plaintiffs' statement that immigration enforcement activities are occurring in their communities, including recently at or near a school, *see* Pls.' Mem. at 13, does not convert these alleged past harms into "actual or imminent," *Lujan*, 504 U.S. at 560-61, injuries sufficient to support standing. Moreover, the instances cited by the declarants, even if assumed accurate and viewed against the backdrop of increased immigration enforcement activity in Plaintiffs' communities, fail to establish standing because Plaintiffs do not assert that they were the subject of those actions. *See, e.g., Hippocratic Med.*, 602 U.S. at 395 (an organization may show standing when the defendant's wrongful conduct has "directly affected and interfered" with the organization's core functions). Nor do they show that their alleged injuries are likely to reoccur.

Plaintiffs' fears of immigration enforcement at schools are all the more speculative in light of the conclusion of Operation Metro Surge. Here, Plaintiffs raise claims for injunctive relief based on Defendants' alleged conduct during Operation Metro Surge. *See* Compl. ¶8 ("In recent weeks, the administration has launched 'Operation Metro Surge' to accelerate its immigration enforcement efforts in the Minneapolis-St. Paul metropolitan area . . . which has resulted in federal agents becoming an increasingly common presence at or near schools and school bus stops.); *id.* ¶9 (alleging "significant reductions in

attendance rates since the onset of 'Operation Metro Surge'"); *id.* ¶51 ("DHS agents have conducted numerous enforcement operations at or near other Minnesota schools" as "part of the surge"). Yet Operation Metro Surge has now concluded. *See* Second Declaration of David Easterwood ¶¶5, 10 ("Operation Metro Surge was an exclusively federal operation" that has reached its "conclusion") (Second Easterwood Declaration) (attached as Exhibit 2). More importantly, the vast majority of DHS personnel who were surged to Minnesota as part of Operation Metro Surge have left. *See* Declaration of Marty Raybon Sr. ¶¶7-10 (CBP demobilized approximately 1,029 employees assigned to Operation Metro Surge throughout February 2026) (attached as Exhibit 3); Second Easterwood Decl. ¶¶8-9 (while approximately 3,000 ICE officers and agents were detailed to the St. Paul Field Office as part of Operation Metro Surge, approximately 482 remain). The detailed ICE officers and agents who remain are focused on arrest and removal of incarcerated individuals and criminal investigations of fraud, money laundering, and public safety priorities. Second Easterwood Decl. ¶¶10-11. That is quite different from the type of at-large arrests in the Twin Cities metro area that were a focus of Operation Metro Surge and the basis for this lawsuit.

Standing "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *See Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) (mem.) (Kavanaugh, J. concurring) ("[P]laintiffs have no good basis to believe that law enforcement will unlawfully stop them in the future based on the prohibited factors—and certainly no good basis for believing that any stop of the plaintiffs is imminent. Therefore, they lack Article III standing[.]"). Here, in light of the changed circumstances, Plaintiffs cannot establish a

"real and immediate threat" of future harm. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). Allegations of past misconduct do not establish that Plaintiffs themselves are sufficiently likely to "again be wronged in a similar way." *Id.* at 111; *see Hussen v. Noem*, 2026 WL 657936, at *40 (D. Minn. Mar. 9, 2026) (concluding Plaintiffs lacked standing because the record does not show "a significant probability that Defendants will stop or arrest" plaintiffs "in the imminent future").

> ### a. Any injury to Plaintiffs from the change in internal immigration enforcement guidance is not legally cognizable.

Plaintiffs allege that they have been injured by DHS's change in its immigration enforcement guidance. But Plaintiffs lack legally cognizable injuries that allow them to challenge such guidance.

In *United States v. Texas*, 599 U.S. 670 (2023), the Supreme Court considered claims brought by states seeking "to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id.* at 674. The Court observed that it had "long held 'that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'" *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). It held that this principle extends more broadly to bar "challenges to the Executive Branch's exercise of enforcement discretion over whether to arrest or prosecute." *Id.* at 677. It concluded that this principle bars states from establishing standing to challenge federal immigration enforcement policies on the ground that they were adversely affected by those policies. *See id.* at 674.

First, the Court explained that the Executive Branch has long had discretion as to how to enforce the laws, particularly in the area of immigration. It stated: "[T]he Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *Id*. at 678 (citation omitted). "That principle of enforcement discretion over arrests and prosecutions extends to the immigration context, where the Court has stressed that the Executive's enforcement discretion implicates not only normal domestic law enforcement priorities but also foreign-policy objectives." *Id*. at 679 (citation omitted).

Second, the Court explained that because the Executive Branch cannot "arrest and prosecute every violator of every law," it "must balance many factors when devising arrest and prosecution policies." *Id*. at 680; *see also id*. (recognizing the longstanding history of federal government "prioritization in making immigration arrests"). The Court explained that this "balancing process in turn leaves courts without meaningful standards for assessing those policies." *Id.*

The Court concluded that "federal courts lack Article III jurisdiction over this suit," and clarified that irrespective of whether the states' claims had merit, the states lacked standing to bring claims challenging federal immigration enforcement policies. *Id*. at 685 ("We take no position on whether the Executive Branch here is complying with its legal obligations under" the relevant statutes). Thus, even if the states had asserted meritorious claims, they lacked a cognizable injury, which requires more than "an asserted right to have the Government act in accordance with law." *Hippocratic Med.*, 602 U.S. at 381 (citation omitted).

