IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

FRIDLEY PUBLIC SCHOOL DISTRICT,

INDEPENDENT SCHOOL DISTRICT 14,

DULUTH PUBLIC SCHOOL DISTRICT,

INDEPENDENT SCHOOL DISTRICT 709, and

EDUCATION MINNESOTA

        Plaintiffs,

    vs.

KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*,

U.S. DEPARTMENT OF HOMELAND SECURITY,

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,

TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*,

MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations*,

DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*,

No. 0:26-cv-01023-LMP-LIB

**MINNESOTA STATE COLLEGES AND UNIVERSITIES' AMICUS MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY UNDER 5 U.S.C. § 705 OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION**

1

U.S. CUSTOMS AND BORDER PROTECTION,

RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection*,

GREGORY BOVINO, *or his successor, in his official capacity as Commander of the U.S. Border Patrol*,

THOMAS HOMAN, *in his official capacity as White House Executive Associate Director of Enforcement and Removal Operations*,

    Defendants.

## **STATEMENT OF INTEREST OF THE AMICUS CURIAE[1]**

In 1995, the Minnesota legislature created the Minnesota State Colleges and Universities system ("Minnesota State" or the "System") by merging various state universities, community colleges, and technical colleges. Minnesota State institutions provide programs of study that meet the needs of students for occupational, general, baccalaureate, and graduate education through the entire state of Minnesota. Minnesota State consists of seven universities, twenty-six colleges, and fifty-four individual campuses. The system serves over 270,000 students annually and serves more students of

---

[1] No party has opposed the filing of this memorandum. No counsel for a party authored this memorandum in whole or in part, no counsel for a party made a monetary contribution intended to fund the preparation or submission of this memorandum, and no person other than *amicus curiae* and its counsel made a monetary contribution to its preparation or submission.

color and indigenous students than all other higher education providers in the state combined.   Minnesota State's core commitments include ensuring access to an extraordinary education for all Minnesotans, being the partner of choice to meet Minnesota's workforce and community needs, and delivering to students, employers, communities and taxpayers the highest value and most affordable higher education option in the state.

For over thirty years, Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP"), and their predecessor the Immigration and Naturalization Service ("INS"), prohibited immigration enforcement in or near schools, including colleges and universities, and other "sensitive" locations absent extraordinary circumstances.   This policy and practice continued unbroken through Democratic and Republican administrations in recognition of the importance of schools, houses of worship, and other civic institutions in the fabric of this country.

No longer.   In January 2025, Defendants rescinded this policy. The Complaint and accompanying documentation ably describe the ways in which this policy change has resulted in enforcement actions and pepper spray on high school campuses, agents camped out at school bus stops, and parents and workers detained at childcare centers.   The harm to Minnesota Pre-K through high school students is significant and seriously curtails the fundamental right provided to all children in the Minnesota Constitution to a general and uniform and thorough and efficient system of public schools throughout the state.   Minn. Const. Art. XIII, § 1.

But pre-K through 12 educational institutions are not the only ones negatively impacted by Defendants' sudden policy change. That change also rescinded protections for college and university students and undermines the corresponding benefits higher education institutions provide to ensure the country's success in the global economy. Minnesota State has an interest in protecting its students by ensuring those students receive the highest possible level of education available. This amicus brief focuses on why the equities and the public interests discussed above and below support a stay or, in the alternative, a preliminary injunction.

## ARGUMENT

The factors the Court considers, whether analyzing Plaintiffs motion under the Administrative Procedures Act stay or a preliminary injunction standard, are identical. *Compare Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) *with Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). A preliminary injunction (or an APA stay) will be granted if the moving party can demonstrate: (1) the moving party's probability of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) the public interest in the issuance of the injunction. *Dataphase Sys., Inc.*, 640 F.2d at 114; *Winter*, 555 U.S. at 20. The balance-of-harms and public-interest factors "merge when the Government" is the non-moving party. *Eggers v. Evnen*, 48 F.4th 561, 564 (8th Cir. 2022). Courts must "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Additionally, the Court must "pay particular regard for the public consequences in employing the

extraordinary remedy of injunction." *Id.* (quoted in *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019)).

