# EXHIBIT 27

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| Fridley Public School District, Independent School District 14, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Markwayne Mullin, *et al.*,<br><br>*Defendants*. | Case No. 0:26-cv-01023 (LMP/LIB) |

**DECLARATION OF DR. BRENDA LEWIS**

I, BRENDA LEWIS, Ph.D., declare as follows:

1. I am a resident of the State of Minnesota and am over the age of 18. I make this declaration based on my personal knowledge, my professional experience, information maintained in the ordinary course of Fridley Public Schools' operations, and information provided to me by district employees acting within the scope of their responsibilities.

2. I have served as Superintendent of Fridley Public Schools, Independent School District No. 14, since 2023. I have more than twenty years of experience as an educator and school administrator.

3. Fridley Public Schools serves approximately 2,800 students across six schools and employs approximately 592 people. It is a small, close-knit, highly diverse first-ring suburban district. Approximately 19% of our students identify as Hispanic or Latino, 37.5% as Black or African American, 7.6% as Asian, 5.1% as Native American,

and 22.7% as white. Approximately 20% of our students are English learners. Many of our children live in immigrant, refugee, multilingual, and mixed-status families.

4. Our obligation as a public school system is to educate every child who is entitled to attend our schools. Immigration status does not change a child's need for instruction, special education, English-language services, meals, transportation, counseling, relationships with trusted adults, or a safe place to learn.

5. The Department of Homeland Security's rescission of the 2021 Guidelines for Enforcement Actions in or Near Protected Areas (the "Protected Locations Policy") has made it much more difficult to educate our students. It has fundamentally altered the conditions under which Fridley Public Schools has to operate. Especially during the extraordinary immigration-enforcement surge in Minnesota beginning in December 2025, the absence of any protections from enforcement operations near schools caused a prolonged operational crisis affecting children, families, employees, governance, instruction, transportation, food service, enrollment, and district finances. We watched families disappear from ordinary school routines, children stop attending because they were afraid, and educators take on roles no school system should have to perform simply to keep children safe, fed, learning, and emotionally supported.

6. The effects did not end when the most visible phase of Operation Metro Surge subsided. The cameras largely moved on, but the consequences did not. The district has continued to address damaged trust, disrupted attendance, academic setbacks, mental-health needs, enrollment loss, and substantial unreimbursed costs.

**Enforcement Actions on and near Fridley Public Schools**

7. Fridley Public Schools documented repeated immigration-enforcement activity at or near schools, school property, school buses, and school bus stops. To my knowledge, none of these incidents involved an ongoing threat to public safety or any other emergency situation that required a law enforcement response.

8. On January 7, 2026, several staff members reported being stopped by immigration agents near school property. One employee reported being held at gunpoint.

9. On January 29, 2026, as I was leaving Fridley High School, a DHS vehicle began following my vehicle and continued following me to a district elementary school.

10. On January 31, 2026, immigration agents staged in parking lots at Fridley Middle School and one of our elementary schools. Those parking lots are district property reserved for students, staff, and authorized visitors. Security-camera and employee photographs recorded the vehicles present on school property.

11. On February 4, 2026, six ICE vehicles carrying DHS agents repeatedly drove back and forth directly in front of one of our elementary schools during morning arrival. The vehicles circled the area while families were trying to bring young children to school. Our crossing guards were trying to move children safely through the crosswalk, which was in a roundabout. The ICE vehicles were circling the roundabout and not allowing children to cross to access their school building. Two of the vehicles followed a mother and her child to the school. The agents also yelled at and mocked the school principal, who was outside supervising morning arrival, and videotaped and photographed her. Staff members were yelled at while they were trying to supervise children.

12. On February 5, 2026, at approximately 4:30 p.m., a teacher encountered an unfamiliar vehicle parked in an elementary-school parking lot. When approached, the driver identified himself as an ICE agent and was wearing a tactical vest marked "ICE Police." Figure 1 is an image of the vehicle captured by the district's security camera.

**Figure 1**




13. Because dismissal and arrival became periods of heightened concern, I personally patrolled the district with security personnel, including our security director, looking for federal agents near schools, buses, bus stops, and routes used by children and staff. Other district employees were assigned to monitor school grounds and arrival and dismissal.

