**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| Fridley Public School District, Independent School District 14, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Markwayne Mullin, *et al.*,<br><br>*Defendants*. | Case No. 0:26-cv-01023 (LMP/LIB) |

# REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION

## TABLE OF CONTENTS

INTRODUCTION .......... 1
I. The school districts have standing .......... 2
A. The school districts have suffered injuries in fact. .......... 3
i. Intrusions on school property are cognizable injuries. .......... 3
ii. The districts' financial harms are cognizable injuries. .......... 9
iii. The interference with school functions and the costs incurred to mitigate it are cognizable injuries. .......... 11
B. The districts' injuries are traceable to the Huffman Memo. .......... 13
C. The districts' injuries are redressable. .......... 20
D. *United States v. Texas* does not preclude standing. .......... 22
II. Education Minnesota has standing. .......... 24
III. The Huffman Memo is final agency action. .......... 26
IV. The Huffman Memo is not committed to agency discretion. .......... 33
V. The Huffman Memo is arbitrary and capricious .......... 35
VI. The Court should vacate the Huffman Memo. .......... 39
CONCLUSION .......... 40

## TABLE OF AUTHORITIES

**<u>Cases</u>**

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967) .................................................................. 35

*Action on Smoking & Health v. C.A.B.*,
699 F.2d 1209 (D.C. Cir. 1983) ............................................................ 36

*Animal Legal Def. Fund v. Reynolds*,
89 F.4th 1071 (8th Cir. 2024) ............................................................ 20, 22

*Arc of Iowa v. Reynolds*,
24 F.4th 1162 (8th Cir. 2022) ............................................................ 18

*Arizona All. for Retired Americans v. Mayes*,
186 F.4th 622 (9th Cir. 2026) ............................................................ 13

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ............................................................ 27

*Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*,
397 U.S. 150 (1970) ............................................................ 31

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
785 F.3d 710 (D.C. Cir. 2015) ............................................................ 27

*Attias v. Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) ............................................................ 16

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................ *passim*

*Biden v. Texas*,
597 U.S. 785 (2022) ............................................................ *passim*

*Block v. Meese*,
793 F.2d 1303 (D.C. Cir. 1986) ............................................................ 17

*Brown v. Davenport*,
596 U.S. 118 (2022) ............................................................ 23

*California Communities Against Toxics v. EPA*,
934 F.3d 627 (D.C. Cir. 2019) ............................................................ 29

*City of Los Angeles v. FAA*,
63 F.4th 835 (9th Cir. 2023) ............................................................ 11

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 7, 10

*Clean Air Council v. Pruitt*,
862 F.3d 1 (D.C. Cir. 2017) .......... 26, 28

*Cmty. Nutrition Inst. v. Young*,
818 F.2d 943 (D.C. Cir. 1987) .......... 30

*Conservation L. Found., Inc. v. Academy Express, LLC*,
129 F.4th 78 (1st Cir. 2025) .......... 25

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .......... 39, 40

*Ctr. for Taxpayer Rts. v. IRS*,
No. 26-5006, — F.4th —, 2026 WL 2635380
(D.C. Cir. Sept. 8, 2026) .......... 12, 17

*Custom Commc'ns, Inc. v. FTC*,
142 F.4th 1060 (8th Cir. 2025) .......... 39

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... *passim*

*DHS v. Regents of the Univ. of California*,
591 U.S. 1 (2020) .......... *passim*

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025) .......... 9

*Entick v. Carrington*,
95 Eng. Rep. 807 (1765) .......... 4

*Env't Health Tr. v. FCC*,
9 F.4th 893 (D.C. Cir. 2021) .......... 36

*Escobar Molina v. DHS*,
811 F. Supp. 3d 1 (D.D.C. 2025) .......... 7

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 35

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) .......... 3, 9, 12, 19

*Firearms Regul. Accountability Coal., Inc. v. Garland*,
112 F.4th 507 (8th Cir. 2024) .......... 31, 32

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
313 F.3d 852 (4th Cir. 2002)........................................................ 30, 31

*Garland v. Aleman Gonzalez*,
596 U.S. 543 (2022)........................................................................ 39

*Garner v. Jones*,
529 U.S. 244 (2000)................................................................... 16, 21

*Gentile v. SEC*,
974 F.3d 311 (3d Cir. 2020) ............................................................ 33

*GLBT Youth in Iowa Schs. Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) .......................................................... 18

*GoJet Airlines, LLC v. FAA*,
743 F.3d 1168 (8th Cir. 2014)........................................................... 30

*Golan v. FreeEats.com, Inc.*,
930 F.3d 950 (8th Cir. 2019)........................................................... 3, 6

*Greer v. Chao*,
492 F.3d 962 (8th Cir. 2007)............................................................. 33

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989)........................................................... 39

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)......................................................................... 12

*Heckler v. Chaney*,
470 U.S. 821 (1985)......................................................................... 34

*Holmes v. Elephant Ins. Co.*,
156 F.4th 413 (4th Cir. 2025) ........................................................ 3, 5

*Immigrant Defs. L. Ctr. v. Noem*,
145 F.4th 972 (9th Cir. 2025) .......................................................... 39

*Index Newspapers LLC v. United States Marshals Serv.*,
977 F.3d 817 (9th Cir. 2020)............................................................... 7

*Iowa League of Cities v. EPA*,
711 F.3d 844 (8th Cir. 2013)........................................................ 26, 27

*Iowa Migrant Movement for Just. v. Bird*,
157 F.4th 904 (8th Cir. 2025) ..................................................... 21, 25

*Iowa v. Wright*,
154 F.4th 918 (8th Cir. 2025) ....................................................*passim*

*Johnson v. Paynesville Farmers Union Co-op. Oil Co.*,
817 N.W.2d 693 (Minn. 2012) ........................................................ 4, 6

*Judulang v. Holder*,
565 U.S. 42 (2011) ........................................................................ 29-30

*Kenney v. Glickman*,
96 F.3d 1118 (8th Cir. 1996) ...................................................... 33, 34

*Laird v. Tatum*,
408 U.S. 1 (1972) ............................................................................ 7, 10

*Light v. United States*,
220 U.S. 523 (1911) ........................................................................ 4, 5

*Linda R. S. v. Richard D.*,
410 U.S. 614 (1973) .......................................................................... 23

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ......................................................... 13, 17, 20, 25

*Missouri v. Biden*,
52 F.4th 362 (8th Cir. 2022) ............................................................ 19

*Morton v. Ruiz*,
415 U.S. 199 (1974) .................................................................... 15, 16

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................ 28, 32, 36

*Murthy v. Missouri*,
603 U.S. 43 (2024) ............................................................................ 17

*New England Synod v. DHS*,
824 F. Supp. 3d 118 (D. Mass. 2026) ................................................ 25

*New England Synod v. DHS*,
No. 4:25-cv-4102 (D. Mass.) ............................................................ 22

*Ngure v. Ashcroft*,
367 F.3d 975 (8th Cir. 2004) ............................................................ 33

*Nken v. Holder*,
556 U.S. 418 (2009) .......................................................................... 40

*NTCH, Inc. v. FCC*,
841 F.3d 497 (D.C. Cir. 2016)........................................................... 21

*Ohio v. EPA*,
603 U.S. 279 (2024)........................................................................ 35

*Oliver v. United States*,
466 U.S. 170 (1984)........................................................................... 5

*Olivier v. City of Brandon*,
607 U.S. 552 (2026)........................................................................ 23

*OSG Bulk Ships, Inc. v. United States*,
132 F.3d 808 (D.C. Cir. 1998)........................................................... 33

*Parsons v. DOJ*,
801 F.3d 701 (6th Cir. 2015).............................................................. 18

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986)........................................................................ 24

*Philadelphia Yearly Meeting of Religious Soc'y of Friends v. DHS*,
187 F.4th 187 (4th Cir. 2026) ....................................................*passim*

*Philadelphia Yearly Meeting of Religious Soc'y of Friends v. DHS*,
No. 25-cv-0243, 2026 WL 280089 (D. Md. Feb. 3, 2026).................. 26

*Plymouth Cnty. v. Merscorp, Inc.*,
774 F.3d 1155 (8th Cir. 2014)........................................................... 11

*Pub. Int. Legal Found., Inc. v. Nago*,
174 F.4th 664 (9th Cir. 2026) .............................................................. 3

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*,
174 F.4th 81 (D.C. Cir. 2026) ..................................................... 39, 40

*Roberts v. Thompson*,
176 F.4th 1045 (8th Cir. 2026) ......................................................... 11

*South Dakota v. Ubbelohde*,
330 F.3d 1014 (8th Cir. 2003)...................................................... 14, 27