The Court's decision in *Texas* shows that Plaintiffs lack standing to challenge DHS's 2025 Guidance. *Texas* establishes that parties challenging the downstream effects of the government's immigration enforcement policies—as Plaintiffs do here—lack a cognizable Article III injury. The Court's logic in *Texas* applied to challenges to federal policies that involve discretion in prioritizing immigration enforcement. Here, too, the 2025 Guidance advises how the Executive Branch should exercise its authority and discretion in immigration enforcement. Plaintiffs' APA claim would have this Court examine the Executive Branch's basis for altering immigration enforcement discretion. But Plaintiffs, like the states in the *Texas* case, lack standing to challenge that guidance.

**b.      Plaintiffs' injuries are not otherwise cognizable.**

Even if the APA claims were not barred by the *Texas* decision, Plaintiffs have failed to show cognizable injuries to themselves under traditional injury standards.

**i.      Plaintiffs have not demonstrated that the 2025 Guidance shows that DHS has directly interfered with Plaintiffs.**

Plaintiffs, all organizations, must satisfy the standards for organizational injuries set forth in *Hippocratic Medicine*, 602 U.S. at 393-96. There, the Supreme Court clarified that it is "incorrect" that standing exists when "an organization diverts its resources in response to a defendant's actions." *Id*. at 395. After all, numerous federal decisions or policies affect school district resources. *Cf. Texas*, 599 U.S. at 680 n.3 (observing that while "federal policies frequently generate indirect effects on state revenues or state spending," such an "attenuated" effect is not enough to show standing)

Plaintiffs nonetheless assert that now-rejected standard, arguing that they have suffered an injury because they have diverted resources in response to the 2025 Guidance. Pls.' Mem. at 17, 29. They cite to *Minnesota v. USDA,* 2026 WL 125180, at *17 (D. Minn. Jan. 16, 2026) for the proposition that a state's "need to spend significant money and divert other tangible and intangible resources" can be irreparable harm, Pls.' Mem. at 27. But there, as this Court knows, the plaintiffs were required to comply with a new federal regulation regarding recertifying SNAP recipients and had to divert resources to fund their compliance obligations. *See Minnesota*, 2026 WL 125180, at *17. Here, the 2025 Guidance requires no such diversion and does not regulate the Plaintiffs in any way. Plaintiffs thus cannot show standing on this theory.

Plaintiffs' alleged pocketbook injuries fare no better. Similar to the diversion of resources theory, Plaintiffs point to reduced school attendance that results in mandatory funding cuts for their districts. Pls.' Mem. at 14. But they cannot show that the 2025 Guidance caused the reduction in attendance or required the schools to take steps that resulted in reduced attendance. The causal chain is simply too attenuated for the decrease in funding to be a cognizable injury here.

Rather, an organization may show standing when the defendant's wrongful conduct has "directly affected and interfered" with the organization's core functions. *Hippocratic Med.*, 602 U.S. at 395 (discussing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)). In *Havens*, the Court had concluded that the plaintiff organization, a housing counseling service, had shown it was directly injured by the wrongful actions of the defendant, an apartment complex owner. *See* 455 U.S. at 379. The defendant had "provided [the

plaintiff's] black employees false information about apartment availability," and those "actions directly affected and interfered with [the plaintiff's] core business activities." *Hippocratic Med.*, 602 U.S. at 395. The Court in *Hippocratic Medicine* thus approved this theory—that an organization can show standing based on the defendant's *direct* interference with the plaintiff. But the Court also cautioned that it has "been careful not to extend the *Havens* ruling beyond its context." *Id.* at 396.

Under this standard, Plaintiffs have not shown that DHS, through its 2025 Guidance, has directly interfered with Plaintiffs and caused them a cognizable injury. In particular, Duluth Public Schools and EdMN have shown no actual direct interference in their activities by DHS. The Superintendent of Duluth Public Schools in his declaration pointed to one instance in December 2025 where an "ICE vehicle was observed near one of our high schools for approximately an hour." Magas Decl. ¶6, Pls.' Ex. 48. It is unclear how "near" to the school the vehicle was as no details were provided. EdMN has not experienced any direct interference by DHS. It relies instead on the alleged harm of diverting resources to address their members' immigration enforcement concerns. Even Fridley Public Schools points to only a handful of instances since the 2025 Guidance was adopted where DHS officers were operating on or "near" school property—and all of those instances allegedly occurred in January and February 2026 during Operation Metro Surge, which has since concluded. Pls.' Mem. at 12. And as noted above, the plaintiff school districts' claims of funding reductions are too attenuated to show the direct interference needed for a cognizable injury. *See Hippocratic Med.*, 602 U.S. at 395.

Plaintiffs instead largely rely on a theory of *indirect* interference by DHS, pointing to the impact on Plaintiffs of concerns of students and others about potential DHS immigration enforcement at Plaintiffs' schools. They argue they have suffered a cognizable harm from the chilling effect that immigration enforcement may have had on student attendance. Pls.' Mem. at 10. But such an indirect effect does not show the kind of *direct* interference and effect that the Court endorsed in *Hippocratic Medicine*.

### ii. Plaintiffs have not shown concrete, particularized, and certainly impending injuries to themselves based on their students' and members' concerns about potential enforcement.

Even if Plaintiffs could rely on this theory that DHS's 2025 Guidance has harmed Plaintiffs through its impact on students, Plaintiffs still cannot meet their burden to show concrete injuries to themselves. "When a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed to establish standing." *Texas*, 599 U.S. at 678 (citation omitted). The plaintiff must show a "future harm" that is "certainly impending." *Clapper*, 568 U.S. at 416. That standard cannot be met by the mere fact that government enforcement has been authorized. In *Clapper*, the plaintiffs claimed that the government's foreign surveillance activities injured them by interfering with their foreign contacts. But the Court concluded that their concerns about enforcement were "necessarily conjectural" and insufficient, as their speculation of harm relied on a provision that "*authorizes*—but does not *mandate* or *direct*—the surveillance that respondents fear." *Id*. at 412.