This changed policy has negatively impacted Minnesota State's students, increased costs and challenges for staff and administration, and undermines Minnesota State's educational mission and the State's workforce and economic needs. For these reasons, the balance of harms/equities and public interest support the Plaintiffs' current motion.

## I.    Defendants' Policy Change Has Negatively Impacted Minnesota State Students.

Defendants' 2025 policy change, particularly in conjunction with their aggressive implementation of Operation Metro Surge, has had a wide-ranging negative impact on the students that attend Minnesota State campuses. For example, students report they are afraid to attend classes in person. (Goings Decl. ¶ 8.) Campuses report that students are increasingly asking for remote instruction. (*Id.*) While remote instruction can replace some of the academic learning associated with in person classes, some academic programs cannot move online because of accreditation requirements, licensing rules, or federal regulations. (*Id.*) In other situations, such as those with lab or hands-on requirements such as equipment repair classes, in-person learning is difficult to replace. (*Id.*) Students who may be most at risk of negative interactions with immigration agents, including international students lawfully attending a Minnesota State school, cannot take online classes due to the requirements of their student visas. (*Id.*)

Often, students have simply decided that the risks of attending classes outweigh continuing their education. At St. Paul College, 61 refugee/asylee students enrolled in the

Fall 2025 semester did not return this spring.  (Goings Decl. ¶ 9.)  Both Minneapolis College and Saint Paul College report spring enrollment below projections (in mid-January, Minneapolis College reported a 16% decline in new enrollments).  (*Id.*)  These are students who cannot increase their educational attainment, get the skills they need to find jobs, and support themselves and their families. (*Id.*)

Even when students decide to attend classes, this policy change has had a negative effect.  Some students report taking fewer classes so there is less risk of exposure in going to and from classes.  (Goings Decl. ¶ 10.)  Other students report a preference for evening and night classes because when it is dark they believe it is less likely immigration enforcement will target them because of the color of their skin.  (*Id.*)

In addition to these educational harms, there are real financial and mental health harms for these students from this policy change.  The long-term financial impacts were mentioned above given the central role that higher and vocational education plays in earning potential.  Students who cannot attend these classes are cut off from one of the biggest drivers of economic success.  (Goings Decl. ¶ 11.)  But there are also short-term impacts for these young people as well.  There are costs associated with dropping classes. (*Id.*)  Books and materials are already paid for and no longer of use. (*Id.*)  And Minnesota State is aware that when students withdraw from school, regardless of the reason, they often do not return or experience barriers in doing so. (*Id.*)

The change in policy has also had a deleterious effect on student well-being and mental health.  Campuses report an uptick in the use of campus food bank services. (Goings Decl. ¶ 12.)  For example, in January 2026 the Saint Paul College campus food

pantry provided 10,604 pounds of food across 616 visits – a 52% increase over January 2025. (*Id.*) Students report an increase in mental health concerns as well. Student requests for counseling have increased as have the number of students. (*Id.*) For example, at Saint Paul College referrals for basic needs appointments increased from seventeen in January 2025 to 132 in January 2026. (*Id.*) And this increase does not account for the students who would otherwise seek counseling services but are afraid to come to campus because of the potential for immigration enforcement. (*Id.*)

Students are understandably fearful of immigration enforcement on campuses. ICE has taken the position that it does not need a judicial warrant to enter private spaces, including campus buildings. *See* https://apnews.com/article/ice-arrests-warrants-minneapolis-trump-00d0ab0338e82341fd91b160758aeb2d (last accessed Mar. 5, 2026). Agents have misrepresented themselves to gain access to university property to detain students. *See* https://www.nytimes.com/2026/02/26/nyregion/columbia-university-ice-student.html (last accessed Mar. 5, 2026). The 2025 policy change has resulted in immense harm to Minnesota State students. It has created an environment of fear and diminishes educational opportunities for the next generation of leaders. And it has done so without any notable public safety benefit.