14. During one patrol, we identified DHS agents at Commons Park, immediately adjacent to Fridley Middle School and Fridley High School. One individual appeared to be wearing tactical gear and another sat in the back seat with his face partially obscured by a

mask. We alerted principals so that staff would have heightened awareness during dismissal. Figure 2 is a photo that our security director took of the vehicle.

**Figure 2**



15. On another occasion, agents followed board members, and vehicles were observed outside their residences. At least one board member was followed while taking her young child to daycare. At one point, four confirmed ICE vehicles were outside a board member's home.

16. I was followed multiple times after I began speaking publicly about what was happening in our district. I received threats and hostile messages because of my advocacy.

One threat could quickly multiply through social media. This created a security burden for me personally and for the district, but I continued to speak because the underlying harm to children and schools was ongoing.

**Impacts on School Attendance and Education**

17. The rise in immigration enforcement actions near schools had an immediate and severe impact on attendance. As of February 2026, district attendance had fallen by approximately one-third since December 2025. The absences continued long past February. In April 2026, more than 70 students still had not returned to class. Families told me and our staff that they were afraid to send their students to school due to immigration activities near schools, school buses, and school bus stops. Many of these families said they were keeping their children home out of fear they or their children would encounter immigration agents, and could be arrested, at school or while waiting for the bus.

18. We received hundreds of calls from families who were terrified to come to school. Our middle-school principal received more than 100 messages from parents who were afraid to send their children to school. Some said they would keep their children home; others asked what the district could do to protect them.

19. Exhibit 52, submitted under seal, is a representative selection of voice messages from parents who called the school district to say their children would not be coming to school because of immigration enforcement at school, specifically. Exhibit 53, also submitted under seal, is a transcript of those voice messages.

20. On January 9 and January 16, 2026, Fridley Public Schools canceled classes because the combination of fear, student absences, staff absences, and enforcement activity due to the fear of ICE activity near schools made normal operations untenable.

21. The fear extended well beyond families lacking lawful status. Legally present immigrants, visa-sponsored employees, U.S. citizens, and families of color expressed fear of being stopped, questioned, followed, or misidentified. I personally encountered international employees walking only a few blocks from school during a period when suspected ICE vehicles were nearby and directed them back into the building because I did not believe it was safe for them to remain outside.

22. District staff members also reported they were afraid to travel to school because of the risk ICE agents would stop or arrest them when they came to school. Fridley Schools has a diverse workforce, with 25% of our teaching staff and 50% of our non-teaching staff being people of color. Many staff are immigrants. The district's international-talent program recruits employees from other countries for difficult-to-fill special-education teaching and paraeducator positions. Even though these employees are legally authorized to live and work in the United States, they were nevertheless afraid to come to work. The district and its partners had to arrange door-to-door transportation for employees so that essential special-education services could continue.

23. The long absences caused by fears of immigration enforcement near school disrupted students' educations. Classrooms were sometimes half empty. Children missed direct instruction, special-education services, English-language development, interventions, counseling, health services, peer relationships, extracurricular activities, and

daily contact with trusted adults. Children who did attend noticed which classmates were missing. Teachers had to teach academic content while simultaneously managing fear, grief, uncertainty, and questions about detained or missing family members and classmates.

24. The disruption was especially harmful for younger children, English learners, and students with disabilities. These children often depend on predictable routines, in-person modeling, specialized services, hands-on instruction, and close adult support. Remote instruction cannot fully replicate those services.

25. The threat of immigration enforcement near schools impacts not just academics, but also school-sponsored afterschool activities. At a high-school basketball game against neighboring Columbia Heights that ordinarily would have drawn a large crowd, the stands were nearly empty because families were afraid to come to school property. The loss of those activities matters because schools are not only places of instruction; they are community anchors and sources of belonging.

26. The emotional harm has persisted beyond the most visible enforcement period. Trauma does not end because a news cycle changes. Some children and families have had to rebuild a basic sense of safety. Some remain hesitant to engage with schools. Trust, once shaken, is not restored overnight.

27. The district must now address academic recovery and emotional recovery at the same time. Students who missed weeks of instruction or received less-effective remote instruction need opportunities to regain academic momentum. Children who lived for weeks in fear of detention, family separation, or encounters with armed agents need sustained mental-health and trauma-informed support.