*Scenic Am., Inc. v. U.S. Dep't of Transp.*,
836 F.3d 42 (D.C. Cir. 2016)............................................................. 27

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)........................................................................... 3

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 7, 25

*Teva Pharms. USA, Inc. v. Kennedy*,
187 F.4th 587 (D.C. Cir. 2026) .......... 16, 21

*Texas v. Biden*,
20 F.4th 928 (5th Cir. 2021) .......... 28, 29, 31

*Texas v. EEOC*,
933 F.3d 433 (5th Cir. 2019) .......... 29

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) .......... 40

*Texas v. United States*,
50 F.4th 498 (5th Cir. 2022) .......... 39

*Tincher v. Noem*,
816 F. Supp. 3d 931 (D. Minn. 2026) .......... 7

*Union of Concerned Scientists v. Wheeler*,
954 F.3d 11 (1st Cir. 2020) .......... 35

*Union Pac. R.R. Co. v. U.S. R.R. Ret. Bd.*,
162 F.4th 908 (8th Cir. 2025) .......... 31, 32

*United Presbyterian Church in the U.S.A. v. Reagan*,
738 F.2d 1375 (D.C. Cir. 1984) .......... 7

*United States v. Gannaway*,
536 F.2d 784 (8th Cir. 1976) .......... 4

*United States v. Jones*,
565 U.S. 400 (2012) .......... 4, 5

*United States v. Missouri*,
114 F.4th 980 (8th Cir. 2024) .......... 11

*United States v. Texas*,
599 U.S. 670 (2023) .......... 22, 23, 24

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .......... 26, 28, 30, 32

*Venetian Casino Resort, LLC v. EEOC*,
530 F.3d 925 (D.C. Cir. 2008) .......... 28

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 8

**Statutes**

5 U.S.C. § 551 .......... 32

5 U.S.C. § 706 .......... 39, 40

8 U.S.C. § 1252 .......... 39, 40

**Other Authorities**

Br. for Petitioners, *DHS v. Regents of the Univ. of California*, No. 18-587, 2019 WL 3942900 (U.S. 2019) .......... 34

CT Insider, *Video Appears to Show ICE Arrest Near School Bus Stop*, https://tinyurl.com/9vpnb32x .......... 9

Prosser & Keeton on Torts (5th ed. 1984) .......... 5

Restatement (First) of Torts (1934) .......... 4, 5

Restatement (Second) of Torts (1965) .......... 4, 6

Restatement (Fourth) of Property, Vol. 2 (2021) .......... 5

Zachary D. Clopton & Nadav Shoked,
The City Suit, 72 Emory L.J. 1351 (2023) .......... 4

## INTRODUCTION

The government identifies no reasoned explanation for DHS's decision to rescind its longstanding restrictions on immigration enforcement actions in places where children learn, people pray, and doctors care for the sick. Instead, it downplays the change and devotes most of its opposition to arguments that the Court cannot review the decision. According to the government, the Huffman Memo did not change anything of consequence because the previous policy (the Mayorkas Memo) did not limit any enforcement actions in protected locations; it just required line agents to get higher approval for them.

The government's litigation position contradicts the text of the Mayorkas Memo and how DHS has characterized it everywhere outside litigation. *See* Pls.' Mem. in Supp. of Mot. for Summ. J. 7-9, Dkt. No. 108 ("Pls.' Mem."). As the Fourth Circuit recently agreed, the Mayorkas Memo "required" DHS agents to "avoid taking enforcement actions at or near" protected locations "to the fullest extent possible." *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. DHS*, 187 F.4th 187, 203 (4th Cir. 2026) ("*PYM*"). Though it did not "completely prevent" enforcement near sensitive locations, it "limited the circumstances under which" it "could occur." *Id.* at 202. By removing those limitations, the Huffman Memo allowed DHS agents to take enforcement actions near schools that they could not take before, causing concrete harm to the plaintiffs and to school communities across the country.

Properly understood, then, the Huffman Memo inflicts cognizable injuries on all three plaintiffs, constitutes final agency action reviewable under the APA, and lacks the reasoned explanation the APA demands. The Court should vacate the memo and restore the previous protections.

## I. The school districts have standing.

The school districts have standing. By removing the "prior limitations on DHS enforcement actions" near sensitive locations, the Huffman Memo "necessarily increases the likelihood that DHS [agents] will engage in immigration enforcement actions at or near" schools. *PYM*, 187 F.4th at 203-04. In *PYM*, the Fourth Circuit held that churches had standing to challenge the Huffman Memo because, by increasing the likelihood of enforcement activity at or near houses of worship, it chilled attendance at their religious services and decreased the financial contributions they received from congregants. *Id.* at 198-202; *id.* at 208-09 (Agee, J., concurring).

The school districts have even stronger grounds for standing here. Unlike in *PYM*, where the plaintiffs cited no enforcement near their churches, the Huffman Memo has enabled dozens of enforcement actions around the plaintiffs' schools and in neighboring districts. Pls.' Mem. 7-12. As a result, the school districts have faced not only drops in attendance and financial losses,

but also direct harms to their property interests. As in *PYM*, those harms are traceable to the Huffman Memo and redressable by the Court.[1]

**A. The school districts have suffered injuries-in-fact.**

***i. Intrusions on school property are cognizable injuries.***

1. An injury confers standing if it has a "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). The "alleged harm need not actually have been actionable at common law"; it need only "have a 'close relationship' to the type of harm that has traditionally been recognized as actionable." *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 958 (8th Cir. 2019). So the school districts need not plead "all [the] elements" of the common-law tort; they need only suffer an injury analogous to the "harm" that the common-law tort addressed. *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 421-22 & n.7 (4th Cir. 2025) (collecting circuit precedent in accord), *cert. denied*, 146 S. Ct. 2549 (2026).

[1] The government incorrectly suggests that the school districts "must satisfy the standards for organizational injuries set forth in" *FDA v. Alliance for Hippocratic Medicine*, which "held that an organization may show standing when the defendant's wrongful conduct has 'directly affected and interfered' with the organization's core functions." Defs.' Opp'n to Pls.' Mot. for Summ. J. and Mem. in Supp. of Mot. for Summ. J. 13, Dkt. No. 116 ("Opp'n") (quoting 602 U.S. 367, 395 (2024)). But *Alliance for Hippocratic Medicine* addressed only "one path" for an organization to show standing, not the only path. *Pub. Int. Legal Found., Inc. v. Nago*, 174 F.4th 664, 676 (9th Cir. 2026).

DHS's intrusions on school property not only have a "close relationship" to a common-law harm—they *are* a common-law harm. "*[A]ny* intrusion upon the land in possession of another" inflicts a common-law "injury." Restatement (First) of Torts § 7 cmt. a (1934) (emphasis added); *accord Johnson v. Paynesville Farmers Union Co-op. Oil Co.*, 817 N.W.2d 693, 701 (Minn. 2012) ("[T]he tort of trespass is committed when a person intentionally enters or causes direct and tangible entry upon the land in possession of another." (citation omitted)); Restatement (Second) of Torts § 163 (1965) (same). Once the plaintiff shows the defendant "tread upon his … ground," the defendant "must justify" the intrusion in court. *United States v. Jones*, 565 U.S. 400, 405 (2012) (quoting *Entick v. Carrington*, 95 Eng. Rep. 807, 817 (1765)).

Contrary to the government's suggestion, that a school district's property is "public property" does not mean it lacks standing to sue for intrusions upon it. Opp'n 15. A "government has … the rights of an ordinary proprietor … to prosecute trespassers" on publicly owned land, *Light v. United States*, 220 U.S. 523, 536 (1911), and "[t]he threat of trespass upon government property … demonstrates substantial injury to the [g]overnment" entity. *United States v. Gannaway*, 536 F.2d 784, 786 (8th Cir. 1976); *see* Zachary D. Clopton & Nadav Shoked, The City Suit, 72 Emory L.J. 1351, 1396-98 (2023) (discussing history of suits by local government entities, including "school district[s]," to protect property interests); Pls.' Mem. 30 n.2 (collecting school district cases).