The "certainly impending" standard also cannot be satisfied by evidence that the threat of potential enforcement has caused apprehensiveness or a chill. A "chill" based on "apprehensiveness" that the government may in the future act wrongfully "in some way that would cause direct harm" to the plaintiff is not enough to show a "threat of specific future harm[.]" *Laird*, 408 U.S. at 13-14. In *Laird*, the plaintiffs brought a First Amendment challenge to Army surveillance of civilian political activity. *See id.* at 3. But the Court concluded that the plaintiffs had not shown a cognizable injury because they had not shown they had sustained, or were "immediately in danger of sustaining, a direct injury as the result of that action." *Id*. at 13. "[S]uch a fear is insufficient to create standing." *Clapper*, 568 U.S. at 417.

Nor can a party generally show standing from the threat of enforcement of a government policy that is directed at others. *See id.* at 419 (recognizing that past cases do not "suggest[] that plaintiffs can establish standing" based on the alleged chilling effect of a policy that "does not regulate, constrain, or compel any action on [the plaintiffs'] part").

Finally, a party generally cannot show that a future injury is "certainly impending" by pointing to "costly and burdensome measures" it has already taken to prepare for a risk. *See id.* at 415-16 (finding "unavailing" the contention that the plaintiffs took measures and incurred costs "as a reasonable reaction to a risk of harm").

Under these standards, Plaintiffs have not shown that concerns about potential immigration enforcement under the 2025 Guidance show an injury to Plaintiffs that is "concrete, particularized, and actual or imminent." *Murthy*, 603 U.S. at 57 (citation omitted). They cannot show a certainly impending injury by pointing to the mere issuance

of internal guidance about immigration enforcement, or subjective concerns related to the potential for immigration enforcement at a school, or measures Plaintiffs have taken to prepare for potential immigration enforcement. Duluth admits it has "experienced less ICE activity," Pls.' Mem. at 17, and alleges one student unenrollment so far. Pls.' Mem. at 20. EdMN has members statewide, but its declarations mainly focus on alleged injuries to members in and around the Twin Cities. *See* Pls.' Exs. 13, 17, 25, 26, 35, 52. And like Duluth and EdMN, Fridley's alleged resource depletions have occurred since Operation Metro Surge. Pls.' Mem. at 12. Accordingly, Plaintiffs, as organizations, have not shown sufficiently direct and cognizable injuries to themselves from the 2025 Guidance.

### 2. Plaintiffs have not clearly shown injuries caused by and traceable to the 2025 Guidance.

Even if Plaintiffs could show cognizable injuries for their APA claims, they have not shown that their injuries are caused by and traceable to the 2025 Guidance.

To establish standing, a plaintiff must show that it "has suffered an injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct . . . ." *Haaland v. Brackeen*, 599 U.S. 255, 291-92 (2023) (citation omitted). To meet this standard, the plaintiff must show that its injury is actually caused by the specific wrongful conduct that it challenges. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (requiring an evidentiary showing of "*de facto* causality").

Here, Plaintiffs' claimed injuries arise from the alleged concerns experienced by teachers, parents, and students confronted with the potential for immigration enforcement. "[W]here a causal relation between injury and challenged action depends upon the decision

of an independent third party[,] . . . standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021) (citation omitted). And where, as here, the causal link depends specifically on the supposed subjective fears of third parties, the link is not sufficient. *See generally, Clapper*.

Under these standards, Plaintiffs have not shown that their injuries are caused by and traceable to DHS's adoption of internal guidance for immigration enforcement. The evidence does not establish that the 2025 Guidance—issued more than a year ago—is the cause of reduced attendance at Fridley and Duluth Public Schools. Rather, what Plaintiffs seem to really be challenging is Operation Metro Surge, as nearly all of the incidents referenced by the Minnesota-based plaintiffs occurred since the start of Operation Metro Surge in December 2025. *See, e.g.*, Exs. 47, 48, 22, 40 (Byron Decl. ¶29, "None of the attorneys . . . can recall *a single instance* of ICE agents at or near a school or bus stop *before Operation Metro Surge began* in December of 2025." (emphasis added)). But Plaintiffs have not clearly shown that the source of their alleged harms—here, Operation Metro Surge—is traceable to the 2025 Guidance. *See Murthy*, 603 U.S. at 68 n.8. For this reason, the courts in *Denver Schools* and *Mennonite Church* denied the plaintiffs' preliminary injunction motions. *See* Minute Entry, *Denver Public Schools*, ECF No. 37 (denying motion for a temporary restraining order and preliminary injunction for the reasons stated on the record); Hearing Tr. at 53 (holding alleged harms were not fairly traceable to the Huffman Memorandum "as opposed to broader concerns about increased immigration enforcement"); *Mennonite Church* at 13.

Even if Plaintiffs could show an injury based on the predictable actions of third parties, the causal link is too attenuated. Organizations and their members can be affected by all manner of federal decisions and policies. But they generally do not have standing to challenge decisions and policies of general applicability unless they can show that those federal decisions and policies directly affect them. "The causation requirement also rules out attenuated links," including "distant (even if predictable) ripple effects." *Hippocratic Med.*, 602 U.S. at 383. For example, in *Hippocratic Medicine*, the Court declined to recognize standing for the plaintiff-doctors to challenge drug approvals merely because "use of the drugs by others may cause more visits to doctors." *Id.* at 392. The Court reasoned that such an approach to standing would be "limitless" with "no principled way to cabin such a sweeping doctrinal change to doctors or other healthcare providers." *Id*. The Court observed that if it found standing in such a situation, teachers in border states would have standing to "sue to challenge allegedly lax immigration policies that lead to overcrowded classrooms." *Id*. That concern is heightened here given the modest changes the 2025 Guidance makes to the prior policies. And in *Missouri v. Biden*, 52 F.4th 362, 370 (8th Cir. 2022), the Eighth Circuit held that a coalition of states failed to establish traceability to challenge an executive directive to use certain climate-related cost estimates in agency rulemaking because those estimates were "only one of innumerable other factors" agencies would consider. As a result, the challenged policy would not clearly result in "regulations that Plaintiffs fear will harm them." *Id.* (citations omitted).