## II. Defendants' Policy Change Has Negatively Impacted Minnesota State, Its Faculty, and Its Administrators.

The harm of this policy change is not confined to Minnesota State students. Faculty are spending more time supporting students and modifying their classes. And administrators devote increasing amounts of time to anticipating and addressing the

consequences of potential immigration enforcement on campus.  All these harms detract from the central mission of Minnesota State to provide an affordable, high-quality education that meets Minnesota's workforce needs, enhances quality of life, and ensures access for all students.

There has been an impact on enrollment at some Minnesota State campuses.  This is particularly troubling given that campuses have worked hard to expand access and enrollment throughout the System.  Minnesota State has two primary sources of revenue – tuition and state appropriations.  (Goings Decl. ¶ 13.)  Any impact on enrollment has a significant impact on System budgets and the educational services these institutions provide. (*Id.*)  Additionally, fewer students on campus negatively impacts facilities-related revenue, including parking, College Store sales, and other on-site services. (*Id.*)

Faculty are stretched thin.  The increase in students requesting remote learning options has resulted in additional work for the faculty.  (Goings Decl. ¶ 14.)  They must prepare and teach classes in multiple modalities to accommodate both the in person and online students.  (*Id.*)  This creates additional work because those modalities require different teaching foci. (*Id.*)  Like many students, some staff members are fearful to come to campus and either take leave or try to find a remote option. (*Id.*)  They are fielding more requests from students for help with immigration issues and mental health concerns and spending more time addressing students' fears and concerns about ICE as opposed to Minnesota State's educational mission. (*Id.*)

Minnesota State administrators are also feeling the strain of this changed policy. They are the ones processing and responding to the increase in class drops.  (Goings Decl.

8

¶ 15.) They are the ones responsible for sending out campus and system wide communications to try and reassure staff and students that they are safe and cared for. (*Id.*) They are the ones scheduling campus wide sessions to discuss these issues. (*Id.*) And they are the ones monitoring social media and other channels to ensure that they have front desk staff and administrators present when there are reports of immigration enforcement in the area – a particular burden for schools in greater Minnesota with multiple campuses. (*Id.*)

Whether framed as the balance of harms or the balance of equities, both run overwhelmingly in favor of the Plaintiffs.

### III. A Stay Is Particularly Necessary Given the Role of Education and Minnesota State in the Success of the State and the Public.

The importance of education in this state predates its founding. The federal government, when Minnesota was not even a gleam in the founders' eyes, passed the 1787 Northwest Ordinance that recognized "being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." An Ordinance for the Government of the Territory of the United States, North-West of the River Ohio (available at https://www.archives.gov/milestone-documents/northwest-ordinance). The Ordinance allocated public land for school support. *Id.*

In 1849, Congress passed the enabling act establishing Minnesota's territorial government. That act set aside two lots in each town to be "reserved for the purpose of being applied to schools in said Territory, and in the states and Territories hereafter to be erected out of the same." An Act to Establish the Territorial Government of Minnesota, in 4 AMERICAN CHARTERS, CONSTITUTIONS, AND ORGANIC LAWS: 1492-1908 at

1987 (Thorpe ed., 1909).  At the Constitutional Convention eight years later, Minnesota drafted its Constitution which includes the following language:

> The stability of a republican form of government depending mainly upon the intelligence of the people, it is the duty of the legislature to establish a general and uniform system of public schools. The legislature shall make such provisions by taxation or otherwise as will secure a thorough and efficient system of public schools throughout the state.

Minn. Const. Art. XIII, sec. 2.  This language was enacted and has been foundational to the success of the State ever since – recognizing that only through education do individuals develop the intelligence, skills, and character to ensure their own success and the success of the state and the republic.