**Impacts on School Finances and Human Resources**

28. The rescission of the Protected Locations Policy and resulting enforcement near schools not only undermined the district's ability to educate our students—it also burdened our staff and inflicted hundreds of thousands of dollars in financial losses.

29. **Remote Learning Costs**. To preserve access to education for children whose families were too afraid to send them to school, Fridley Public Schools created a temporary virtual-learning option beginning January 20, 2026. More than 400 students shifted to remote learning.

30. This shift to remote learning placed a heavy burden on our staff and finances. Administrators and teachers had to redesign curricula and lessons for remote instruction. Staff prepared and distributed Chromebooks; technology employees individually rostered and enrolled students in the online programs; staff prepared supplies for elementary and middle-school students and obtained internet hotspots and data cards. Family communications had to be written and distributed rapidly. As a result, staff time that ordinarily would have gone to intervention, enrichment, instructional planning, student support, and direct services was redirected to remote operations.

31. To support online instruction, the district had to transition substitute teachers to full-time status, meaning it had to increase their salaries. It also had to pay hourly employees more because they had to work more hours to support e-learning.

32. To support remote learning, the district incurred at least $75,381.97 in identifiable e-learning-related staff time, technology preparation, connectivity, and communications costs. It paid approximately $500 for supplies sent home to elementary

and middle-school students. These figures do not capture every indirect cost, including the value of instructional time diverted from students physically present in our buildings.

33. The documented e-learning costs include substantial administrator and staff planning time; extra paid hours for hourly employees; employees assigned to synchronous remote instruction during time otherwise available for in-person students; technology staff time to roster students and prepare Chromebooks; hotspots and data cards; and three months of specialized family-communication support.

34. Even as remote instruction demands more work from teachers, it is not as effective as in-person instruction for many students, particularly younger learners, students with disabilities, and English learners. Based on our experience during the COVID-19 pandemic, we know the move to remote learning last school year will result in academic and social setbacks that will require additional resources to remediate.

35. **Loss of Funding**. Enrollment losses compounded the problem. When a student is absent for fifteen consecutive days, they are automatically unenrolled from school under Minnesota law. Fridley Schools loses funding for every student who is unenrolled. By the time of my February declaration, Fridley Public Schools had already been required to unenroll at least 20 students because of prolonged consecutive absences, and many additional children had transferred, moved out of state, left the country, or otherwise stopped attending.

36. Because Minnesota school funding is significantly tied to pupil enrollment and attendance-related measures, losing children during the school year produces a revenue loss after staffing and programming decisions have already been made. The district cannot

simply eliminate a classroom teacher, counselor, principal, or bus route every time several children disappear from enrollment.

37. **Loss of Meal Reimbursements**. Because of the high absences, the district also lost student-nutrition revenue because meals are reimbursed only when they are served. A district analysis comparing pre-surge and affected meal counts estimated approximately $36,585.36 in lost breakfast reimbursement and $96,561.36 in lost lunch reimbursement from December 2025 through February 2026, partially offset by approximately $1,311.21 in estimated a la carte differences, for an estimated net loss of approximately $131,835 for that period alone.

38. These enrollment and nutrition losses illustrate a broader financial problem: when children are absent, the district can simultaneously lose revenue and incur new costs. Regardless of absences, we still have fixed building, employee, utility, transportation, special-education, and other fixed costs, but revenue tied to enrollment, attendance, and meals can and did decline while emergency-response expenses rise.

39. **Transportation Costs**. Because so many students and staff feared coming to work because of the risk of enforcement actions near school, the district also incurred transportation costs to ensure that these students and staff felt they could safely come to school. Families asked for door-to-door transportation to school because they did not feel comfortable waiting at school bus stops where they might encounter immigration agents. The district incurred approximately $250,000 in additional transportation costs per month from December 2025 through June 2026 to provide transportation to students and staff afraid to come to school because of immigration enforcement. Over seven months, that is

approximately $1.75 million. This is substantially greater than the more-than-$100,000 estimate available when my February declaration was prepared, because the enforcement activity continued for months after that declaration. The district would not have needed to incur these high costs but for ICE activity around schools and bus stops.

40. These transportation expenditures were not optional conveniences. They were undertaken to keep children connected to school and to ensure that employees, including staff in hard-to-fill special-education roles, could safely report to work. Without those measures, attendance and staffing disruption would have been worse.