The intruders' status as "federal agents" (Opp'n 15) does not defeat standing either. *See Jones*, 565 U.S. at 405-06 (reviewing common-law protections against "government trespass" that inform the Fourth Amendment); *see also Oliver v. United States*, 466 U.S. 170, 183 (1984) ("the government's intrusion on an open field … is a trespass at common law"). Although government agents might have a reason to enter school property that would give them a defense to a trespass suit, that does not negate the "*harm-defining* element," *Holmes*, 156 F.4th at 426—the "intrusion," Restatement (First) of Torts § 7 cmt. a (1934)—that gives the school districts standing to sue. *See Holmes*, 156 F.4th at 426 ("[T]he only elements that matter are the ones that define the *harm* of the analogous cause of action.").[2]

The government also claims DHS's intrusions on school property do not resemble a trespass because they were "brief," caused no "damage to property,"

---

[2] Of course, an entry on publicly owned property is not always an actionable trespass: Someone who uses public property would not be liable if he is authorized to use the area—for example, when the land is open to the general public. *Light*, 220 U.S. at 536. But school grounds are *not* open to the general public. Ex. 27, Lewis Decl.¶10 (school "parking lots are reserved for students, staff, and authorized visitors"). And a defendant's authorization (or "license") to enter is only a defense to a trespass suit. *See* Prosser & Keeton on Torts § 18, at 112 & n.2 (5th ed. 1984) ("[I]n the case of trespass to land," "the burden of proving a license is upon the defendant."); *accord* Restatement (First) of Torts § 10 cmt. c (1934); Restatement (Fourth) of Property, Vol. 2, § 1.1 (2021) (Draft) ("authorizations usually take the form of affirmative defenses"). Thus, whether the agents were authorized to enter is not a "*harm-defining* element" that affects the school districts' standing to sue. *Holmes*, 156 F.4th at 426.

and did not "prevent access" to the school. Opp'n 15. But none of those features even bear on whether an act is an "actionable" trespass, let alone whether it causes a common-law "harm." *Golan*, 930 F.3d at 958; *see Johnson*, 817 N.W.2d at 701, 704 (property owner may sue "for any trivial trespass"; "[a]ctual damages are not an element of the tort"); Restatement (Second) of Torts § 163 (1965) (trespass requires "no harm" to persons or property aside from the entry on the plaintiff's land). And under Article III, the court must "consider the nature or type of the harm, not its extent." *Golan*, 930 F.3d at 959.

DHS's incursions on district property are precisely "the type of harm that has traditionally been recognized as actionable." *Golan*, 930 F.3d at 958. They therefore constitute injuries sufficient for standing. *Id.*

2. The record also shows a "substantial risk" DHS would intrude on one of the school districts' properties again absent judicial relief. *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (citation omitted). In the month the plaintiffs filed this case, DHS entered Fridley Schools' property three times—twice using it as a "staging area" for enforcement operations, Opp'n 15, and once pulling into an elementary school parking lot to look inside the school. Ex. 27, Lewis Decl.¶¶10-12; Ex. 28, Boyd Decl.¶5. DHS has also engaged in dozens of enforcement actions on school property in neighboring districts. Pls.' Mem. 7-9. Though an isolated instance of "past harm" might not suggest a future threat, *see* Opp'n 11, these repeated intrusions certainly show that the risk of

recurrence is "not 'chimerical.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("history of past enforcement" is "good evidence" of a substantial risk of recurrence); *see Tincher v. Noem*, 816 F. Supp. 3d 931, 963 (D. Minn. 2026) ("A recurring-injury case … is not speculative when actual repeated incidents are documented." (citing *Index Newspapers LLC v. United States Marshals Serv*., 977 F.3d 817, 826 (9th Cir. 2020))); *Escobar Molina v. DHS*, 811 F. Supp. 3d 1, 33 (D.D.C. 2025) (repeated past warrantless arrests showed substantial risk DHS would arrest one of the plaintiffs again).

Those repeated enforcement actions on school grounds in Fridley and nearby districts also distinguish this case from those the government cites, where the plaintiffs "complain[ed] of no specific action … against them." *Laird v. Tatum*, 408 U.S. 1, 9 (1972); *see Susan B. Anthony List*, 573 U.S. at 159 (distinguishing *Clapper v. Amnesty Int'l USA* because there, the plaintiffs "'fail[ed] to offer any evidence that their communications ha[d] been monitored' under the challenged statute" (quoting *Clapper*, 568 U.S. 398, 411-12 (2013))); *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984) (no enforcement action was "threatened or even contemplated against" the plaintiffs under the challenged program).

Here, moreover, DHS's stated reason for the change—to enable arrests near churches and schools—reinforces that the threat is "real and substantial."

*PYM*, 187 F.4th at 204 (concluding that DHS's statements supported this finding even without past DHS enforcement near plaintiffs' churches).

The government claims that the plaintiffs no longer face a threat of enforcement on or near school property because, after the plaintiffs filed this case, DHS "concluded" Operation Metro Surge. Opp'n 10-11. But standing is assessed "as of the commencement of the suit"—at the peak of Metro Surge, when Fridley had experienced multiple intrusions on school property within the span of a month. *Iowa v. Wright*, 154 F.4th 918, 938, 940 (8th Cir. 2025) (citation omitted). The government's argument that later events "deprive[d] the plaintiff[s] of a personal stake in the outcome of the lawsuit" goes to "*mootness*, not standing." *West Virginia v. EPA*, 597 U.S. 697, 719 (2022). To show mootness, the government bears the "heavy burden" to show it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* It does not even claim to meet that burden.

Nor could it: the Huffman Memorandum remains in place, ICE still maintains six times as many agents in the Twin Cities Metro Area relative to its typical force, Easterwood Decl.¶¶8-9, Dkt. No. 70 (St. Paul field office staffed 482 officers relative to the typical 80), and DHS has continued to operate near schools and bus stops in Minnesota and around the country. *See* Ex. 33, D-Y-Decl.¶4; Ex. 39, Mercer Decl.¶¶4-8; Ex. 40, K-B-Decl.¶6; Ex. 41, G-B-Decl.¶4; Ex. 65 (September 8 and 9, 2026 arrests near schools and on a

college campus); Ex. 66 (same); Ex. 67, E-M-Decl.¶¶4-6 (August 26, 2026 arrest of parents at school bus stop just after pick-up); Ex. 68, Acevedo Sanchez Decl.¶¶1-8 (June 11, 2026 arrest near school); CT Insider, Video Appears to Show ICE Arrest Near School Bus Stop, https://tinyurl.com/9vpnb32x.

Since the districts faced a substantial threat of more enforcement on school property when they filed this case, and the same conduct "could harm [them] in the future," the case remains live. *Wright*, 154 F.4th at 941.

***ii. The districts' financial harms are cognizable injuries.***

In addition to the intrusions on its property, Fridley Schools has suffered significant financial harm. Because parents have kept students home, the district has lost state funds and meal reimbursements. Ex. 27, Lewis Decl.¶¶35, 37; Ex. 69, Lewis Supp. Decl.¶¶4-5; *see also* Ex. 47, Magas Decl.¶¶9-10. "Monetary costs are of course an injury," even when they result from the indirect or "downstream" effects of government action that regulates third parties. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111, 112-13, 116 (2025) (citation omitted); *see FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 384 (2024) (listing "a variety of familiar circumstances where government regulation of a third-party … may be likely to cause injury in fact to an unregulated plaintiff"); *Wright*, 154 F.4th at 939 ("indirect harm to states by federal rules" via "predictable effects" on "third parties" confers standing).

The government's insistence that plaintiffs cannot challenge government policies that do not "directly regulate or constrain" them (Opp'n 8-9, 20-22) thus misstates the law. In *Department of Commerce v. New York*, for example, the plaintiff states had standing to challenge an agency action that did not regulate the states but would have chilled their immigrant residents' responses to the census, which would have caused them to lose funding. 588 U.S. at 767. That the states' injuries flowed indirectly from chilling effects on third parties did not defeat standing. *Id*. at 768; *see PYM*, 187 F.4th at 208-09 (Agee, J., concurring) (emphasizing that houses of worship had standing to challenge Huffman Memo because it chilled attendance at religious services and caused the plaintiffs to receive fewer financial contributions).

The government's cases did not hold otherwise. In all of them, the courts rejected standing not because the plaintiffs alleged indirect harms, but because they identified no "present objective harm or a threat of specific future harm"; they "inflict[ed] harm on themselves" based on speculative fears. *Clapper*, 568 U.S. at 416, 418 (quoting *Laird*, 408 U.S. at 13-14). Unlike in those cases, the districts' financial injuries are not "self-inflicted," *id.* at 418; they flow from the "predictable effect of Government action on the decisions of third parties." *Dep't of Com*., 588 U.S. at 768. And the Court need not engage in "speculation" to recognize the "substantial risk" that parents will keep their children home from school or that the school districts will lose money as a result. *Id.* at 767-

68. They already have. Ex. 27, Lewis Decl.¶17; Ex. 47, Magas Decl.¶7; Ex. 42, Iverson Decl.¶10; Ex. 52 (transcripts of parent voicemails); Ex. 53 (voicemail audio). *Department of Commerce* thus controls this case. *See PYM*, 187 F.4th at 200 & n.6 (plaintiffs showed injury-in-fact because they experienced "an objective and verifiable decline in attendance").