That same logic applies here. The 2025 Guidance provides generally applicable guidelines. To conclude that Plaintiffs' purported injuries are fairly traceable to the

memoranda, which do not regulate or otherwise constrain Plaintiffs' conduct, would confer standing on "virtually every citizen" to "challenge virtually every government action" that they disagree with. *Id.* The Supreme Court declined to go down that path in *Hippocratic Medicine*. *See id.* So too should this Court.

If anything, Plaintiffs' alleged harms appear to be traceable not to the Huffman Memorandum, but to policies instituted by the Plaintiffs themselves, such as online learning causing fewer students to appear in class, *see* Pls.' Mem. at 15, or by the State of Minnesota, which ties school funding to enrollment. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (concluding that fiscal injuries were self-inflicted "from decisions by their respective state legislatures").

### 3. Plaintiffs have not shown that the relief sought would redress their alleged injuries.

Even if Plaintiffs could demonstrate that their claimed injuries are cognizable and traceable to the 2025 Guidance, they have not shown that their "injury likely would be redressed by the requested judicial relief." *Hippocratic Med.*, 602 U.S. at 380. Plaintiffs claim that the 2025 Guidance has caused them injury because student attendance has declined, and they have had to divert resources to address their students' concerns about potential immigration enforcement. But Plaintiffs have not shown that an order from this Court enjoining and vacating the 2025 Guidance—thus returning DHS to the 2021 Guidance—would remedy Plaintiffs' attendance concerns and avoid the diversion of Plaintiffs' resources.

First, DHS's 2021 Guidance did not prohibit immigration enforcement actions in schools or at bus stops or even restrict such actions to exigent circumstances. Such actions were still permitted so long as higher-level approval was granted. The Vitello Memorandum similarly requires higher-level case-by-case determinations from supervisors prior to carrying out enforcement actions in or near protected locations. *See* Pls.' Ex. 8. Thus, even if Plaintiffs obtained the relief they seek and DHS followed the 2021 Guidance, that order would not mean that fewer or no immigration enforcement actions on school grounds could be authorized. *See Denver Schools*, Hearing Tr. at 54 (finding that plaintiffs' injuries are "based largely on broader immigration enforcement policy changes that wouldn't be affected by anything I do here today").

Second, Plaintiffs have not shown that the order they seek would in fact remedy their attendance and diverted-resource concerns. In particular, this Court's order would not control the actions of—let alone the subjective concerns of—third parties such as Plaintiffs' students and their parents. When a plaintiff suffers harm because of the impact of a defendant's allegedly wrongful conduct on third parties, it is harder for the plaintiff to show that a court order will redress the conduct. "[R]edressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Haaland*, 599 U.S. at 294 (citation omitted). When the injury involves the actions of third parties, an injunction may "not give [the plaintiff] legally enforceable protection" from the harm. *Id.* at 293. If redress of the injury would involve "choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot

presume either to control or to predict," the plaintiff must show that those choices by third parties "will be made in such a manner as to . . . permit redressability of injury." *Lujan*, 504 U.S. at 562. Under those circumstances, standing "is ordinarily substantially more difficult to establish." *Id.* (citation omitted).

Plaintiffs do not meet this heavier burden. It is speculative to assume that subjective concerns of teachers, parents, and students about future immigration enforcement based on their experiences during Operation Metro Surge would be assuaged by a court order requiring DHS to operate under the 2021 Guidance, which would still permit DHS enforcement action at schools. *See Denver Schools*, Hearing Tr. at 55-56 (concluding that plaintiffs' alleged injuries would not be redressed by enjoining the 2025 Guidance). Given these uncertainties, Plaintiffs have not shown that it is likely that the order they seek will in fact redress the injuries that they claim support standing.

In sum, Plaintiffs have not satisfied any of the three prongs of standing for their APA claim.

### B.    This Court lacks jurisdiction to issue the requested injunction.

Another impediment to Plaintiffs' claims is that a provision of the INA deprives the Court of jurisdiction to issue Plaintiffs' requested relief. Section 1252(f)(1) of Title 8 of the U.S. Code provides that, "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing this action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." 8 U.S.C. § 1252(f)(1). Part IV of the subchapter includes

27

Sections 1221-1231, provisions that "charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination and removal of aliens." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022).

In *Aleman Gonzales*, the Supreme Court interpreted Section 1252(f)(1) as applying broadly to immigration enforcement operations. The Court explained that the provision "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 550. Accordingly, if an order enjoins or restrains action that "in the Government's view" serves to "enforce, implement, or otherwise carry out" 8 U.S.C. §§ 1221-1231, it is impermissible—regardless of whether the court considers the Government to be carrying out those sections as "properly interpreted." *Id.* at 550-52 (emphasis omitted). Because Plaintiffs' requested injunction would restrict how the Government engages in immigration enforcement activity in or near schools, it restrains the Government "from actions that[,]" in the Government's view, "are allowed" by Sections 1221-1231, and it "interfere[s] with the Government's efforts to operate" those provisions. *Id.* at 551. Section 1252(f)(1) thus bars this Court from enjoining or restraining Defendants from engaging in immigration enforcement as authorized by Sections 1226 and 1231. *See Biden v. Texas*, 597 U.S. 785, 797 (2022) (holding that lower-court order enjoining DHS's Migrant Protection Protocols, a programmatic implementation of Section 1225(b)(2)(C), "violated" Section 1252(f)(1)); *see also Philadelphia Yearly*, 767 F. Supp. 3d at 337 ("Consistent with 8 U.S.C. § 1252(f)(1), this injunction does not enjoin or restrict

Defendants from conducting arrests in or near places of worship when authorized by an administrative or judicial warrant.); *New England Synod*, 2026 WL 412329, at *32 ("The preliminary injunction will also, as noted, exempt immigration-enforcement actions taken pursuant to an administrative warrant or judicial warrant."); *N.S. v. Dixon*, 141 F.4th 279 (D.C. Cir. 2025) (vacating district court order enjoining Marshals from arresting and detaining criminal defendants suspected of civil immigration violations).