While these acts focused primarily on primary education, Minnesota also invested in higher education as well.  The University of Minnesota was established by the Minnesota Territorial Laws of 1851, Chapter 3, approved on February 25, 1851. Seven years later in 1858, Dr. John Ford, an education advocate, lobbied the Minnesota Legislature to establish a system for creating normal schools, functionally a teacher training college.  The following year, he succeeded in getting the Winona Normal School chartered as the state's first teacher training school.  Minnesota Historical Society, https://www.mnhs.org/mnopedia/search/index/thing/winona-normal-school#:~:text=The%20Winona%20Normal%20School%20was,state's%20first%20teacher%20training%20school.  The school established a three-year curriculum and admitted its first students in 1860.  *Id.* The Winona Normal School would eventually expand its educational offerings beyond teacher preparation and transform into Winona State University, one of the seven universities that are part of the Minnesota State system.

In addition to the Normal School system, which would change its name many times over the years, Minnesota also had a system of technical colleges and a system of community colleges.  The Girls Vocational School in Minneapolis, founded in 1914, and the Mankato Vocational School, founded in 1946, were chartered to provide technical training for residents.  Minnesota also chartered "junior" colleges, which came to be known as community colleges.  These three systems were governed by different state boards and provided differing educational foci, but all served the same ultimate goal, to ensure that the residents of Minnesota were attaining the highest levels of educational, economic, and personal success possible.

In 1995, the Minnesota Legislature crafted new legislation to create the Minnesota State Colleges and Universities system, merging the state universities, community colleges, and technical colleges into one entity under the direction of one chancellor.  Minn. Stat. § 136F.02 (1995).  Today, Minnesota State's seven universities, twenty-six colleges, and fifty-four campuses, make up the third largest system of state colleges and universities in the country and offers the lowest tuition in the State.  64% of Minnesota resident students who are pursuing an undergraduate credential are doing so at a Minnesota State college or university.

All of which is to say that education, and education provided by Minnesota State institutions, has been a bedrock value for Minnesota residents.  We see the importance of this system, as well as the education provided by the University of Minnesota and other private colleges, throughout our daily lives.  Minnesota consistently ranks in the top five in national surveys regarding quality of life.  Minnesota is a "donor state," regularly

11

providing the federal government with more in tax revenue than it receives in federal aid. We are home to seventeen Fortune 500 companies, vastly outperforming what might be expected for a state of its size and population. And our residents are happier, healthier, and safer than those in many other parts of the country.

This did not happen by accident. It happened because from before its founding until today, Minnesota valued education and the opportunities that education provide to the people who live here, work here, start businesses here, and raise families here. Any balancing of the equities would have to overcome this substantial and foundational interest that the Plaintiffs have, that Minnesota State has, and that the public has in the high-quality education provided by Minnesota schools both pre-k through 12 and higher education. Whatever justification[2] Defendants may assert to no longer respect the importance and sanctity of sensitive locations such as those of the Plaintiffs and Minnesota State, it pales in comparison to the harm it has created and continues to create as identified herein.

## CONCLUSION

For decades, immigration enforcement recognized a sensitive locations policy that tracked with the fundamental rights enumerated by both the country's and the state's founders: the importance of education, religious freedom, First Amendment expression at public gatherings. It also respected the policy choices of State and Federal elected officials including ensuring people seeking healthcare, social services, or fleeing domestic violence

---

[2] Amici note that public reporting and sworn statements provided under oath in case after case in this District since the beginning of Operation Metro Surge call into question the veracity of any factual basis for Defendants' justification.

could safely do so.  With no analysis, no public input, and questionable factual predicates, Defendants upended the status quo and, in the process, greatly harmed Plaintiffs, amici, and the residents of Minnesota.  For these reasons and the reasons set forth above and in Plaintiffs' briefing, amici ask the Court to enter a stay or preliminary injunction to pause Defendants' change to the sensitive location guidance and reinstate the policy that Defendants maintained for over thirty years.

Dated: March 18, 2026

Respectfully submitted,

KEITH ELLISON
State of Minnesota
Attorney General

/s/Joseph Weiner
JOSEPH WEINER
Assistant Attorney General
Atty. Reg. No. 0389181
445 Minnesota Street, Suite 400
St. Paul, Minnesota 55101-2127
(651) 757-1431
(651) 282-5832 (Fax)
Joseph.Weiner@ag.state.mn.us

ATTORNEYS FOR AMICI MINNESOTA STATE COLLEGES AND UNIVERSITIES