41. When children stay home, they also lose routine access to school breakfast and lunch. Some families were afraid to leave their homes even to obtain groceries. To ensure students could eat, district social workers, administrators, teachers, and other staff collected, purchased, packed, and delivered food and household essentials. This diverted social workers from their ordinary responsibilities, including suicide-risk assessments, support for children in foster care, services for children experiencing homelessness, attendance work, and emotional support. Some staff members making deliveries also feared being followed by federal agents.

42. In summary, the district's financial harm includes at least four distinct categories: lost or threatened enrollment-based revenue; lost student-nutrition reimbursement; direct emergency costs such as transportation and e-learning; and additional employee compensation, along with diverted employee time and operational capacity that would otherwise have been used for ordinary educational functions.

43. Using the figures currently available to me, the district incurred approximately $1.75 million in additional transportation costs for December through June; the e-learning cost analysis identifies at least $75,381.97 plus approximately $500 in separately noted supplies; and estimated student-nutrition losses for December through February are approximately $131,835. Those three categories alone total almost $2 million, before accounting for enrollment-related aid losses, security costs, mental-health and recovery costs, staff time not separately charged, later nutrition losses, or other operational consequences.

44. I understand that these figures will continue to be refined through district financial records. I am providing them to show the magnitude and duration of the harm, not to suggest that every consequence can presently be reduced to a final audited number.

45. **Supervision**. The heightened threat of immigration enforcement near schools also changed the ordinary work of educators. We have an obligation to supervise children to keep them safe at school. The significant risk that armed agents will appear on school property to conduct immigration operations threatens student safety and requires school staff to take more steps to monitor students. During the surge in enforcement last year, teachers escorted children directly to buses and parent vehicles. Staff who were not otherwise assigned to arrival and dismissal were placed into monitoring roles. Administrators fielded sightings and safety calls. District leaders spent time coordinating food, transportation, virtual instruction, communications, security, and family support.

46. **Protocols and Training**. The rescission of the Protected Locations Policy has required Fridley Schools to divert resources to prepare for immigration enforcement

activities near school grounds and school bus stops since even before the surge in immigration enforcement in Minnesota that began in December 2025. Since January 2025, the district has had to develop new protocols and train staff about what to do if ICE agents appear on school property. Fridley Public Schools has had to train employees on how to respond to immigration agents, develop protocols for reviewing warrants and other documents, communicate repeatedly with families, and maintain operational plans for future enforcement activity. Those functions will remain necessary so long as schools and school-related locations remain exposed to heightened immigration-enforcement risk.

**Conclusion**

47. In my professional judgment, the harm to Fridley Public Schools cannot be measured only by the number of enforcement encounters on school grounds. To fully account for the scope of the damage, we need to look at what those encounters did to the functioning of a school system: emptied classrooms, frightened children, disrupted special-education and English-language services, remote learning, food deliveries, door-to-door transportation, staff reassignment, enrollment loss, lost meal reimbursement, security patrols, threats, and a continuing need for academic and emotional recovery.

48. From the perspective of an educator, the effect of enforcement at and near schools is unmistakable: children have been afraid to attend, parents have been afraid to bring them, employees have been afraid to report to work, and the district has been forced to spend extraordinary resources recreating basic access to school.

49. Schools depend on trust. Children have to believe they can enter a schoolhouse without surveillance or intimidation. Parents have to believe they can take a

child to a bus stop or school door without risking detention. Employees have to believe they can travel to work and perform their jobs. The rise in immigration arrests and surveillance near schools has profoundly damaged that trust.

50. The rescission of the protected-areas policy matters even after Operation Metro Surge because the underlying uncertainty remains. Without a clear rule protecting schools and school-related locations, families have no assurance that the conditions that caused this disruption will not recur.

51. I continue to believe that public schools must be places of learning, safety, stability, and belonging. The experiences described above are why I have continued to advocate for restoration of clear protections around schools. The district's experience demonstrates that enforcement activity in and around school communities can chill access to public education even when agents do not enter a classroom to arrest a child.

52. The facts described in this declaration are true to the best of my knowledge. Where I identify estimates, I have done so expressly. The district's final financial losses may be greater as additional records are reconciled and as the long-term enrollment, academic, mental-health, and recovery consequences become clearer.

53. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Dated: August 12, 2026

/s/ Brenda Lewis
Brenda Lewis, Ph.D.