#### *iii. The interference with school functions and the costs incurred to mitigate it are cognizable injuries.*

By chilling school attendance, the enforcement actions enabled by the Huffman Memo have also "interfered with the [school districts'] duty" to educate their students—a cognizable injury. *Plymouth Cnty. v. Merscorp, Inc.*, 774 F.3d 1155, 1158 (8th Cir. 2014). Schools cannot teach absent students, and they cannot educate students as effectively over the Internet. Ex. 27, Lewis Decl.¶34; Ex. 47, Magas Decl.¶13. The drop in attendance has therefore impaired the districts' educational functions, which the districts may sue to protect. *See* Pls.' Mem. 32-33; *United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024) (government was injured when state "impaired" its law enforcement functions); *City of Los Angeles v. FAA*, 63 F.4th 835, 843 n.4 (9th Cir. 2023) (local governments may sue to protect their "responsibilities, powers, and assets" (citation omitted)). The remote learning costs the schools "reasonably incur[red]" to "mitigate" the harm are also injuries-in-fact. *Roberts v. Thompson*, 176 F.4th 1045, 1053 (8th Cir. 2026) (citation omitted).

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), does not suggest otherwise. There, the plaintiffs were non-profit advocacy organizations, not local governments, and they sought to "manufacture [their] own standing" by "incurring costs to oppose" government actions that did not threaten to harm them. *Id.* at 394. They lost because "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* But as the Court made clear, an entity still has standing when the defendant has "directly affected and interfered with [the plaintiff's] core business activities," like when it "perceptibly impair[s] [the plaintiff's] ability to provide [its] services." *Id.* at 395 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

That is just what happened here. The school-adjacent enforcement enabled by the Huffman Memo "perceptibly impaired" the school districts' "ability to provide services" to their students. *Id.* at 394-95 (citation omitted). As *Alliance* itself confirms, that injury is sufficient for standing even if it stems from third parties' responses to the government's actions. *Id.* at 383; *see, e.g.*, *Ctr. for Taxpayer Rts. v. IRS*, No. 26-5006, — F.4th —, 2026 WL 2635380, at *5 (D.C. Cir. Sept. 8, 2026) (organization that advised taxpayers had standing to challenge IRS procedure, which allowed the unlawful disclosure of taxpayer information, because it chilled immigrant taxpayers from using the

organization's services). That the Huffman Memo "does not tell schools what they can and cannot do" (Opp'n 17) thus does not defeat standing. *See Arizona All. for Retired Americans v. Mayes*, 186 F.4th 622, 633 (9th Cir. 2026) ("[A] 'direct' effect [under *Alliance*] does not mean … that an organizational plaintiff must be directly regulated by a challenged law.").

**B. The districts' injuries are traceable to the Huffman Memo.**

These injuries are "fairly traceable" to the Huffman Memo. *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). As the Fourth Circuit recently explained, "a primary effect of the [Huffman Memo] is to remove the prior limitations on DHS enforcement actions at or near" protected locations. *PYM*, 187 F.4th at 203. "By this change in directive, the [Huffman Memo] necessarily increases the likelihood that DHS will engage in immigration enforcement actions at or near" those locations. *Id.* at 204. Indeed, that was the whole point. *Id.* The policy thus "contributes" to the substantial risk that DHS will continue to take enforcement actions on and near school property, which infringe the districts' property interests, chill student attendance, and cost the districts money. *Massachusetts*, 549 U.S. at 523. That contribution establishes traceability. *See id.*; *accord Wright*, 154 F.4th at 938-39.

Indeed, the record shows that the Huffman Memo "enabled" DHS's enforcement actions both on and near Fridley Schools' property, *Wright*, 154 F.4th at 938-39, which all occurred outside the "limited circumstances" in

which the Mayorkas Memo permitted them. Pls.' Mem. 21-22, 36-37 (quoting ICE_AR045). The government does not claim that any of those actions responded to a threat to public safety or the like. *See id.* It only denies that the Mayorkas Memo limited school-adjacent enforcement to those circumstances. Opp'n 17, 29. Although it agrees that the memo imposed "bright line rules," *id.* at 25, it claims they "only required a higher level of approval," *id.* at 33.

The government's litigation position conflicts with the text of the Mayorkas Memo and DHS's consistent characterization of it. The Mayorkas Memo imposed an express "obligation" to "refrain" from enforcement actions near protected areas "to the fullest extent possible." ICE_AR045. As ICE put it, that obligation "*require[d]* that … [t]o the fullest extent possible, [ICE] *shall* not undertake immigration enforcement actions" in protected areas. Ex. 63 at 3 (emphasis added) (ICE webpage on protected locations policy). Thus, as the Huffman Memo explained, the Mayorkas Memo's "bright line rules" did not just require prior approval; they placed restrictions on "where [the] immigration laws [were] permitted to be enforced." ICE_AR003; *accord* Ex. 56, Fleischaker Decl.¶¶12-15; Ex. 57, Doyle Decl.¶¶6-7.[3] In doing so, DHS claimed,

[3] Contrary to the government's claim, these two declarations of former DHS officials are not offered as "expert legal testimony." Opp'n 33. Like DHS's public statements cited above, they are relevant because they confirm that DHS "treated" the Mayorkas Memo "as a constraint on its discretion," such that it was binding. *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1029 (8th Cir. 2003) (considering testimony of agency staff member for this purpose).

the memorandum "tie[d] the hands" of agents, "thwart[ed]" law enforcement, and allowed immigrants to "hide in America's schools and churches to avoid arrest." Ex. 55 (DHS press release describing Huffman Memo). Conversely, the Huffman Memo "expand[ed] law enforcement" and "empower[ed]" agents so that immigrants could "no longer" seek refuge in those locations. *Id.* The Mayorkas Memo thus "limited the circumstances under which enforcement activities at sensitive locations could occur," and the Huffman Memo "remove[d] the prior limitations." *PYM*, 187 F.4th at 202-03.[4]

The Mayorkas Memo's boilerplate disclaimers—that it did not alter DHS's "statutory" authority or create any "right or benefit … enforceable at law"—do not undermine the Fourth Circuit's conclusion. *Contra* Opp'n 4 (quoting Mayorkas Memo, ICE_AR047). No agency policy can limit "statutory" authority; only Congress can do that. But DHS's internal directives still "b[ind] DHS staff," *Biden v. Texas*, 597 U.S. 785, 808-09 (2022); *accord Morton v. Ruiz*,

[4] The "limited circumstances" described in the Mayorkas Memo are not synonymous with the "exigent" circumstances in which agents could take action without headquarters approval. Opp'n 24-25. They defined the circumstances in which an enforcement action near a protected location was not "possible" to avoid, such that it fell within the exception to the "obligation" to "refrain" from such actions. ICE_AR045 ("The phrase 'to the fullest extent possible' recognizes that there might be limited circumstances under which an enforcement action needs to be taken in or near a protected area. The following are some examples of such limited circumstances …."). Indeed, the original 1993 policy also separated the substantive standard for engaging in enforcement actions from the "exigent circumstances" required to forgo prior approval, which were described in a separate manual. ICE_AR020.

415 U.S. 199, 235 (1974). And even if the memo created no "enforceable" "right," it still imposed an "obligation" to avoid enforcement near protected locations. ICE_AR045. The Court must assume DHS agents would have followed that obligation if it remained in force. *Garner v. Jones*, 529 U.S. 244, 256 (2000); *see Teva Pharms. USA, Inc. v. Kennedy*, 187 F.4th 587, 600-01 (D.C. Cir. 2026) (plaintiff had standing to challenge the standard by which agency selected drugs for program even though plaintiff could not later sue to enforce the more favorable standard it sought). Because the Mayorkas Memo would have prohibited the enforcement actions that caused the plaintiffs' harms, its rescission was a contributing cause of those harms.

The government's other causation arguments fare no better.

First, it claims that the plaintiffs' injuries "are more traceable to the overall increase in immigration enforcement" than to the Huffman Memo. Opp'n 23. "But Article III standing does not require that the [challenged action] be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017). The plaintiffs "need only show that the [Huffman Memo] is 'in part responsible for'" the harm. *PYM*, 187 F.4th at 201 (citation omitted); *accord Wright*, 154 F.4th at 938-39 (holding that even a "negligible contribution" sufficed). If the Huffman Memo had not lifted the prior restrictions on enforcement near protected locations, DHS could not take as many enforcement actions near

schools. The memo has thus "contribute[d]" to the risk that DHS would take those actions during and after Operation Metro Surge. *Massachusetts*, 549 U.S. at 523; *see PYM*, 187 F.4th at 201 (attendance declines were traceable to Huffman Memo even if "the administration's broader focus on immigration enforcement" also played a role); *cf. Murthy v. Missouri*, 603 U.S. 43, 69 & n.8 (2024) (plaintiffs lacked standing because harmful decisions were not "attributable, *even in part*, to the defendants" (emphasis added)).