**C.    Plaintiffs have not shown they are likely to succeed on their APA claims.**

Even if Plaintiffs had standing, they have not shown a clear right to relief on the APA claim, which asserts that DHS acted arbitrarily when it adopted its 2025 Guidance. The APA claim fails because: (1) DHS's internal guidance to its officers regarding its enforcement approach is committed to agency discretion by law, (2) the guidance is not a "final agency action," and (3) the guidance is not arbitrary and capricious.

**1.    Enforcement is committed to agency discretion by law.**

First, Plaintiffs' APA claim fails because it challenges a matter that is committed to agency discretion by law.

The APA bars judicial review of agency action to the extent that it "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agency action may be deemed committed to agency discretion "even where Congress has not affirmatively precluded review." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of

discretion"—where, effectively, "there is no law to apply"—the APA does not permit judicial review. *Id.* (citation omitted).

To determine if a matter is committed to agency discretion, courts review the statutory scheme to determine if it provides an adequate standard of review. *Id.* at 831. "Congress may limit an agency's exercise of enforcement power if it wishes," but only when Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under § 701(a)(2)." *Id.* at 833-34. Courts also may consider whether, as a matter of tradition, action is committed to agency discretion. *See id.* at 832 ("For good reasons, such a decision has traditionally been 'committed to agency discretion,' and we believe that the Congress enacting the APA did not intend to alter that tradition.").

Decisions are "general[ly] unsuitabl[e]" for judicial review when they require "a complicated balancing of a number of factors which are peculiarly within its expertise" or involve where best to spend "agency resources," including "whether the particular enforcement action requested best fits the agency's overall policies." *Id.* at 831. Decisions committed to agency discretion include, for example, an agency's decision not to institute enforcement proceedings, *id*. at 831-35; the allocation of lump-sum appropriations, *see Lincoln v. Vigil*, 508 U.S. 182, 192-95 (1993); and the refusal of an agency to grant reconsideration, *ICC v. Bhd. of Locomotive Eng'rs,* 482 U.S. 270, 282-83 (1987).

Enforcement decisions traditionally involve considerable agency discretion. *See, e.g.*, *supra* Part I.A.1.a (discussing *Texas*); *JGE ex rel. Tasso v. United States*, 772 F. App'x 608, 612 (10th Cir. 2019) ("law enforcement decisions surrounding the investigation and

prosecution of crimes . . . involve the exercise of discretion"); *Go Leasing, Inc. v. Nat'l Transp. Safety Bd.*, 800 F.2d 1514, 1523 (9th Cir. 1986) ("the Administrator need not promulgate rules constraining his discretion as to when to employ a particular statutory enforcement action"). Law enforcement guidance is generally committed to agency discretion because enforcement decisions inherently require a complicated balancing of factors to assess how the agency can best carry out its responsibility to enforce the law. *Cf. Heckler*, 470 U.S. at 831; *Texas*, 599 U.S. at 680 ("the Executive Branch must balance many factors when devising arrest and prosecution policies").

Finally, where "the type of agency decision in question has traditionally been committed to agency discretion," the action does not "become[] reviewable" just because "the agency gives a reviewable reason" for it (or fails to do so). *Locomotive Eng'rs*, 482 U.S. at 282-83 (cleaned up).

Under these standards, DHS's adoption of the 2025 Guidance, which provides internal guidance to immigration enforcement officers, is committed to agency discretion. The analysis begins with the statute. Congress through the INA and other statutes has granted immigration officers broad discretion in carrying out the immigration laws. *See Arizona*, 567 U.S. at 396 ("A principal feature of the" congressionally established "removal system is the broad discretion exercised by immigration officials.").

Plaintiffs do not show that immigration statutes limit DHS's discretion in carrying out its enforcement responsibilities. The Executive Branch's duty is to execute the laws; how it executes the laws is subject only to constitutional constraints. *Cunningham v. Neagle*, 135 U.S. 1, 64-65 (1890). The INA gives DHS broad authority to investigate and

make arrests, s*ee, e.g.*, 8 U.S.C. §§ 1226(a), 1357(a), evincing only limited intent to dictate agency discretion in carrying out enforcement operations. *See id.* For example, Congress limits when immigration officers may enter a farm for investigative purposes. *Id.* § 1357(e). But aside from the requirement to obtain warrants in certain circumstances, *see, e.g.*, *id.* §§ 1357(e), 1226(a), Congress has not placed other restrictions on DHS's ability to enter or approach specific locations, including schools, when conducting immigration operations. Because Congress has circumscribed the Executive Branch's discretion in limited ways as to where it can conduct enforcement actions or under what circumstances, Congress's failure to do so with respect to schools means that DHS's enforcement guidance in these areas is committed to agency discretion by law.

Because internal enforcement guidance is committed to agency discretion, Plaintiffs cannot challenge the procedural aspects of the 2025 Guidance. When Section 701(a)(2) precludes review of "agency action," it precludes review of an agency's "reasons" for the guidance or the perceived lack thereof. *Locomotive Eng'rs*, 482 U.S. at 282-83.