Second, the government suggests that the districts cannot rely on the drops in attendance to show standing because "plaintiffs cannot establish standing based on the alleged chilling effect of agency guidance" that does not regulate the plaintiffs. Opp'n 23, 26. That simply misstates the law: A plaintiff may show causation based on "the predictable effect of Government action on the decisions of third parties." *Dep't of Com.*, 588 U.S. at 768. The third parties need only react to the government action "in predictable ways" that harm the plaintiffs. *Id.*; *see Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.) ("It is impossible to maintain, of course, that there is no standing to sue regarding action of a defendant which harms the plaintiff only through the reaction of third persons."); *Ctr. for Taxpayer Rts.*, 2026 WL 2635380, at *5 (organization had standing to challenge an internal IRS procedure because it chilled the organization's clients from engaging with its tax-related services). Because the standard is "*de facto* causality," not "*legal*" tort-law causation, a

harmful "public reaction" to the government's action is sufficient for standing even if the reaction is "an irrational one." *Block*, 793 F.2d at 1309.

The plaintiffs easily meet that standard here. Multiple sworn declarations and voice messages directly from parents all cite enforcement *at and near schools* as the reason parents have kept their children home. Ex. 27, Lewis Decl.¶19; Ex. 42, Iverson Decl.¶10; Ex. 52; Ex. 53; Ex. 47, Magas Decl.¶7. Ex. 64, M-C-D-Decl.¶¶4-5. The government cites no evidence that students were absent from school due to enforcement that took place elsewhere. Thus, there is no genuine dispute that the rise in enforcement actions near schools permitted by the Huffman Memo was at least "a motivating factor in the third party's injurious actions." *Arc of Iowa v. Reynolds*, 24 F.4th 1162, 1171 (8th Cir. 2022) (quoting *Parsons v. DOJ*, 801 F.3d 701, 714 (6th Cir. 2015)), *vacated on other grounds*, 33 F.4th 1042 (8th Cir. 2022). That is sufficient to show that the absences, and the financial harms that flow from them, are traceable to the Huffman Memo. *Id.*[5]

Finally, DHS's direct enforcement actions on and near the plaintiffs' property, and the student absences that result, are nothing like the "distant …

[5] The declarations do not support the government's claim that parents "misunderstand" the Mayorkas Memorandum to prohibit all enforcement near schools. Opp'n 26. And in any event, because the standard is *de facto* (not proximate) causation, parents' decisions could still be traceable to a challenged policy even if they rested on a "misreading" of the policy. *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 669 (8th Cir. 2024).

ripple effects" courts have found too "attenuated" to support traceability. Opp'n 27. In *Alliance for Hippocratic Medicine*, the plaintiff doctors relied on a "highly speculative" chain: the FDA's decision to relax regulations on an abortion pill "might" cause more pregnant women to experience complications from it, some of those women might come to the plaintiffs' emergency rooms, the plaintiffs might need to treat them, and they might divert resources from other patients to do so, even though they could not identify any time that happened before. 602 U.S. at 390-91. The Court compared that string of speculative leaps to a vague claim that "lax immigration policies" at the border may have led to "overcrowded classrooms" in a specific teacher's school, a claim the plaintiffs do not make here. *Id.* at 392. Likewise, in *Missouri v. Biden*, the plaintiffs had to speculate that "at some point in the future," an agency would "issue one or more regulations that rely in some way" on the specific cost estimates that the plaintiffs challenged, that the agency would "disregard any objections to the methodology by which the … estimates were calculated," and "that this yet-to-be-identified regulation will then harm Plaintiffs in a concrete and particularized way." 52 F.4th 362, 368 (8th Cir. 2022) (citation omitted).

The causal chain here is more straightforward: DHS lifted limits on enforcement actions on and near schools, which enabled enforcement actions on and near the plaintiffs' *own* schools and frightened their students away, costing them money. That simple chain of causation falls well within the broad

bounds the Supreme Court and Eighth Circuit have set. *See*, *e.g.*, *Wright*, 154 F.4th at 937 (state had standing to challenge rule that "enable[d]" carmakers to make less efficient gas vehicles, which "increased greenhouse gas emissions," which threatened to raise sea levels and erode state territory).

Thus, the districts' injuries are fairly traceable to the Huffman Memo.

**C. The districts' injuries are redressable.**

The school districts' injuries are also redressable because "the risk of injury 'would be reduced to some extent if [the plaintiffs] received the relief they seek.'" *Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071, 1078 (8th Cir. 2024) (quoting *Massachusetts*, 549 U.S. at 526). Although vacatur "would not completely prevent immigration enforcement actions" at or near schools, it would "restore" the obligation that "limited" those actions to exceptional circumstances. *PYM*, 187 F.4th at 202. That would reduce the risk that DHS would enter the school districts' property. And "[a]s a matter of logic, at least some of the immigrants" who have not attended school because of the increased enforcement actions near schools would "return … if DHS reinstates its old policy limiting enforcement actions at those locations." *Id*. "This is sufficient to satisfy the low bar of redressability." *Id.*

The government's principal counterargument rests on its claim that the Mayorkas Memo "*did not* prohibit immigration enforcement actions in and around schools or even restrict such actions" to exceptional circumstances.

Opp'n 29. As explained, that misconstrues the policy. If the Court restored the Mayorkas Memo, DHS agents could only enforce near schools in "limited circumstances"—when not "possible" to avoid those areas. ICE_AR045. By limiting such enforcement to those circumstances, the Mayorkas Memo would "reduce[] the threat" that DHS will continue to take enforcement actions on the plaintiffs' property. *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 916 (8th Cir. 2025). That is all Article III requires. *See id.*; *see also Teva Pharms.*, 187 F.4th at 600-01 (plaintiff had standing to challenge guidance that governed decisions that harmed the plaintiffs because vacatur would require the agency to proceed under a more favorable standard).[6]

Moreover, it is not "speculative" (Opp'n 30) to believe that parents who kept their children home because of increased immigration enforcement near schools would be more likely to send their children to school if DHS limited the enforcement activities they fear. Indeed, the Mayorkas Memo was designed to prevent the chilling effect the Huffman Memo has caused. ICE_AR044-45

---

[6] Even if the Court "could not direct DHS or its officials as to how they may exercise their enforcement discretion" under the Mayorkas Memo, Opp'n 30 (quoting Stay Order at 25), that would not defeat redressability. As explained, courts must "presume [DHS] follows its … internal policies," *Garner*, 529 U.S. at 256, and "[s]tanding is not defeated by the possibility that an agency might ultimately wield its discretion in a way that does not fix a party's alleged injury." *NTCH, Inc. v. FCC,* 841 F.3d 497, 506 (D.C. Cir. 2016); *see also Teva Pharms.*, 187 F.4th at 600-01 (plaintiff had standing to challenge guidance that governed individual decisions even though court would lack jurisdiction to ensure that individual decisions complied with the law post-vacatur).

(seeking to avoid the "restraining impact" of immigration enforcement on use of essential services and preserve "children['s] access to their schools"). As one parent attests, "[i]f the government reestablishes the policy that protected schools from the majority of immigration control measures, I would feel much better about sending my daughter to school." Ex. 64, M-C-D-Decl.¶9. Indeed, when other courts have ordered DHS to follow the Mayorkas Memo, attendance at the plaintiffs' religious services has increased. *See*, *e.g.*, Ex. 58, Merrill Decl.¶¶44-45; *New England Synod v. DHS*, No. 4:25-cv-4102 (D. Mass.), Dkt. No. 64 ¶¶10-12, Dkt. No. 68 ¶¶28-29, Dkt. No. 78 ¶¶39-42. Restoring the same protections here would likewise make Fridley and Duluth parents more likely to send their children to school. At minimum, it would "reduce" the "risk" of absences. *Animal Legal Def. Fund*, 89 F.4th at 1078.

The school districts thus have standing.

### D. *United States v. Texas* does not preclude standing.

Unable to contest that the school districts have suffered redressable injuries-in-fact, the government suggests that *United States v. Texas*, 599 U.S. 670 (2023), exempts "immigration enforcement policies" from the rule that parties may establish standing based on "downstream" injuries. Opp'n 12. But DHS's direct incursions on the school districts' property are not "downstream" injuries, and the government overreads *Texas*.