### 2.    The challenged action is not final agency action subject to APA review.

The APA claims fail for another reason: Plaintiffs have not shown that the 2025 Guidance was a reviewable final agency action that has led to legal consequences.

The APA limits review to final agency action. 5 U.S.C. § 704. The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). If the challenged agency action is not a final agency action, the Court lacks jurisdiction under the APA to review

the action. *Minn. Bankers Ass'n v. FDIC,* 152 F.4th 893, 897 (8th Cir. 2025) (finding guidance letter issued to financial institutions was not a final agency action subject to judicial review).

To be a final agency action, the action must satisfy two conditions. "[T]he action must mark the consummation of the agency's decision-making process," and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up); *see also Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2013) (analysis turns on "whether an agency announcement is binding on regulated entities or the agency").

Under this standard, it is not enough to show that "there may be practical consequences" flowing from agency action to establish that "legal consequences flow from the agency's conduct." *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003). Rather, to be reviewable, the agency action "must itself be the source of the parties' obligations, modifying the applicable legal landscape by interpreting the scope of their statutory rights or duties." *Sinclair Wyo. Refin. Co. v. EPA*, 72 F.4th 1137, 1143 (10th Cir. 2023) (cleaned up).

In litigation over guidance documents, "the finality inquiry is often framed as the question of whether the challenged agency action is best understood as a non-binding action, like a policy statement or interpretive rule, or a binding legislative rule." *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015); *see also Minn. Bankers*, 152 F.4th at 897. A policy statement "explains how the agency will . . . exercise its broad enforcement discretion . . . under some extant statute or rule," and an

interpretive rule is "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Id.* (citations omitted). By contrast, a legislative rule "modifies or adds to a legal norm based on the agency's own authority flowing from a congressional delegation to engage in supplementary lawmaking." *Id.* (cleaned up). "The most important factor in differentiating between binding and nonbinding actions is" whether the guidance carries "the force and effect of law." *Id.* at 716 (citation omitted).

Plaintiffs have not shown that the enforcement guidance they challenge is final agency action. They merely state—in a footnote and without elaboration—that the enforcement guidance is final agency action, citing the *Philadelphia Yearly* decision in the District of Maryland. Pls.' Memo at 22 n.4. More recently, a court in the district of Massachusetts disagreed with that conclusion and held that the 2025 Guidance is not final agency action. *See New England Synod*, 2026 WL 412329, at *25-28. This Court should follow the well-reasoned analysis in *New England Synod* for the reasons set therein and below.

The 2025 Guidance carries no binding, legal consequences for Plaintiffs. Rather, it is merely an internal advisement to DHS officers about officers' and agents' use of discretion and the requirements for supervisory approval for ICE enforcement actions in protected areas. *See* Pls.' Exs. 6 and 8. Even the prior 2021 Guidance—the internal guidance that Plaintiffs asks this Court to reinstitute—did not create any rights that conferred an enforceable benefit on any person. *See* Pls' Ex. 5 at 6. ("This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive

34

or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.").

The 2025 Guidance does not have the force and effect of law. DHS's actual immigration enforcement authority is derived from statute. *See* 8 U.S.C. § 1226; 8 U.S.C. § 1357. The 2025 Guidance does not modify the applicable legal regime by interpreting the scope of the parties' statutory rights or duties, as it offers no interpretations of statutes or regulations. *See* Pls.' Exs. 6 and 8. It does not require or prohibit enforcement actions in protected areas or otherwise determine the legal rights of, impose regulatory burdens on, or create affirmative legal benefits for Plaintiffs. Further, both Memos comprising the 2025 Guidance expressly disclaim that they create or revoke any binding or enforceable legal rights. *See* Pls.' Ex. 6 at 2; Pls.' Ex. 8 at 3.

The 2025 Guidance thus does not share the characteristics of agency actions that the Supreme Court has found to be final agency actions subject to APA review. The Court has found the "final agency action" requirement satisfied where an agency terminated a national program requiring certain non-Mexican nationals to be returned to Mexico to await the results of their removal proceedings and forbidding government staff from continuing the program, *see Biden*, 597 U.S. at 791, 793, 795, 807-09; where an agency made a definitive determination whether property contained "waters of the United States," which affected the property owner's liability for the disposal of pollutants and was binding for five years, *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 593, 598-600 (2016); and where an agency adopted regulatory requirements for actions that will affect endangered species, thus altering the "legal regime," *Bennett*, 520 U.S. at 158, 177-78. The

2025 Guidance has no similar legal consequences for any external parties. *Cf. Ass'n of Flight Attendants-CWA*, 785 F.3d at 712-13 ("internal guidance document issued to FAA aviation safety inspectors" "does not carry the 'force and effect of law'" and therefore "does not reflect final agency action"). Plaintiffs allege only practical, not legal, consequences flowing from the 2025 Guidance. *See* Pls.' Mem. at 12-20. But practical consequences are insufficient to show a final agency action. *See Reliable Automatic Sprinkler Co.*, 324 F.3d at 732.

Finally, the mere potential for later agency action is not final agency action. *See DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.,* 76 F.3d 1212, 1214-15 (D.C. Cir. 1996) (finding no final agency action where the action affected the plaintiff's legal rights only "on the contingency of future administrative action").

Because Plaintiffs cannot show that legal consequences directly flow from the 2025 Guidance, they cannot establish that 2025 Guidance is a final agency action, and this Court lacks jurisdiction over the APA claims. *See Sinclair*, 72 F.4th at 1139.