In *Texas*, the Court rejected a "novel standing argument" in "an extraordinarily unusual lawsuit" that "raise[d] only" one "narrow … question": whether courts may "order the Executive Branch to take enforcement actions against violators of federal law … by making *more* arrests." 599 U.S. at 681, 684-86 (emphasis added). Relying on narrow precedent that declined to review decisions *not* to prosecute, the Court held that courts may not order the government to "arrest *more* criminal noncitizens" because "'a party lacks a judicially cognizable interest in the prosecution … of another.'" *Id.* at 674, 676-77 (quoting *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973)); *accord id.* at 687 (Gorsuch, J., concurring). It reasoned that "when the Executive Branch elects *not* to arrest or prosecute, it does not exercise coercive power over an individual's liberty or property, and thus does not infringe upon interests that courts often are called upon to protect." *Id.* at 678 (majority opinion).

The government's selective quotations from *Texas* must not be "stretch[ed] … beyond" that nonenforcement "context." *Brown v. Davenport*, 596 U.S. 118, 141 (2022); *see Olivier v. City of Brandon*, 607 U.S. 552, 565 (2026) ("[G]eneral language in judicial opinions should be read as referring in context to circumstances similar to those then before the Court." (brackets and citation omitted)). Here, unlike in *Texas*, the plaintiffs do not challenge the decision *not* to enforce; they challenge DHS's decision to authorize *more* enforcement: an exercise of "coercive power" on and around their own property

that predictably affects their property interests, students, and finances. 599 U.S. at 678. Indeed, they do not even challenge any decision about "*whether* to arrest" someone, *id.* at 677 (emphasis added)—only about the circumstances in which DHS may do so on or near school property. *See PYM*, 187 F.4th at 198 n.5 (rejecting comparison to *Texas* on this ground).[7]

*Texas* thus does not preclude jurisdiction here.

## II. Education Minnesota has standing.

Education Minnesota ("EdMN") also has standing because the Huffman Memo substantially raised the risk that DHS would arrest its educator-members at work. That risk is not "speculative." Opp'n 19. DHS already arrested two of EdMN's members on and near school grounds. Ex. 43, Byron Decl.¶7; Ex. 16, Rank Decl.¶¶5-21; Ex. 23, Williams Decl.¶¶12-18. The government does not claim that those arrests occurred in any of the "limited circumstances" permitted by the Mayorkas Memo. ICE_AR045. And EdMN has thousands of members who work in schools, including many who are Hispanic or noncitizens—groups DHS has targeted. Ex. 43, Byron Decl.¶¶8-9. Especially when the plaintiffs filed suit, EdMN faced a "substantial risk" that

---

[7] Indeed, there is nothing unusual about a suit seeking to enforce limits on the where-and-how of affirmative enforcement actions that affect the plaintiff's own property. *See, e.g., Pembaur v. City of Cincinnati*, 475 U.S. 469, 474 (1986) (property owner could sue government for unlawful entry into his premises even though he was not the target of the criminal investigation).

at least one of its thousands of members would be arrested at or near school again. *Susan B. Anthony List*, 573 U.S. at 158, 164 (citation omitted).

By removing the prior limits on arrests near their workplaces, the Huffman Memo has "contribute[d]" to the substantial risk of arrests, and its vacatur would "reduce" that risk. *Massachusetts*, 549 U.S. at 519, 522. That the risk may be "traceable to the increased pace of immigration enforcement" during Metro Surge (Opp'n 19) does not matter. As explained, "[a] plaintiff can satisfy traceability by showing 'that the defendant's conduct is one among multiple causes' of the alleged injury," *New England Synod v. DHS*, 824 F. Supp. 3d 118, 144 (D. Mass. 2026) (quoting *Conservation L. Found., Inc. v. Academy Express, LLC*, 129 F.4th 78, 90 (1st Cir. 2025)), and the remedy need not completely eliminate the threat. *Iowa Migrant Movement*, 157 F.4th at 916.

EdMN also has standing because the rise in enforcement near schools enabled by the Huffman Memo has increased its members' workloads and driven them to exhaustion. Pls.' Mem. 46-47. Though these harms "flow from the school districts' decisions to implement remote learning," Opp'n 19, the Huffman Memo increases the need for remote learning because it enables more enforcement near schools, which drives more students to stay home. The memo is thus a "*de facto*" cause of the harm. *Dep't of Com.*, 588 U.S. at 768.

## III. The Huffman Memo is final agency action.

The Huffman Memo is a final agency action subject to APA review. An agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) either "determined" "rights or obligations" or had "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation marks omitted). The government does not dispute that the Huffman Memo satisfies the first prong of the test. Opp'n 32. Because it "redetermined the rights and obligations of DHS personnel," it also satisfies the second. *PYM v. DHS*, No. 25-cv-0243, 2026 WL 280089, at *4 (D. Md. Feb. 3, 2026).

An internal memorandum satisfies the second prong of the *Bennett* test if it imposes or declines to impose obligations on the agency. *See Biden*, 597 U.S. at 808 (memo final because it "bound DHS staff"); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598-99 (2016) (the "denial" of an order that would have "b[ound] the two agencies authorized to bring civil enforcement proceedings" was final). A decision to "revok[e]" or suspend a rule that imposes obligations is itself final. *Clean Air Council v. Pruitt*, 862 F.3d 1, 6-7 (D.C. Cir. 2017). Thus, as the government agrees, whether the Huffman Memo was final "is, in large part, dependent on whether the Mayorkas Memorandum constituted a final agency action …." Opp'n 34. It did.

Both the text of the Mayorkas Memo and the agency's own treatment of it confirm that it bound agency staff. *See Iowa League of Cities v. EPA*, 711

F.3d 844, 862-63 (8th Cir. 2013) (agency statement is considered binding if it "appears on its face to be binding" *or* if the agency "treats" it as binding (quotation marks omitted)). The text of the Mayorkas Memo expressly invoked the language of *Bennett*: It imposed an "obligation" on the agency to refrain from enforcement near protected locations "to the fullest extent possible." ICE_AR045. DHS's own characterizations confirm that "[t]he 2021 Mayorkas Memo require[d]" DHS to follow that obligation. ICE Website, Ex. 63 at 3; *accord* DHS Press Release, Ex. 55 (Mayorkas Memo "tie[d] the hands" of immigration agents, "thwart[ed]" law enforcement, and allowed people to "hide in America's schools and churches to avoid arrest"). That "constraint on [the agency's] discretion" was sufficient to bind the agency. *Ubbelohde*, 330 F.3d at 1028-30; *see*, *e.g.*, *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016) (action was binding because it withdrew "*some* of the [agency's] discretion" (emphasis added)). The Mayorkas Memo thus "determine[d]" the agency's "obligations." *Bennett*, 520 U.S. at 177-78.[8]

---

[8] Because the Mayorkas Memo imposed an obligation on agency staff, it differs from the nonbinding guidance addressed in the cases the government invokes. *See Ass'n of Flight Attendants v. Huerta*, 785 F.3d 710, 716-17 (D.C. Cir. 2015) (guidance nonfinal because it did not "limit agents' discretion" but only recommended what they "should" or "may need" to do); *Arizona v. Biden*, 40 F.4th 375, 381 (6th Cir. 2022) (guidelines nonfinal because they only outlined general immigration enforcement priorities that officers "should" follow and did not "forbid … *any* enforcement action" at all).

It follows that the rescission of the Mayorkas Memo is final agency action as well. In removing the obligation the Mayorkas Memo imposed, the Huffman Memo permitted agents to take enforcement actions in protected locations even when "possible" to "refrain" from them—that is, outside the "limited circumstances" to which the Mayorkas Memo restricted them. ICE_AR045. The "rescission" of that restriction is "subject to the same test" as the decision to impose it. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983); *see Clean Air Council*, 862 F.3d at 6-7; *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) (policy "permitting" disclosure of information without notice).[9]

Unable to prevail under the two-pronged *Bennett* test, the government adds its own requirements for final agency action and argues the Mayorkas Memo failed to satisfy them. None of its arguments work.

First, an agency action need not impose "obligations or prohibitions on the public or regulated parties" or "create any rights or benefits" to be final.

[9] The Mayorkas Memo's disclaimer that it did not alter DHS's "statutory authority" (ICE_AR047) does not defeat APA review any more than it defeats standing. *See Texas v. Biden*, 20 F.4th 928, 948-49 (5th Cir. 2021) (rescission of policy requiring agency to return migrants to Mexico was final agency action even though it "did not end DHS's statutory authority" to "conduct returns"), *rev'd on other grounds*, *Biden*, 597 U.S. at 807 (noting that the Fifth Circuit "correctly held" decision was a final agency action). An agency's continued statutory authority to revise its internal policies "does not make an otherwise definitive decision nonfinal." *Hawkes*, 578 U.S. at 598.