### 3. Plaintiffs have failed to show that the Huffman Memorandum is arbitrary and capricious.

Even if the Court were to reach the merits of Plaintiff's APA claims, they would fail.[1] DHS's decision to issue the Huffman Memo was not arbitrary or capricious. Indeed, it is unlikely there is any review in a change of enforcement guidance like the memos at issue in this case. *See Heckler*, 470 U.S. at 831 ("an agency's decision not to prosecute or

---

[1] Although Plaintiffs' complaint asserts that the Huffman Memorandum should have been issued pursuant to notice-and-comment rulemaking, they have not sought relief on that claim in their motion for a preliminary injunction or stay.

enforce" is "generally committed to an agency's absolute discretion"). Even if there is judicial review under the APA's arbitrary-and-capricious standard, it "is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That review is "narrow." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under this standard, a court "simply ensures that the agency has acted within a zone of reasonableness," and "may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423 (2021). When an agency changes a policy, it need not demonstrate "that the reasons for the new policy are better than the reasons for the old one," but only that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Here, DHS adequately explained its reasons for making modest changes in the internal guidance for determining when immigration officers can take enforcement action in or near protected areas. DHS recognized that "officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location." *See* Huffman Memorandum. DHS reiterated that "law enforcement officers should continue to use that discretion along with a healthy dose of common sense." *Id.* DHS determined, however, that it was not necessary "for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced" and authorized ICE and CBP to issue "further guidance to assist officers in exercising appropriate enforcement discretion." *Id.* To that end, ICE

37

issued follow-on guidance charging supervisors with the responsibility of determining whether enforcement actions should occur at sensitive locations. *See* Vitello Memorandum.

These memoranda are more than sufficient to explain the modest changes from the Mayorkas Memorandum. To recap, the Mayorkas Memorandum "creates no legally enforceable rights and confers only limited protections against immigration officers' exercise of discretion." *Mennonite Church*, 778 F. Supp. 3d at 12. Indeed, the Mayorkas Memorandum provides "no bright-line definition of what constitutes 'near'" a protected location and, like the Huffman Memorandum, directs officers to use the "exercise of judgment." *Id.* The Mayorkas Memorandum did not prohibit immigration enforcement at schools and further provided that immigration officers are authorized to enter schools and other protected places with "prior approval from their Agency's headquarters" or from a supervisor the agency may "otherwise delegate." *Id*. "That prior written approval requirement has changed only minimally under the Vitello guidance, which directs officers to seek prior verbal or written approval from Assistant Field Office Directors and Assistant Special Agents in Charge." *Id.* Accordingly, Plaintiffs' claim that DHS has departed from a longstanding policy of "avoiding immigration enforcement at sensitive locations" without a reasoned explanation does not withstand scrutiny. Pls' Motion at 22-24.

Plaintiffs also miss the mark in claiming that DHS should have accounted for "substantial reliance interests" based on the Mayorkas Memorandum. *Id.* at 24. Plaintiffs do not identify any decisions they made in reliance on the prior internal guidance. Accordingly, this case bears no resemblance to the reliance interests at issue in *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30-31 (2020). For one, the Court reviewed that

policy change only because "DACA is not simply a non-enforcement policy" but much more; the policies here, on the other hand, are exclusively enforcement guidance for law enforcement officers. *Id.* at 18. Moreover, that case challenged the termination of a program that provided immigration benefits to a specific group of individuals brought to the United States as children, and the Court recognized the longstanding reliance interests of those beneficiaries. *See id.* at 31 (stating that recipients had "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance" on DACA). Here, Plaintiffs do not have any comparable cognizable reliance interests in the way DHS chooses to authorize its officers to conduct immigration enforcement actions under the Mayorkas Memorandum as opposed to the Huffman Memorandum. To the extent Plaintiffs were under the misimpression that the Mayorkas Memorandum shielded them altogether from immigration enforcement at protected locations, any such reliance would be unreasonable and mistaken under a plain reading of the policy. *See Libby Welding Co. v. United States*, 444 F. Supp. 987, 992 (D.D.C. 1977) (stating that an agency need only consider and weigh a party's valid, reasonable reliance interests—not "unreasonable" ones).

## II. Plaintiffs Have Not Shown That They Will Suffer Irreparable Harm if the Relief They Seek Is Not Granted.

Plaintiffs have also not shown irreparable harm. "A plaintiff seeking a preliminary injunction must establish that . . . [it] is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20 (2008). A mere "possibility of irreparable harm" is insufficient. *Id.* at 22. The harm "must be both certain and great; it must be actual and

not theoretical." *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986). "Injunctive relief will 'not be granted against something merely feared as liable to occur at some indefinite time.'" *Id.* (citation omitted). "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *Miller v. Honkamp Krueger Fin. Servs., Inc.,* 9 F.4th 1011, 1015 n.3 (8th Cir. 2021) (internal quotation omitted).

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp.*, 563 F.3d at 319. A plaintiff must show more than a future risk of irreparable harm; "there must be a clear showing of immediate irreparable injury." *Berkley Risk Adm'rs Co. v. Accident Fund Holdings, Inc.*, No. 16-cv-2671, 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (citation modified). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

Plaintiffs have not shown that they will suffer irreparable harm if the Court does not grant the preliminary relief they seek. Plaintiffs argue that they face harm from the 2025 Guidance because it "makes it much 'more difficult' for Fridley and Duluth Schools 'to accomplish their primary mission[s]'"; teacher workloads have increased to accommodate online learning; schools lose money when students are absent for more than two weeks; and schools have spent money and time assuaging the concerns of students and staff members. Pls.' Mem. at 25-27 (alteration in original). EdMN claims harm to its business operations from its diversion of resources toward handling inquiries and concerns

related to immigration enforcement. Pls.' Mem. at 27. But the relief Plaintiffs seek—staying the 2025 Guidance and thus returning to the 2021 Guidance—would not enable Plaintiffs to provide those assurances, because the 2021 Guidance did not categorically prohibit enforcement actions at schools. Plaintiffs' argument that they will face harm from immigration enforcement only if DHS operates under the 2025 Guidance is thus too speculative to show irreparable harm.