Opp'n 34. It need only change the rules "to which the … agency is subject." *Bennett*, 520 U.S. at 169, 178 ("biological opinion" was final agency action even though it was directed at another agency, not the plaintiffs, because it had a "powerful coercive effect on the action agency"); *Biden*, 597 U.S. at 808 (internal DHS memo rescinding program under which DHS returned certain migrants to Mexico was final because it "bound DHS staff" to discontinue the program, even though it did not change any immigrants' legal rights); *Texas v. EEOC*, 933 F.3d 433, 443 (5th Cir. 2019) (memo was final because it "binds EEOC staff to an analytical method in conducting … investigations" and deciding which employers "to refer for enforcement actions").[10]

Second, an agency action need not rely on an "interpretation[]" of a "statute or regulation" to be final. Opp'n 34. The memorandum in *Biden v. Texas* did not rely on a legal interpretation, either. 597 U.S. at 793-96. The fact that it relied on DHS's "law enforcement discretion" did not make it unreviewable. *Id.* at 807; *see also Judulang v. Holder*, 565 U.S. 42, 52 n.7

---

[10] The government's focus on whether the Mayorkas Memorandum was a "policy statement" (Opp'n 32) thus asks the wrong question. *See Texas*, 20 F.4th at 949 ("Even if the [memo terminating the Remain-in-Mexico program] is merely a 'policy statement,' … such statements can nonetheless constitute 'final agency action' under the APA."), *rev'd on other grounds*, *Biden*, 597 U.S. at 807 (Fifth Circuit "correctly" decided memo was final action); *accord California Communities Against Toxics v. EPA*, 934 F.3d 627, 631 (D.C. Cir. 2019) ("[T]he finality analysis is … distinct from the test for whether an agency action is a legislative rule" required to go through notice-and-comment).

(2011) (reviewing immigration policy that was "not an interpretation of any statutory language"). As the Eighth Circuit has held, "a policy statement or set of enforcement guidelines" may "impose binding limitations on the exercise of [the agency's] enforcement discretion." *GoJet Airlines, LLC v. FAA*, 743 F.3d 1168, 1173 (8th Cir. 2014). When a policy limits that discretion, it is a final agency action. *Biden*, 597 U.S. at 808; *see Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987) (agency's "cabining of [its] prosecutorial discretion can in fact rise to the level of a substantive, legislative rule" subject to review and notice-and-comment); *accord Hawkes*, 578 U.S. at 598-99 (agency action was final because it amounted to a refusal to issue an order that would bind agencies not to "bring civil enforcement proceedings").

Third, the government claims that the Huffman Memo does not have sufficiently "direct and appreciable legal consequences" to be final. Opp'n 35 (quoting *Hawkes*, 578 U.S. at 598). But *Bennett*'s second prong is disjunctive: The action must determine "rights or obligations" "*or*" have "legal consequences." 520 U.S. at 178 (emphasis added). And anyway, a policy's binding effect (or denial thereof) on agency staff *is* a "'direct and appreciable legal consequence' satisfying the second prong of *Bennett*." *Hawkes*, 578 U.S. at 604 (Kagan, J., concurring). The case the government cites does not hold otherwise. *See Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d

852, 859-61 (4th Cir. 2002) (holding that "persuasive" effects of nonbinding informational "research publication" on third parties did not make it final).

To be sure, the Eighth Circuit has said that a final agency action "'must inflict some legal injury upon the party seeking judicial review,' … either compel[ling] affirmative action or prohibit[ing] otherwise lawful action." *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 518 (8th Cir. 2024) ("*FRAC*") (citation omitted). But the injury need only be a legally cognizable "injury in fact" sufficient for standing. *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 152 (1970); *accord Union Pac. R.R. Co. v. U.S. R.R. Ret. Bd.*, 162 F.4th 908, 919 (8th Cir. 2025) (decision inflicted a sufficient injury because it had "adverse concrete consequences"). And the policy may inflict that injury through its "effect … on the decisions of third parties." *Dep't of Com.*, 588 U.S. at 768, 780-85 (reviewing and remanding agency action under the APA); *see Bennett*, 520 U.S. at 168-69 (holding biological opinion was final because it would likely prompt third-party agency to lower water levels, which would have downstream effects on plaintiffs who used the water). The rescission of the Remain-in-Mexico policy was final even though it only indirectly injured the plaintiff (Texas) by "increas[ing] the number of immigrants paroled into Texas" who sought driver's licenses, which "cost[] Texas money." *Texas*, 20 F.4th at 970, *rev'd on other grounds*, 597 U.S. at 807 (Fifth Circuit "correctly held" memo was final action).

As in these cases, the Huffman Memo has caused the plaintiffs legally cognizable injuries, including intrusions on their property, interference with their operations, and significant financial losses. Pls.' Mem. 27-34. Although the Huffman Memo did not "compel[] affirmative action" or "prohibit[] otherwise lawful action," *FRAC*, 112 F.4th at 518 (citation omitted), the Mayorkas Memorandum did: It prohibited most enforcement actions near schools and other protected locations. Pls.' Mem. 21-26; *PYM*, 187 F.4th at 202-03. "It follows" that the decision to rescind that prohibition is final action as well. *Hawkes*, 578 U.S. at 598-99 ("denial of … safe harbor" was final action, even though it did not compel or prohibit anything, because the APA defines "'agency action'" to include the "'denial'" of a rule or order (quoting 5 U.S.C. § 551(13))). Indeed, the Supreme Court and Eighth Circuit have found agency actions were final even though they did not compel or prohibit anything. *See id.* at 598-99; *Union Pac. R.R.*, 162 F.4th at 918-19 (order allowing "only the unrestricted participation of third party" in an administrative proceeding was a final agency action). Were it otherwise, courts could not subject the "rescission" of a requirement to the "same test" as the decision to promulgate it, as the Court has held they must. *State Farm*, 463 U.S. at 41.

Because it repealed a binding obligation, the Huffman Memorandum was a final agency action under the APA.

## IV. The Huffman Memo is not committed to agency discretion.

"The APA establishes a 'basic presumption of judicial review'" that carries full force in the immigration context. *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (citation omitted). Seeking to rebut that presumption, the government argues that the Huffman Memo was "committed" to DHS's unreviewable "discretion by law." Opp'n 36-40. The Court has construed that exception "narrowly": It is (1) "limited … to certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion" and (2) precludes review only in those "rare" cases where there is "no meaningful standard" for courts to apply. *Dep't of Com.*, 588 U.S. at 772 (citation modified). Neither requirement is met here.

First, only "individual, case-by-case determinations" not to enforce are committed to unreviewable discretion; courts regularly review "policies [and] standards" that govern enforcement. *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996); *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) ("[A]n agency's adoption of a general enforcement policy is subject to review."). Unlike the decisions in the government's cited cases, the Huffman Memo is not a "*single-shot*" enforcement decision about a particular case. *OSG Bulk Ships*, 132 F.3d at 812 (citation omitted); *see Ngure v. Ashcroft*, 367 F.3d 975, 983 (8th Cir. 2004) (decision in "particular case"); *Greer v. Chao*, 492 F.3d 962, 966-67 (8th Cir. 2007) (same); *Gentile v. SEC*, 974 F.3d 311, 319 (3d Cir.

2020) (same). The Court is not being asked to review any decision about "whether a violation has occurred," whether DHS would "succeed" if it acts, or whether a "technical violation[]" is worth pursuing. *Kenney*, 96 F.3d at 1122-23 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985)). And unlike the inaction in *Heckler*, the Huffman Memo reflected an "affirmative," written decision to rescind a binding obligation, which "provides a focus for judicial review." *Regents*, 591 U.S. at 18 (citation omitted).

Second, the settled rules that apply "when an agency rescinds a prior policy" furnish meaningful standards to review the rescission. *Regents*, 591 U.S. at 29-30. In *Regents*, those rules furnished a sufficient standard to review the rescission of DACA, *id.* at 24-33, even though "[n]o one … suggested that the [immigration statutes] expressly or implicitly circumscribe[d] the Secretary's decision to rescind DACA's broad policy of nonenforcement," Br. for Petitioners 19, *DHS v. Regents of the Univ. of California*, No. 18-587, 2019 WL 3942900, at *19 (U.S. 2019). The Supreme Court held that DACA's rescission violated the APA because DHS failed to provide a "reasoned analysis" that considered DHS's "original reasons" for the prior policy, the "alternatives" within the prior policy's "ambit," and whether the prior policy had engendered reliance interests. *Regents*, 591 U.S. at 29-30. This Court need only determine whether DHS followed those directions here.