Plaintiffs also cannot establish irreparable harm due to the conclusion of Operation Metro Surge.  As another judge of this Court recently concluded, the "significant reduction in the scope of Defendants' Minnesota-based operations" makes "it less likely that irreparable harm will occur absent an injunction." *Hussen*, 2026 WL 657936 at *1, 44-45.

## III.    Plaintiffs Have Not Shown That the Public Interest and Balance of Equities Support Granting the Relief.

The final two preliminary injunction factors, the public interest and the balance of the equities, "merge" when the Government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As discussed above, Plaintiffs cannot establish a cognizable injury sufficient to confer Article III standing, let alone the much higher standard of an irreparable injury required for the "extraordinary remedy" of a preliminary injunction.  *Winter*, 555 U.S. at 22. While Plaintiffs have alleged their students' concerns and their own, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (citation omitted). Courts may not "blithe[ly]" dismiss the public interest in the prompt removal of individuals who are subject to lawful removal. *Nken*, 556 U.S. at 436. Moreover, 8 U.S.C. § 1252(f)(1) reflects Congress's determination

that the public interest supports avoiding judicial interference with enforcement by immigration officers carrying out their arrest and removal functions. The order Plaintiffs seek would interfere with those enforcement functions.

## IV. Any Relief Granted Should be Narrowly Tailored and Limited to Named Parties with Standing

"A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Accordingly, "a preliminary injunction must be narrowly tailored to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th Cir. 2015) (cleaned up). As the Supreme Court reiterated in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), injunctions must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861. Applying these principles, the Eighth Circuit recently stayed an overbroad injunction prohibiting DHS's immigration enforcement activities because it was "too broad" and "too vague." *Tincher v. Noem*, 164 F.4th 1097, 1099 (8th Cir. 2026). Plaintiffs' proposed injunction suffers from the same flaws.

A Section 705 stay is subject to the same equitable limits as a preliminary injunction. Section 705 was designed "to reflect existing law . . . and not to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). The Supreme Court recently instructed that "[w]hen interpreting a statute that authorizes federal courts to grant" preliminary relief, courts "do not lightly assume that Congress has intended to depart from established principles" of equity. *Starbucks Corp. v. McKinney*, 602 U.S.

339, 346 (2024) (citation omitted). The plain language of Section 705 requires the Court to consider relief that merely "preserve[s] status or rights pending conclusion of the review proceedings" tailored "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. The statute directs courts to apply traditional equitable principles, which include tailoring relief to be no more intrusive than necessary to prevent irreparable harm to the parties. Thus, Section 705's text, precedent, and the applicability of the injunction standard confirm that Section 705 is constrained by the same traditional equitable principles as the Judiciary Act of 1789. *See CASA, Inc.*, 606 U.S. at 846. And just as those principles foreclose universal preliminary injunctions, they also foreclose universal relief under Section 705. *See id.* at 849-50. So does 8 U.S.C. § 1252(f), which bars lower courts from restraining the government from apprehending aliens as authorized by Sections 1226 and 1231 of Title 8 of the U.S. Code, whether through an injunction or a stay under Section 705.

Moreover, this Court's ability to order relief is cabined by the specificity requirement of Rule 65(d), which sets out the basic requirements that an order granting an injunction must follow. The rule provides that such an order must "state its terms specifically" and must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). The specificity requirements of Rule 65(d) "[are] designed to prevent uncertainty and confusion" and to avoid basing "a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam). Therefore, the

four corners of the injunctive order itself must sufficiently describe what actions the defendants may or may not take.

Here, the language of Plaintiffs' proposed order is not specific enough to enable Defendants' full compliance as the order does not define what distance constitutes being "near" a school or bus stop, nor does it define what is considered a "bus stop." For instance, does "bus stop" include all public transportation bus stops, neighborhood bus stops for students, or both? Does the restriction apply only during times when school children are present or at all hours of the day?  Defendants should be subject to potential contempt by having to guess at what conduct is restrained under the injunction. *See Denver Schools*, Hearing Tr. at 53-54 (rejecting injunction as overbroad because if all schools and bus stops were included, "as well as anywhere near them, then the entire city would be covered"). Moreover, EdMN has only alleged that some of its members across the state have experienced any effects from immigration enforcement. EdMN should list those members for whom an injunction might apply.

If the Court finds Plaintiffs have met their considerable burden for injunctive relief, it should grant relief limited only to the specific plaintiffs or members of the organizations that can establish standing. To grant the unbounded relief Plaintiffs request would violate *CASA*'s premise that injunctive relief does not extend by default to everyone potentially affected by the alleged harm.

Finally, if the Court grants an injunction, it should require a bond commensurate with the scope of any injunction pursuant to Rule 65(c).

## CONCLUSION

Because Plaintiffs have not met their heavy burden, the Court should deny the Motion.


Dated: March 11, 2026                    BRETT A. SHUMATE
                                         Assistant Attorney General
                                         Civil Division

                                         ANDREW WARDEN
                                         Assistant Branch Director
                                         Federal Programs Branch

                                         /s/ *Jessica A. Lundberg*
                                         JESSICA A. LUNDBERG
                                         (WA Bar No. 60100)
                                         Trial Attorney
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, NW
                                         Washington, D.C. 20005
                                         (202) 305-4688
                                         jessica.a.lundberg@usdoj.gov
                                         *Counsel for Defendants*