Nor did Congress strip judicial review over DHS policies that establish binding criteria governing where and when officers may take immigration enforcement actions. To the contrary, the Immigration and Nationality Act ("INA") itself imposes several "location-based restrictions on DHS officers' and agents' authority to enforce immigration law" and on "the mechanics of enforcement." Opp'n 38. The government does not suggest that violations of those restrictions would be unreviewable. Nonetheless, it argues that because the INA does not also restrict enforcement near "sensitive locations" like schools, the Court should infer Congress meant to shield those decisions from review. *Id.* But "[t]he mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967). To the contrary, "Congress's determination that some fetters were needed" supports judicial review. *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 18 (1st Cir. 2020).

## V. The Huffman Memo is arbitrary and capricious.

The Huffman Memo fails APA review on the merits. Contrary to the government's suggestion, the APA does not ask only whether "the agency has acted within a zone of reasonableness." Opp'n 41. To survive review, the agency's action must be both "reasonable *and* reasonably *explained*." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (emphasis added) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). And the explanation must consider

the "important aspect[s] of the problem," examine the relevant data, and articulate "a rational connection between the facts found and the choice made." *Id.* at 292-93 (quoting *State Farm*, 463 U.S. at 43). That standard applies equally to immigration matters. *Regents*, 591 U.S. at 25-33. But DHS provided no "reasoned analysis" to justify rescinding the Mayorkas Memorandum, much less one that addressed the required factors. *Id.* at 30.

The only statements in the memo that vaguely approach reasons for the rescission—that the Mayorkas Memo's "bright line rules" were not "necessary" and that immigration agents "frequently apply enforcement discretion" (Opp'n 41)—offer neither an indication that "[DHS] considered the relevant factors" nor "a discernable path to which the court may defer." *Env't Health Tr. v. FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021) (citation modified). They do not even mention the "original reasons" that the Mayorkas Memo gave for limiting enforcement near sensitive locations—to avoid the restraining impact on access to education, healthcare, and other essential services; they do not discuss any alternatives to full repeal; and they ignore the "reliance interests" the prior policy created. *Regents*, 591 U.S. at 29-30; *see* Pls.' Mem. 51-55.

These two statements in the one-page Huffman Memo thus cannot sustain DHS's decision to declare open season on sensitive locations it "previously determined require special protection." ICE_AR003; *see Action on Smoking & Health v. C.A.B.*, 699 F.2d 1209, 1217 (D.C. Cir. 1983) (court could

not sustain rescission of rule based on the "conclusion that the matters covered by the rescinded provisions are better 'left to carrier discretion'"; to accept that explanation would "render judicial review of informal rules meaningless").

Rather than defend what the Huffman Memo actually did—rescind an obligation that "limited" when enforcement actions near previously protected locations "could occur," *PYM*, 187 F.4th at 202; Pls.' Mem. 21-26—the government defends only its post-hoc recharacterization of the memo: as a "modest" change in internal approval procedures. Opp'n 41. But as the government admits, in the agency's public statements outside litigation, even DHS has understood the Huffman Memo to remove "bright line rules regarding where our immigration laws are permitted to be enforced." *Id.* (quoting ICE_AR003); Ex. 55; Ex. 63 at 3. Courts cannot sustain agency actions based on "*post hoc* justifications … raised in court"; the policy must rise or fall on the agency's "contemporaneous explanations" for it. *Regents*, 591 U.S. at 23. And here, DHS's contemporaneous explanation not only supports the plaintiffs' and the Fourth Circuit's understanding of the policy, but also fails to provide any "reasoned analysis" that might support that decision. *Id.* at 30.

The government's claim (at 42) that the Mayorkas Memo engendered no reliance interests is also off base. Students relied on its protections, under which immigration arrests and other operations near schools were virtually unheard of, to attend school without fear of arrest or detention. *See*, *e.g.*, Ex.

64, M-C-D-Decl.¶3 (testifying that when the prior protections were in place, "my daughter always considered her school to be her safe place," but now she "has begun to feel unsafe going to school"); Pls.' Mem. 10-11, 13-14 (recounting students' fear of increased immigration enforcement near schools and resulting absences). And schools relied on them in forgoing policies and trainings about how to handle such enforcement. *See* Ex. 47, Magas Decl.¶¶14-16; Ex. 27, Lewis Decl.¶46 (districts had to develop new policies and procedures to respond to increase in immigration enforcement at and near schools).

The government says that this reliance was "unreasonable" because the Mayorkas Memo did not "shield[] [people] altogether from immigration enforcement in or near sensitive locations." Opp'n 42-43. Although the Mayorkas Memo's exceptions might affect the "strength of any reliance interests," "that consideration must be undertaken by [DHS] in the first instance, subject to normal APA review." *Regents*, 591 U.S. at 31. It was DHS's job, not the plaintiffs' or the courts', "to assess *whether* there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns" when it rescinded the Mayorkas Memo. *Id.* at 33 (emphasis added). It did not.

Because it ignored the reasons for the previous protections, the effects of their rescission on people's access to essential services, the alternatives to full discretion, and reliance interests, the Huffman Memo fails APA review.

## VI. The Court should vacate the Huffman Memo.

Because the Huffman Memorandum is arbitrary and capricious, the Court should "set [it] aside." 5 U.S.C. § 706(2); *see Custom Commc'ns, Inc. v. FTC*, 142 F.4th 1060, 1074 (8th Cir. 2025) ("The ordinary practice is to vacate unlawful agency action." (citation omitted)); *accord Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989).

Contrary to the government's claim, 8 U.S.C. § 1252(f) does not prohibit vacatur. That section provides that courts may not "enjoin or restrain the operation of" a specified set of statutory provisions. *Id.* As courts of appeals have uniformly held, this language applies only to injunctions and restraining orders, not to vacatur of agency action under the APA. *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 119-20 (D.C. Cir. 2026) ("*RAICES*"); *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 989-90 (9th Cir. 2025); *Texas v. United States*, 50 F.4th 498, 528 (5th Cir. 2022).

As the Supreme Court has held, § 1252(f) "generally prohibits lower courts from entering *injunctions that order* federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (emphasis added). Indeed, § 1252(f)'s "title—'Limit on injunctive relief'" confirms the "narrowness of its scope": "nothing more or less than a limit on

injunctive relief." *Biden*, 597 U.S. at 798, 801 (citation omitted). But "[v]acatur under Section 706 functions quite differently from an injunction." *RAICES*, 174 F.4th at 119. "When a court employs the extraordinary remedy of injunction," "it directs the conduct of a party, and does so with the backing of its full coercive powers," including contempt. *Nken v. Holder*, 556 U.S. 418, 428 (2009) (quotation marks omitted). A "vacatur," by contrast, "does nothing but re-establish the status quo absent the unlawful agency action." *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022). Unlike an injunction or restraining order, it "act[s] directly against the challenged agency action" "in the same way that appellate courts vacate the judgments of trial courts." *Corner Post*, 603 U.S. at 830-31, 838 (Kavanaugh, J., concurring) (quotation marks omitted). It "does not 'enjoin' or 'restrain' anyone." *RAICES*, 174 F.4th at 119.

Thus, while vacatur would restore the Mayorkas Memo's requirements, the Court's order would not "enjoin" or "restrain" DHS from acting. 8 U.S.C. § 1252(f). Section 1252(f) poses no bar to relief.

## CONCLUSION

The Court should vacate the Huffman Memorandum.

Dated: October 5, 2026

/s/ Sean Ouellette

**NILAN JOHNSON LEWIS PA**
Amanda Cialkowski (0306514)
Kathleen Curtis (0388279)
250 Marquette Avenue South, Suite 800
Minneapolis, MN 55401
(612) 305-7500
acialkowski@nilanjohnson.com
kcurtis@nilanjohnson.com

**ZIMMERMAN REED LLP**
David Cialkowski (0306526)
June Hoidal (033330X)
Michael Laird (0398436)
Jeffrey J. Harrington (0327980)
Molly F. Billion (0402616)
80 South 8th Street, Suite 1100
Minneapolis, MN 55402
(612) 341-0400
david.cialkowski@zimmreed.com
june.hoidal@zimmreed.com
michael.laird@zimmreed.com
jeffrey.harrington@zimmreed.com
molly.billion@zimmreed.com

*Counsel for Plaintiffs*
**Admitted pro hac vice*

**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, D.C. 20043
(202) 322-1959
Sean Ouellette* (DC Bar 1741535)
Elena Goldstein* (DC Bar 90034087)
Paul R.Q. Wolfson* (DC Bar 414759)
Allyson Scher* (DC Bar 1616379)
souellette@democracyforward.org
egoldstein@democracyforward.org
pwolfson@democracyforward.org
ascher@democracyforward.org

**THE LAW OFFICE OF KEVIN C. RIACH**
Kevin Riach (389277)
125 Main St. SE, Suite 339
Minneapolis, MN 55414
(612) 203-8555
kevin@riachdefense.com